UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

FERNANDO J. ESPUELAS, JACK C. CHEN,
STEVEN J. HELLER, PETER R. MORALES,
WALTER MÖLLER, BETSY D. SCOLNIK,
ADRIANA J. KAMPFNER, and PETER E.
BLACKER,

      Defendants.

06 Civ. 2435 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

   The Securities and Exchange Commission ("SEC" or "Commission")

brings this action ("Complaint" or "Compl.") against former executives of StarMedia

Network, Inc. ("StarMedia" or the "Company") alleging violations of Section 17(a) of the

Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Sections 10(b), 13(a) and

13(b)(2)(A) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.

§§ 78j(b), 78m(a), 78m(b)(2)(A), and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R.

§§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13.  Defendants Espuelas, Chen, Morales,

Scolnik and Kampfner (the "moving defendants") have moved to dismiss the Complaint

pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).   For the reasons set forth below, the motion

is granted in part and denied in part.

**BACKGROUND**

StarMedia was a publicly traded Internet portal that targeted Spanish- and Portuguese-speaking markets.  (Compl. ¶ 22.)  The Complaint concerns StarMedia's improper recognition of fourteen million dollars of revenue earned by two of its subsidiaries during the last three quarters of 2000 and the first two quarters of 2001.  (*Id.* ¶ 3.)  The SEC alleges that defendants violated the securities laws by aiding and abetting StarMedia's violations of its record-keeping obligations (*Id.* ¶¶ 100-08), by making, causing, or aiding the making of materially false and misleading statements in StarMedia's filings with the SEC, its representation letters to outside auditors, and its discussions with potential private investors  (*Id.* ¶¶ 82–87), and in the case of defendant Chen, by selling a substantial portion of StarMedia stock while in possession of the material, confidential information that StarMedia had overstated its revenues (*Id.* ¶ 88). In November 2001, the company announced that it would restate its financial statements. (*Id.* ¶ 3.)  On December 23, 2003, the company, by then renamed, filed a voluntary petition for Chapter 11 reorganization.  (*Id.* ¶ 22.)  Unless otherwise noted, the facts recited below are taken from the Complaint and are accepted as true for the purposes of this motion.

**I.      The Parties**

Fernando J. Espuelas and Jack C. Chen founded StarMedia in 1996.  (*Id.* ¶¶ 14–15.)  Espuelas was StarMedia's Chief Executive Officer until August 2001, and the Chairman of its Board of Directors until November 2001.  (*Id.* ¶ 14.)  As CEO, Espuelas managed StarMedia's corporate functions, including its accounting practices.  (*Id.*)  Chen served as StarMedia's President until May 2001, as a director until August 2001, and as

Vice Chairman of the Board from June 2001 until August 2001. (*Id.* ¶ 15.) As President, Chen managed Starmedia's day-to-day affairs. (*Id.*)

From February 1999 until November 2001, Betsy Scolnik was StarMedia's Senior Vice President for Strategic Development and later an Executive Vice President. (Compl. ¶ 17.) Adriana Kampfner was StarMedia's Vice President for Global Sales and the President of StarMedia's subsidiary, StarMedia de Mexico. (*Id.* ¶ 18.) Peter R. Morales was StarMedia's Controller and Vice President for Finance from June 1998 until November 2001. (*Id.* ¶ 20.)

Steven J. Heller was a Senior Vice President and Chief Financial Officer of StarMedia from May 1999 until November 2001. (*Id.* ¶ 16.) Heller has since settled all claims brought against him by the SEC. (Final Judgment as to Defendant Steven J. Heller, Apr. 18, 2006.) Walther Möller was the president of StarMedia's subsidiary AdNet S.A. de C.V. ("AdNet") from the time of AdNet's acquisition by StarMedia in April 2000. (*Id.* ¶ 19.) Möller, a Mexican citizen residing in Mexico, has not responded to the Complaint. (*Id.*; Pl. Br. at 3.). Peter E. Blacker was employed by StarMedia as its Senior Vice President, Global Sales Strategy & Partnerships from December 1997 until May 2001. (Compl. ¶ 21.) Blacker has settled all claims brought against him by the SEC. (Final Judgment as to Defendant Peter E. Blacker, Oct. 27, 2006.)

## II. StarMedia's Improper Recognition of Revenue

During the second, third, and fourth quarters of 2000 and the first and second quarters of 2001, StarMedia improperly recognized revenue from three categories of transactions. The first two kinds—what the Complaint calls "base book" and

"incremental revenue" transactions—were barter deals.  In the base book transactions

StarMedia agreed that for every dollar of third-party advertising one of StarMedia's

partners directed to it, StarMedia would purchase one dollar of services from that partner.

The incremental revenue transactions involved the same dollar-for-dollar exchange, but

required StarMedia to prepay its partners.  In the third type of transaction, StarMedia

agreed to provide customers with advertising services on a contingent basis, or in some

instances, for free.  The facts surrounding the improper recognition in each relevant

reporting period are set forth below.

### A. The Second and Third Quarters of 2000

#### 1. The AdNet Acquisition and the Base-Book Transactions

In 2000, StarMedia's stock price was dropping and its cash reserves were

dwindling.  (*Id.* ¶ 30.)  To match its optimistic statements of revenue growth and to help

secure additional financing, StarMedia needed to increase its revenue.  (*Id.*)  In April

2000 StarMedia acquired AdNet from Harry Möller Publicidad, S.A. de C.V. ("HMP")

and Grupo MVS, S.A. de C.V. ("MVS") for five million dollars cash and fifteen million

dollars worth of StarMedia common stock.  (*Id.* ¶ 23.)  The acquisition also included an

earnout provision that entitled HMP and MVS to additional StarMedia shares if AdNet

met certain revenue targets.  (*Id.*)  At the time, AdNet was a "leading Mexican Internet

search portal and Web Directory" with a revenue stream that StarMedia coveted.  (*Id.*

¶¶ 23, 26.)

As much as sixty percent of AdNet's pre-acquisition revenue was

attributable to an arrangement it had with HMP and MVS.  (*Id.* ¶ 27.)  HMP and MVS

directed their clients to purchase advertising from AdNet, and in exchange, for every

dollar of advertising those clients bought, AdNet purchased a dollar of television and radio advertising from HMP or production services from MVS. (*Id.*) To maintain AdNet's arrangement with HMP and MVS after the acquisition, StarMedia hired Walther Möller, whose family owned HMP, to be AdNet's President and entered into service and advertising agreements of its own with HMP and MVS. (*Id.* ¶ 28.)

At some point during the second quarter of 2000, Espuelas, Chen, Heller, Scolnik, and Kampfner learned that StarMedia's revenues were short of its budget projections. (*Id.* ¶ 31.) Subsequently, Espuelas and Chen "caused" StarMedia to recognize advertising revenue from base book transactions conducted by its subsidiary AdNet with HMP and MVS. (*Id.*) Under Generally Accepted Accounting Principles ("GAAP"), StarMedia should not have recognized the full amount of the advertising purchased by HMP and MVS customers. (*Id.* ¶ 32.) Rather, StarMedia should have treated the advertising purchases as part of a barter transaction. (*Id.*) When it restated its financial statements in November, 2001, StarMedia wrote off over ninety percent of the revenue it had recognized from base book transactions in the second quarter of 2000. (*Id.* ¶ 33.) During the third quarter, Espuelas and Chen again caused StarMedia to recognize the full amount of AdNet's base book transactions, rather than treating them as barter transactions. (*Id.* ¶ 39.) This revenue was also improperly recorded and contributed to the overstating of StarMedia's revenue in 2000 by 16%. (*Id.* ¶¶ 39, 60.)

2. Misleading Insertion Orders

StarMedia also improperly recognized revenue from a contingent purchase of $500,000 of Internet advertising made by AMG International, Inc. ("AMG") in the second quarter of 2000. (*Id.* ¶ 34.) On behalf of StarMedia, Scolnik, Kampfner, and

Blacker orally agreed that AMG would only have to pay the full purchase price if AMG approved the advertising services.  (*Id.*)  If AMG did not approve, it would only be required to pay $10,000.  (*Id.*)  Later, in December 2000, this oral agreement was memorialized in writing.  (*Id.* ¶ 36.)  The client did not approve the purchased advertising services, and pursuant to the oral and written side agreements, never paid the remaining $490,000.  (*Id.* ¶ 36.)

StarMedia policy required that the sales department provide an accurate insertion order or contract to the finance department so that the company could recognize the appropriate revenue from its customers.  (*Id.* ¶ 41.)  Scolnick, Kampfner, and Blacker are alleged to have been aware of this policy.  (*Id.*)  StarMedia's finance department received an insertion order for AMG's $500,000 purchase, but was not informed of the side agreement that made the purchase contingent.  (*Id.* ¶ 35.)  Neither Skolnik, Kampfner, nor Blacker advised the finance department that the information contained in the insertion order was incomplete.  (*Id.* ¶ 34.)  The Complaint does not allege which, if any, of the defendants prepared, read, or were otherwise aware of the contents of the insertion order.[1]

During the third quarter, Blacker offered Groupe Danone ("Danone") $500,000 of Internet services at no charge as an incentive for Danone to hire StarMedia to work on a large project in Latin America.  (*Id.* ¶ 37.)  However, Blacker told Danone's media buyer that StarMedia required a signed insertion order to reserve the provision of free services.  (*Id.*)  Blacker negotiated this arrangement with the knowledge and consent

---

[1]  Rather, the Complaint alleges that "[i]n order to cause the company to recognize the entire $500,000 as revenue in the period, Scolnick, Kampfner, and Blacker did not inform StarMedia's finance department of the contingent terms of the transaction."  (*Id.* ¶ 34.)  It also alleges that "Scolnick, Kamfner, and Blacker each knew that as a result of his or her conduct, StarMedia improperly recognized revenue from the transactions . . . with AMG's portfolio company."  (*Id.* ¶ 41.)

of Kampfner, and "under pressure from Scolnik." (*Id.*) Blacker then had the $500,000 insertion order submitted to StarMedia's finance group, but the insertion order did not specify that StarMedia was providing the services for free. (*Id.* ¶ 38.) As a result, StarMedia improperly recognized the $500,000 "order" as revenue in the third quarter. The Complaint does not actually allege that Blacker's submission of the insertion order to the finance group or department was with the knowledge or consent of Kampfner or Scolnik. (*Id.* ¶¶ 37, 38.) Rather the Complaint alleges that "Blacker, Kampfner, and Scolnik knew that the services were to be provided free of charge, but they withheld the information from StarMedia's finance group." (*Id.* ¶ 38.) The SEC also alleges that "Scolnik, Kamfner, and Blacker each knew that as a result of his or her conduct, StarMedia improperly recognized revenue from the transactions with Danone . . . ." (*Id.* ¶ 41.)

### B.    The Fourth Quarter of 2000

#### 1.    Base Book Transactions

During the fourth quarter 2000, Espuelas and Chen again caused StarMedia to improperly recognize revenue from the base book transactions. (*Id.* ¶ 56).

#### 2.    The Incremental Revenue Transactions

At some point in the fourth quarter of 2000, Espuelas, Chen, Heller, Kampfner, and Scolnik learned that StarMedia's projected revenue for that quarter would be less than budgeted. (*Id.* ¶ 42.) In November, the group discussed increasing StarMedia's revenue by enlisting Möller's family and business connections with MVS and HMP. (*Id.* ¶ 43.) Scolnick and Kampfner initiated discussions with Möller; meanwhile, Heller, at Chen's direction, became increasingly involved in the discussions

as well.  (*Id.*)  On November 29, 2000, Möller sent Heller an e-mail proposing a structure (and attached a diagram) for what the Complaint calls the "incremental revenue" transactions.  (*Id.* ¶ 44.)  The next day at a meeting in Mexico City, Espuelas and Kampfner reached an agreement with Möller on the structure of the transactions.  (*Id.* ¶ 45.)

Under the agreement, StarMedia would provide AdNet with funds characterized as "capital contributions."  (*Id.* ¶ 46.)  Then, AdNet would use those capital contributions, along with some of its own money, to purchase $3.2 million of services from HMP and MVS.  (*Id.*)  In exchange, HMP and MVS agreed to have its clients purchase $2.6 million of advertising from StarMedia de Mexico and $623,000 of advertising from AdNet.  (*Id.*)  Thus the structure of the incremental transactions was quite similar to the base book transactions.

On December 4, 2000, StarMedia wired $345,000 to HMP, and the next day, Möller sent Kampfner an e-mail with the dollar amount of advertising fifteen HMP and MVS clients would purchase from StarMedia's subsidiaries.  (*Id.* ¶ 47.)  Möller asked Kampfner to recommend "inventory" to be run for each client, so that insertion orders could be generated.  (*Id.*)  Some of the HMP and MVS clients were unaware of the advertising purchases, while others were alleged to be "indifferent toward them because HMP and MVS were paying, directly or indirectly, for the advertising."  (*Id.* ¶ 49.)  In connection with these transactions, StarMedia recognized $2.6 million in revenue from StarMedia de Mexico and $623,000 from AdNet during the fourth quarter of 2000.  (*Id.* ¶ 51.)  StarMedia later paid an additional $1.08 million of the nearly $3 million it still owed HMP and MVS under the terms of their agreement.  (*Id.* ¶ 53.)

Morales learned about the incremental revenue transactions when Heller asked Morales to authorize the December 4 wire transfer to HMP. (*Id.* ¶¶ 47, 54.) Heller told Morales that StarMedia would recognize all revenue from the transactions in the fourth quarter but would not recognize the purchased services as expenses until the services were utilized. (*Id.* ¶ 55.) Morales told Heller that he thought that the transactions should be classified and recorded as barter transactions. (*Id.*) Morales relented when Heller assured him that Heller would deal with StarMedia's auditors if there were any questions about the transactions. (*Id.*)

### 3. Misleading Insertion Orders

StarMedia also improperly booked revenue in this quarter from two sets of insertion orders that did not reveal side agreements. First, Blacker submitted to StarMedia's finance group insertion orders for $1 million of services for Danone, again without indicating that StarMedia was providing the services for free. (*Id.* ¶ 57.) Scolnik and Kampfner were aware that Danone was not obligated to pay for the services. (*Id.*) The Complaint does not allege whether they actually knew that Blacker had submitted a misleading insertion order but does not allege that "Scolnik and Kampfner each knew that, as a result of her conduct, StarMedia improperly recognized revenue from . . . the transaction with Danone." (*Id.* ¶ 61.)

Second, Scolnik and Blacker negotiated, and Kampfner approved, another advertising transaction with AMG that was contingent on AMG's approval. (*Id.* ¶ 58.) Scolnik, Blacker, and Kampfner did not disclose the contingent nature of the $750,000 transaction to the finance group resulting in StarMedia's recognition of the full amount of the transaction. (*Id.*) The Complaint does not allege which, if any, of the defendants

prepared, read, or were otherwise aware of the contents of the insertion order, but again alleges that "Scolnik and Kampfner each knew that, as a result of her conduct, StarMedia improperly recognized revenue from . . . the transaction with the portfolio company of AMG." (*Id.* ¶ 61.)

### C. The First Quarter and Second Quarters of 2001

At some point during the first quarter 2001, Espuelas, Chen, Heller, Kampfner, and Scolnik learned that StarMedia's expected revenue for the quarter was below budget. (*Id.* ¶ 64.) During the quarter, StarMedia improperly booked revenue from following base book, incremental revenue, and contingent transactions.

### 1. Base Book and Incremental Revenue Transactions

On March 10, 2001, Kampfner reported to Espuelas, Chen, and Heller that she had discussed StarMedia's revenue shortfall with Möller. (*Id.* ¶ 67.) Kampfner explained that Möller had told her that he could generate $2 million in base book revenue and that she told him "to do it."[2] (*Id.*) Kampfner also advised that Möller would confer with an MVS executive in the hopes of meeting StarMedia's quarterly target of $3 million in revenue from the incremental revenue transactions. (*Id.*) Subsequently on March 14, 2001, Kampfner told Espuelas, Chen, and Heller that Möller wanted StarMedia to pay for some of the services that HMP and MVS had provided in the fourth quarter of 2000. (*Id.* ¶ 68.) Möller also advised that StarMedia should issue HMP and MVS shares pursuant to the earnout provision in the AdNet acquisition agreement. (*Id.*) On March 27, 2001, Kampfner told Chen that Möller was near the incremental revenue

---

[2] Notwithstanding this allegation, the Complaint alleges that Espuelas and Chen, but apparently not Kampfner, caused StarMedia to improperly record revenue on the AdNet base book transactions. (*Id.* ¶ 65.)

target for the quarter. (*Id.* ¶ 70.) In the end, StarMedia recognized $2.6 million in revenue from the incremental revenue transaction for the first quarter. (*Id.* ¶ 66.) To reward Möller for his efforts and upon the suggestion of Scolnik and Chen, Espuelas took Möller and his wife out to dinner and had the company pay for the couple to take a vacation. (*Id.* ¶ 71.) After the quarter closed, Heller directed Morales to transfer $950,000 from StarMedia to AdNet; Heller told Chen that the transfer was earmarked for payment to HMP. (*Id.* ¶ 72.)

In the second quarter of 2001, Espuelas, Heller, Kampfner and Scolnik learned that StarMedia's expected revenue was below budget. (*Id.* ¶ 76.) Espuelas (but not Chen) caused StarMedia to improperly record revenue from the base book transactions. (*Id.* ¶ 77.) Espuelas, Heller, Kampfner, Scolnik, Möller, and Morales (but not Chen) implemented additional incremental revenue transactions resulting in StarMedia's recognition of $2.675 million in revenue. (*Id.* ¶ 78.) After the close of the second quarter, Heller, Morales, and Kampfner directed the transfer of $517,500 from StarMedia to AdNet with the understanding that these funds would be then forwarded to HMP as part of the incremental revenue transactions conducted in the first or second quarters of 2001. (*Id.* ¶ 79.)

2.     Misleading Insertion Orders

The Complaint alleges that Scolnik, Kampfner, and Blacker "negotiate[ed] or approv[ed] the terms" of two contingent transactions with AMG in the first quarter of 2001, but none disclosed the contingencies to the finance group. (*Id.* ¶ 73.) The Complaint does not specify whether insertion orders were prepared in connection with these transactions, and if so, whether any of the defendants had any knowledge of the

contents of the orders.  (*Id.*)  It is alleged, however, that as a result of their conduct, each defendant knew that StarMedia improperly recognized $1.5 million in contingent revenues.  (*Id.* ¶¶ 73-74.)

### III.  The Resulting False or Misleading Statements or Omissions

The Complaint alleges that defendants made three sorts of misleading statements.  First, it alleges that as a result of the base book and incremental revenue transactions and the misleading insertion orders, StarMedia's SEC filings contained misleading statements and financial information.  (Compl. ¶ 82.)  Second, it alleges that StarMedia did not disclose the "true economic realities" of the challenged transactions to its outside auditor, Ernst & Young, despite the fact that Chen, Heller, and Morales, signed management representation letters that affirmed that they had provided Ernst & Young with all the terms and arrangements relating to StarMedia's "significant contracts and agreements," that  "receivables represent valid claims . . . and do not include amounts for . . . other types of arrangements not constituting sales," and that the company had disclosed relevant frauds.  (*Id.* ¶¶ 85–86.)  Third, the Complaint alleges that Espuelas, Chen, Heller, and Scolnik "each played a role in the presentation of financial information, discussions, and negotiations" with a consortium led by BellSouth that eventually provided additional financing to StarMedia.  (*Id.* ¶ 87.)

## DISCUSSION

### I.    Pleading Standard

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all of the factual allegations in the Complaint and draw all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In so doing, the court need not "accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotations and alterations in original omitted). Indeed, to survive a motion to dismiss, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI*, 493 F.3d at 98 (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).

While securities complaints brought by the SEC are not governed by the Private Securities Litigation Reform Act, *see* 15 U.S.C. § 78u-4(b), they are still subject to the heightened pleading standards imposed by Rule 9(b) to the extent that they make allegations sounding in fraud. *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 & n.63 (S.D.N.Y. 2007); *see also SEC v. Power*, No. 06 Civ. 15343 (RWS), 2007 U.S. Dist. LEXIS 87632, at *20–*21 (S.D.N.Y. Nov. 27, 2007) (applying Rule 9(b) to reporting and recordkeeping violations under Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13, 13b2-1 where claimed violations were based on fraud). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* However, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Thus, the Second Circuit has interpreted Rule 9(b) to require plaintiffs to "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. To support a strong inference of scienter, plaintiff may not put forth a motive possessed by nearly all corporate insiders, but must "allege that defendants benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 308 (internal quotations and alterations omitted); *see also id.* ("[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some

cases give rise to an inference of recklessness.") (internal quotations and alterations omitted).[3]

Section 20(e) of the Exchange Act authorizes the SEC to bring claims for aiding and abetting primary violations of the Exchange Act. 15 U.S.C. § 78t(e). Section 20(e) imposes liability on any person who "knowingly provides substantial assistance to another person in violation of" the Exchange Act or SEC rules promulgated thereunder. *Id*. There is a split of authority in this district as to whether Section 20(e) encompasses recklessness in addition to actual knowledge. Section 20(e) was passed as part of the PSLRA in the wake of *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), in which the Supreme Court had held that the Exchange Act did not authorize private claims for aiding abetting Section 10(b) violations. *See SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 372 (S.D.N.Y. 2006). Some courts in this district have relied on pre-Reform Act precedents in finding that where defendants owe a fiduciary duty to those defrauded, the SEC may state a claim for aiding and abetting upon a pleading of recklessness or actual knowledge. *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d at 491; *SEC v. Power*, 2007 U.S. Dist. LEXIS 87632, at *15; *SEC v. Jones*, No. 05 Civ. 7044 (RCC), 2006 U.S. Dist. LEXIS 22800, at *18–*19 (S.D.N.Y. Apr. 25, 2006); *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006). However, based on a thorough analysis of the PSLRA's text, structure and legislative history, Judge Cote has

---

[3] At oral argument, defendants urged the Court to apply the Supreme Court's analysis in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) to the issue of scienter in this case. In *Tellabs*, the Supreme Court held that in order to plead a "strong inference of fraudulent intent" under the PSLRA, the complaint must plead sufficient facts for a reasonable person to "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 2510. The Court notes that because actions by the SEC are not governed by the PSLRA, *Tellabs* may not be directly controlling. *Cf. SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d at 488. However, the Court need not decide this issue to resolve the motion before it because the Court finds it would reach the same conclusions even if it applied the rule in *Tellabs*.

held that "knowingly" refers only to "actual knowledge," rather than to recklessness as well. *SEC v. KPMG LLP*, 412 F. Supp. 2d at 382–83; *see also SEC v. Fehn*, 97 F.3d 1276, 1287–88 (9th Cir. 1996) (reaching same result); *SEC v. Cedrick Kushner Promotions*, 417 F. Supp. 2d 326, 334–35 (S.D.N.Y. 2007) (following *KMPG*); *SEC v. Pasternak*, No. 05-3905, 2008 U.S. Dist. LEXIS 48289, at *107–*110 (D.N.J. June 24, 2008).

In *KPMG*, Judge Cote points out that elsewhere in the PSLRA knowingly is defined as "actual knowledge," that the Senate considered and rejected an amendment that would have added recklessness to the standard, and that it is unlikely that the Congress intended to codify the existing scienter standards for aiding and abetting, given its awareness of divergent approaches among the Circuits. 412 F. Supp. 2d at 382–83. The Court finds Judge Cote's analysis to be persuasive. Thus, to state a claim that defendants aided and abetted violations of the Exchange Act, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation. *See SEC v. Cedrick Kushner Promotions*, 417 F. Supp. 2d at 334; *see also Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003) (applying same test for allegations of aiding and abetting violations of Section 13(a) and 13(b)(2)(A)). To allege substantial assistance, the complaint must allege that the aider and abettor's conduct was a substantial causal factor in the perpetuation of the underlying violation. *See SEC v. Zwick*, No. 03 Civ. 2742 (JGK), 2007 U.S. Dist. LEXIS 19045, at *49 (S.D.N.Y. Mar. 16, 2007). The complaint must also allege the acts of the aider and abettor proximately caused the primary violation. *See SEC v. Treadway*, 430 F. Supp. 2d at 339.

## II.      Violations of Section 10(b), Rule 10b-5, and Section 17(a)

The Complaint alleges that Espuelas, Chen, and Scolnik violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5.[4]  It further alleges that Kampfner aided and abetted StarMedia's violation of these same provisions.  To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, the SEC must plead that defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  "Essentially the same elements are required under Section 17(a)(1)–(3)[5] in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)."[6]  *Id.*

---

[4] Chen is also alleged to have engaged in insider trading in view of Section 10(b), rule 10b-5 and Section 17(a).  These allegations are addressed in Section II.B, *infra*.

[5] It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly--

   (1) to employ any device, scheme, or artifice to defraud, or

   (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.  15 U.S.C. § 77q(a).

[6] The SEC makes no argument in its opposition papers suggesting that it was not obligated to plead scienter to state a claim under Section 17(a).  Thus the Court does not reach the question of whether the Complaint states a claim under Sections 17(a)(2) or (3).  *See SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir. 1997) (noting that "violation of § 77q(a)(2) can be established by a showing of negligence" and "negligence is sufficient to establish a violation of § 77q(a)(3)"); *SEC v. Glantz*, No. 94 Civ. 5737 (CSH), 1995 U.S. Dist. LEXIS 13701, at *15 (S.D.N.Y.  Sept. 19, 1995) ("The necessary elements to state a claim under Section 17(a)(2) are similar to those necessary for Section 10(b) but they differ in two ways:  (i) under Section 17(a)(2), allegations and proof of scienter are not required and (ii) plaintiff must allege that defendant actually obtained money or property by means of the untrue statements."); *SEC v. Norton*, No. 95 Civ. 4451 (SHS), 1997 U.S. Dist. LEXIS 15167, at *9 (S.D.N.Y. Sept. 30, 1997) ("The necessary

The Complaint alleges that Espuelas and Chen violated Sections 10(b) and 17(a) because they knew or were reckless in not knowing that the corporate filings and publicly disclosed financial information that they ratified were false or misleading in that StarMedia had improperly accounted for both the base book and incremental revenue transactions. The Complaint's allegations against Scolnik are less clear, but they appear to be that Scolnik knew or was reckless in not knowing that StarMedia's financial statements improperly recognized revenue from the incremental revenue and contingent transactions. Kampfner is alleged to have aided and abetted Scolnik's fraud.

### A. Primary Violations of Espuelas, Chen, and Scolnik

#### 1. The Complaint Alleges Material Misrepresentations with Sufficient Particularity

In a "securities fraud complaint based on misstatements [the complaint] must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99; *see also Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 516 (S.D.N.Y. 2007) ("[P]laintiff must set forth the who, what, when, where and how of the alleged fraud.") (quotations omitted)). While the Complaint is not a model of clarity, the Court finds that the SEC has set forth allegations with the requisite particularity for all the fraudulent activities underlying the 17(a) and 10(b) claims except for those surrounding the BellSouth transaction.

---

elements to state a claim under [Section 17(a)(3)] are identical to those required under both Section 10(b) and 17(a)(1) except that plaintiff need not allege or prove scienter.").

A complaint pleads false or misleading statements with sufficient particularity if it alleges that there was a restatement correcting earlier corporate filings and identifies the restated financials. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005); *Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004). This is largely because GAAP requires restatement only when there were accounting errors in previously issued financials. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 437. Here, the SEC alleges that StarMedia restated its revenues for 2000 and 2001. It further alleges that Espuelas and Chen signed StarMedia's 10-K statement for 2000. These allegations are sufficient to allege with particularity fraudulent statements by Espuelas and Chen, at least with respect to the company's 10K for 2000.

While the SEC does not make the argument explicitly, it appears to rely on the "group pleading" doctrine to attribute fraudulent statements to Scolnik generally, and to Espuelas and Chen with respect to the first and second quarters in 2001. "In this circuit, the group pleading doctrine creates a presumption that statements in prospectuses, registration statements, annual reports, press releases, [and] group-published information … are the collective work of those individuals with *direct involvement* in the everyday business of the company." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 489 (S.D.N.Y. 2007) (emphasis in original, quotes and citations omitted); *accord In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 440-41 ("A plaintiff may invoke the group pleading doctrine against a defendant only if the plaintiff has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company."). While there is some tension between the group pleading doctrine and the distinction between primary violators and aiders and abetters, the Second Circuit and

courts in this District appear to have permitted application of the doctrine against corporate insiders while rejecting it as against outside professionals who provided services to the fraudsters. *See In re Salomon Analyst Level 3 Litigation*, 350 F. Supp. 2d 455, 472-73 (S.D.N.Y. 2004) (collecting cases). Applying the doctrine to the case at hand, the Court finds that Espuelas, Chen, and Scolnik all qualify as "corporate insiders" with direct involvement in the everyday business of StarMedia, and therefore that all the alleged misstatements in StarMedia's 2000 and 2001 financial reports are attributable to them. Espuelas and Chen easily qualify as the highest ranking officers in the company, and Scolnik similarly qualifies as Senior Vice President and later Executive Vice President, reporting directly to Espuelas and Chen. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 441 (applying the group pleading doctrine to executive vice presidents).

The group pleading doctrine is not, however, available to the SEC in connection with its allegations concerning the BellSouth transaction. With regard to this transaction, the SEC alleges only that Espuelas, Chen, and Scolnik violated 17(a) and 10(b) because sometime during the years "2000 and 2001" they each played a wholly unspecified "role" in StarMedia's negotiations with BellSouth. (Compl. ¶ 87.) This allegation fails utterly to provide these defendants with "fair notice of the specific conduct with which [each] is charged." *SEC v. Parnes*, No. 01 Civ. 0763 (LLS), 2001 U.S. Dist. LEXIS 21722, at *14 (S.D.N.Y. Dec. 21, 2001); *see also Shields*, 25 F.3d at 1128 ("Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim . . .."). Accordingly, the court will not consider the BellSouth transaction in its analysis.

## 2. The Complaint Properly Pleads Scienter for Scolnik but not for Espuelas and Chin

The SEC does not argue that they have pleaded scienter by alleging motive and opportunity.[7]  (*See* Pl. Br. at 27–30).  Rather, the SEC claims that the Complaint has adequately alleged strong circumstantial evidence of conscious misbehavior or recklessness.  (*Id.*)  While strong circumstantial evidence of conscious misbehavior or recklessness is sufficient to plead scienter, the absence of improper motive means that "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).  At oral argument, the SEC conceded that Espuelas and Chen were liable only for their misstatements concerning the base book and incremental revenue transactions.  (Tr. of March 17, 2008 Hearing at 23-24.)  Hence, whether the SEC has properly pleaded scienter for Espuelas and Chen depends entirely on whether the facts set forth in the Complaint are sufficient to draw a strong inference that they knew or were reckless in not knowing that the accounting of these transactions violated GAAP.  The same is true for Scolnik with regard to the incremental revenue and contingent transactions.

Conclusory allegations do not support a strong inference of fraudulent intent.  *See Shields*, 25 F.3d at 1129 ("Shields's frequent conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b).").  Similarly, certain

---

[7] Given that the only apparent motive for the alleged fraud is the success of StarMedia generally, allegations of motive and opportunity would likely fail anyway.  *See Caiafa v. Sea Containers Ltd.*, No. 06 Civ. 2565 (RMB), 2007 U.S. Dist. LEXIS 72750, at *36 (S.D.N.Y. Sept. 25, 2007) ("The alleged desires to raise additional capital in a private placement or to maintain compliance with the financial covenants of a company loan agreement are inadequate to support an allegation of intent to commit fraud.") (alterations and quotations omitted)

allegations consistent with innocent conduct are never sufficient for a strong inference.

Allegations that corporate officers took affirmative action to meet revenue, earnings, or profit estimates contribute little to a strong inference because such actions are common practice. *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegations that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness."). It is also well-settled that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. Finally, while there is case law supporting a strong inference of fraudulent intent when large restatements are alleged, the complaints in these cases have all contained additional supporting allegations. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 90, 92 (2d Cir. 2000) (holding that magnitude of restatement was sufficient to plead scienter when coupled with allegations that despite repeatedly receiving reports that advanced royalties were overcapitalized, defendants continued their accounting without correction); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-492, 496 (S.D.N.Y. 2004) (holding that large restatement was enough for strong inference of fraudulent intent when coupled with allegations that defendants knew that idleness and declining demand meant that airplanes owned by the company were worth far less than they were accounted for).

It would likely be sufficient for a strong inference of recklessness if a complaint added the allegation that defendants had a high level of accounting expertise to

allegations of GAAP violations and a large restatement.  *See SEC v. DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 497, 500 (S.D.N.Y. 2000) (holding that scienter sufficiently pleaded when defendants were alleged to have overstated their assets and revenues by as much as 1408% in ten major GAAP violations and were "lifelong accounting professionals").  Accounting knowledge, however, cannot be "attributed to defendants simply because of their positions at the company."  *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 415 (S.D.N.Y. 2007).  In the absence of accounting expertise or allegations that defendants "benefited in a concrete and personal way from the purported fraud" or "engaged in deliberately illegal behavior", to properly plead scienter a complaint must either allege that defendants (1) "knew facts or had access to information suggesting that their public statements were not accurate" or (2) "failed to check information they had a duty to monitor".  *Novak*, 216 F.3d at 308.  The first rule reflects the idea that "while there is no requirement that a defendant must know the precise accounting treatment that would have been applied before he can have the requisite scienter," plaintiffs must allege at the very least that defendants had access to information contradicting the substance of reported accounting.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 567-68.  Similarly, the second rule, referred to as allegations of "red flags", reflects the idea that defendants cannot ignore obvious warning signs, the investigation of which would reveal the accounting problems.  *See In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 358, 359-62 (S.D.N.Y. 2005) (holding that the red flag cases "stand for the proposition that non-conclusory allegations that a corporate officer ignored 'reasonably available data that would have indicated that [a company's] statements were

false and misleading' are adequate to plead recklessness or conscious disregard", quoting *In re Atlas Air Worldwide Holdings*, 324 F. Supp. 2d at 491).

In *Rothman v. Gregor*, for example, plaintiffs alleged that the managers of GT Interactive Software Corporation, a seller of computer software, had committed fraud in their accounting of advanced royalties to developers. *Rothman*, 220 F.3d at 84. According to defendants' own accounting policy, the advances would be recognized as assets unless "it is not likely that the amounts will be recovered through sales of the related product"—in which case the advances would be expensed. *Id.* at 85. The Complaint alleged that defendants consistently accounted for the full amount of the advances as assets instead of expenses despite receiving regular reports that revenue from the purchased software fell far short of the advances themselves. *Id.* at 85-86. The Complaint further alleged that defendants initiated several lawsuits seeking to recover the royalty payments, arguing that the related software was not commercially viable. *Id.* at 86. The court concluded that together with the great size of the eventual restatement—84% of the revenues were retroactively expensed—the allegations were sufficient for a strong inference of recklessness because defendants had access to information requiring the advances be expensed in accordance with their own policy and repeatedly made contradictory statements in their financial reports. *Id.* 90-92.

Similarly, in *In re Bristol-Myers Squibb Sec. Litig.*, plaintiffs alleged that executives at Bristol-Myers Squibb, a pharmaceutical company, had committed fraud by accounting improperly for its drug sales to wholesalers. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 563-64 (S.D.N.Y. 2004). The Complaint alleged that, in a practice known as "channel stuffing", Bristol-Myers Squibb would provide incentives for

wholesalers to purchase additional inventory beyond what they needed so that the company could report the proceeds and meet its revenue targets. *Id*. The arrangement resembled consignment sales in that the drugs were not paid for until they were re-sold, but it also differed from consignment sales in that the wholesalers had no right to return the inventory. *Id*. at 565-66. Ultimately, the company restated its financial statements so that the transactions were recorded as consignment sales, with the consequence that revenue originally reported upon shipment of the drugs was reported either when the drugs were sold or when the incentives expired. *Id*. 564-65. The complaint alleged that defendants were reckless because they were fully aware of the arrangement's details and because the provisions of GAAP at issue were "simple", "fundamental", and their violation "obvious". *Id*. at 566. But the court rejected plaintiffs' argument, holding that the arrangement was admittedly not a "traditional" consignment sale and that while the determinative provision of GAAP was simply stated—"whether the risks and rewards of ownership transferred upon shipment of the goods"—the application of the provision was decidedly complex. *Id*. at 566-67.

The particular accounting improprieties in this case—reporting of revenue from barter transactions[8]—were considered in *In re Homestore.com, Inc. Sec. Litig.* ("*In re Homestore.com I*"), 252 F. Supp. 2d 1018, 1024-25 (C.D. Cal. 2003), *aff'd, Simpson v. AOL Time Warner Inc.*, 452 F.3d 1439 (9th Cir. 2006), and *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F.Supp. 22 192, 215 (S.D.N.Y. 2004). Both cases involved improperly reported revenue in various barter transactions that traded internet advertising for advertising or other services, including arrangements between Homestore.com,

---

[8] The reporting of contingent sales transactions stands on a different footing and is analyzed separately, *infra*.

defendant in the first case, and AOL Time Warner, defendant in the second. *Id.* The court in *In re Homestore.com I* described barter transactions:

> "Barter transactions"- These are two-party reciprocal transactions. Plaintiff alleges that Homestore and other companies agreed to trade services, generally advertising for some amorphous service such as "web services" or "marketing solutions." Then, instead of just trading those services, the two companies agree to buy each other's services for an extremely exaggerated rate. For example, Homestore might pay $5 million for marketing solutions, and the other company pays $5 million for advertising. Homestore then realizes the $5 million in revenues. The problem is that in accounting for these transactions, Homestore is supposed to provide actual market value of the services, "net out" the cost of the reciprocal transaction (making the net revenue zero), and report the two transactions as linked. Homestore allegedly did not properly account for transactions on several occasions.

*In re Homestore.com I*, 252 F. Supp. 2d at 1022-23. In addition to these "two-party" transactions, the court also described a "three-party" transaction where a third party—in this case, AOL—would sell Homestore.com's advertising for a commission to a second party with money Homestore.com had given the second party for some other good (usually stock). *Id.* at 1023. The complaint in *In re Homestore.com I* alleged that Stuart Wolff, Homestore.com's Founder and CEO, was reckless in not knowing that these transactions should have been accounted for as barter transactions and that no revenue should have been recognized from them. *Id.* at 1031. The complaint alleged that Wolff had a "hands-on managerial style, and thus was in a position to know how revenue was being recognized" and that he was obsessed with meeting "revenue targets". *Id.* at 1032. While the court ultimately found that the complaint had sufficiently pleaded scienter as to Wolff, it noted that "[t]hese allegations, standing alone, support no inference of deliberate recklessness." *Id.* Critical to the court's holding that the complaint adequately pleaded

recklessness were allegations that Wolff discussed with fellow officers the fact that the third leg of the three-party transactions would not be documented in order to avoid detection by the company's auditors.

With these principles in hand, the court turns to the specific allegations against Espuelas, Chen, and Scolnik.

### Espuelas and Chen

Espuelas and Chen co-founded StarMedia in 1996. (Compl. ¶ 14-15.) Espuelas served as its CEO until August 2001 and its Chairman of the Board until November 2001. (Compl. ¶ 14.) He was responsible for managing all of StarMedia's corporate functions, including its accounting practices, and served as the company's principal spokesperson on matters concerning the company's financial performance. (*Id*.) Chen served as StarMedia's President until May 2001 and served on its board of directors until August 2001. (Compl. ¶ 15.) As President, Chen managed the day-to-day affairs of the company. (*Id*.)

The SEC's allegations that Espuelas and Chen "knew or [were] reckless in not knowing" that the base book transactions "were to be accounted for as barter transactions" or that income from these transactions was "improperly recorded as revenue," (Compl. ¶¶ 39, 65, 77), are conclusory and do not support a strong inference of fraudulent intent. *Shields*, 25 F.3d at 1129. The SEC must allege sufficient facts to show that "[d]efendants knew or were reckless in not knowing that the accounting . . . at issue was wrong and, therefore, that the financials recognizing revenue . . . were wrong." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 568. In its brief and at oral

argument, the SEC argued that the following facts are sufficient: (1) Espuelas and Chen periodically received internal reports informing them that revenues were falling short of budget projections (*Id*. at ¶¶ 31, 42, 64, 76); (2) familiar with the base book transactions from the acquisition of AdNet, they chose to account for the proceeds of these transactions as revenue following receipt of these reports (*Id*. at ¶ 31); (3) after receiving further such reports, they participated in several meetings devising and arranging for the implementation of the incremental revenue transactions (*Id*. at ¶¶ 42-46); (4) throughout this time, Espuelas and Chen were aware through internal reports that the base book and incremental revenue transactions were producing large percentages of StarMedia's total revenue (*Id*. at ¶¶ 60, 63, 76); and (5) the restatement in November 2001 of StarMedia's financials concluded that under GAAP, the transactions should have been accounted for as barter transactions and that more than 90% of the revenue they produced shouldn't have been recorded (*Id*. at ¶¶ 3, 33).

As noted above, allegations of defendants' desire to meet revenue projections contributes little to a strong inference of fraudulent intent. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 566; *see*, *also*, *Kalmit*, 264 F.3d at 139; *Acito*, 47 F.3d at 54. Similarly, the relative significance of the questioned revenue stream is insufficient to qualify as a "red flag." *See Chill v. Gen. Elec. Co.*, 101 F.3d 65, 66-70 (2d Cir. 1996) (record profits at subsidiary was not a "red flag" indicating recklessness); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d at 359-62 (holding that defendants' knowledge of large revenues from the allegedly improper transactions was insufficient to raise a red flag). The fact that a large percentage of the questioned revenues were ultimately restated is certainly some evidence of recklessness. *See Rothman v. Gregor*,

220 F.3d at 90, 92; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 488-492, 496. However, the strength of such an inference is lessened where, as here, the restatement follows shortly after the adoption of a new accounting standard for the questioned revenues, a development ignored by the SEC in its complaint. Nor is there any allegation in the complaint that Espuelas or Chen were familiar with the applicable accounting rules either before or after their modification in January of 2000.

Even though Espuelas and Chen are not accounting professionals, a strong inference of recklessness might be drawn from allegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 375 (D.N.J. 2007) ("[I]n cases examining alleged wrongs by an issuer rather than an accountant, GAAP violations might be given additional significance only where the provisions of GAAP so coincide with conclusions obvious to any business person and present recitals of knowledge so common to the business-rather than accounting-community, that a violation of this type of GAAP provision equates to a self-evident business nonsensicality which cannot be made by a defendant with a non-culpable state of mind."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-40 (E.D. Va. 2000) (holding that a strong inference of recklessness or knowledge could be drawn when, *inter alia*, the accounting principles at issue were "not complex" and defendants reported revenue on unexecuted contracts); *see also In re Baan Co. Sec. Litig*, 103 F. Supp.2d 1, 21-23 (D.D.C. 2000); *In re Bristol-Myers Squibb* 312 F. Supp. 2d at 566-67. However, the Complaint contains no specific reference to any accounting principle or standard that was violated by StarMedia's recognition of revenue from the base book transactions, alleging only that "[h]ad it accounted for these 'base

book' deals as barter transactions, as required by GAAP, StarMedia would have recognized little or no revenue from the transactions" (*Id.* ¶ 32). The same is true of StarMedia's recognition of revenue in the incremental revenue transactions, which the Complaint merely alleges were "improper" (*Id.* ¶ 51), although the Complaint does allege that Morales believed they should have been recorded as barter transactions. (*Id.* ¶ 55).

Although the parties have not provided the court with a description of a "traditional" barter transaction akin to the traditional consignment sale in *In re Bristol-Myers Squibb*, the court notes that the rules or standards for reporting advertising barter revenue are contained in Emerging Issues Task Force Issue No. 99-17. *See* Emerging Issues Task Force Issue No. 99-17, *Accounting for Advertising Barter Transactions* (abstract) ("EITF 99-17"). The evolution of these standards was noted by the Ninth Circuit in affirming the district court decision in *In re Homestore.com I*:

> Internet companies have historically engaged in barter transactions between themselves, often in order to place advertising on each other's websites. Beginning in fiscal year 2000, the SEC implemented a new accounting standard that required companies engaging in barter transactions to report only the net revenue that was earned from these related transactions, rather than the gross revenue received.

*Simpson v. AOL Time Warner Inc.*, 452 F.3d at 1043.

As the Complaint implicitly recognizes, it is not the case that revenue may never be recognized from barter transactions. Revenue and expenses from barter transactions of advertising services may be recognized when the fair value of the advertising can be determined within reasonable limits. EITF 99-17; *In re Homestore.com II*, 347 F. Supp. 2d at 805-06. Under EITF 99-17, "barter transactions

that involve a nonmonetary exchange of advertising" should result in recorded revenues and expenses "only if the fair value surrendered in the transaction is determinable based on the entity's own historical practice of receiving cash, marketable securities, or other consideration that is readily convertible to a known amount of cash." EITF 99-17 ¶ 4; *In re Homestore.com II*, 347 F. Supp. 2d at 805-06. EITF 99-17 likewise provides specific rules for determining whether and to what extent past cash transactions may be used to determine the fair value of the advertising surrendered by the entity. EITF 99-17 ¶¶ 5–7. As a general rule, an entity may recognize revenue from barter transactions up to the dollar value of qualifying cash transactions recorded within the previous six months. *Id*.

The SEC does not allege that these rules are "simple" or "fundamental". Even if they were, like the accounting rule *In re Bristol-Myers Squibb*, EITF 99-17 hardly seems to announce a standard that is easily applied. Furthermore, EITF 99-17 was issued in early 2000, just before the alleged accounting improprieties took place, with the goal of providing guidance where none had previously existed. *See* EITF 99-17 (describing growing problem of advertising barter transactions between Internet companies and prescribing certain rules, effective January 20, 2000, for determining when revenue should be recognized from such transactions). It was public knowledge both before and after its issuance that internet companies were reporting revenue from advertising barter transactions. *See* Jeremy Kahn & Feliciano Garcia, *Presto Chango! Sales are Huge!* Fortune, Mar. 20, 2000 ("*Presto Chango! Sales are Huge!*") (describing and criticizing the prevalence of barter revenue and the "wiggle room" left by GAAP for reporting it); Matt Krantz, *Web Site Revenue May Not Be Cash*, USA Today, Sept. 9, 1999 (describing the prevalence of barter revenue and noting that "[c]ompanies that aren't booking barter

feel like they're at a disadvantage"). All this suggests that while reporting of barter transactions by internet companies was publicly criticized, it was far from obvious how the GAAP provisions were to be applied. As the *Fortune* article noted:

> GAAP requires that barter transactions be recorded at "fair value." But the rules do not explain how fair value should be determined. That was never an issue for old-media giants that sold most of their advertising for cash. But figuring out the equivalent cash value for a Website's ad space -- much of which may never have sold for real money -- can be a challenge. "It's a matter of revenues based on history vs. those based on fantasy," says Jack Ciesielski, publisher of The Analyst's Accounting Observer newsletter. In mid-January [2000] the EITF proposed that barter advertising should be counted as revenue only when a company has an established history of earning cash for the same space.

*Presto Chango! Sales are Huge!*

More importantly, the fact that AdNet barter transactions accounted for sixty percent of AdNet's revenue *before* StarMedia acquired it, (Compl. ¶ 27), suggests that Espuelas and Chen used AdNet's practice as a proxy for determining that, at least for the base book transactions, StarMedia's accounting was legitimate. The Complaint does not allege that at the time of the acquisition, Espuelas and Chen knew that the bulk of AdNet's barter revenue could not be recognized. Nor does it allege that the purchase of AdNet was not *bona fide*. *Cf. In re Homestore.com I*, 252 F.Supp.2d at 1024. It is counterintuitive to infer that StarMedia's senior executives would cause the company to acquire AdNet if they actually believed that AdNet's reserves were illusory. Yet if defendants believed that StarMedia was acquiring a true revenue stream—an inference strongly supported by the fact that StarMedia agreed to an earn-out based on AdNet's

future revenues—on what allegations can the SEC rely to raise a strong inference that defendants knew these revenues to be phantom?

In light of these deficiencies, the Court concludes that the SEC has failed to plead scienter for Espuelas and Chen with regard to the base book and incremental revenue transactions. For the base book transactions, the SEC fails to "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Although the Complaint alleges sufficient facts to infer that Espuelas and Chen knew the details of these transactions, there are no allegations that they misrepresented these details to the public or concealed aspects of them they were obligated to disclose. *Cf. In re Homestore.com I*, 252 F. Supp. 2d at 1033. While allegations that Espuelas and Chen made statements contradicting an internal or publicly available accounting policy at StarMedia might suffice for scienter, *see Rothman*, 220 F.3d at 85, the Complaint does not allege the presence of such a policy. There are not even allegations that Espuelas or Chen made any public statements implying that they doubted the accuracy of the accounting. *Cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d at 491 (finding a strong inference of fraudulent intent when defendants made public statement admitting that aircraft may be worth far less than their reported worth). To the extent the SEC is arguing that recklessness may be inferred from "an egregious refusal to see the obvious, or to investigate the doubtful," *Novak*, 216 F.3d at 308, it is relying on the idea that the proper accounting for the base book transactions was obvious. But where there is no paradigm for the proper accounting of barter transactions, and the application of the correct accounting rules is complex, this argument must fail. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 566-

67.  This is especially true when Espuelas and Chen had a proxy for believing that trading internet advertising for TV and radio advertising could produce revenue—namely the accounting by AdNet prior to its acquisition.  Nor should knowledge of the large percentage of revenues attributable to the base book transactions itself have necessitated further investigation.  *See Chill v. Gen. Elec. Co.*, 101 F.3d at 26-70; *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d at 359-62.

The analysis is essentially the same for the incremental revenue transactions.  These transactions are also barter transactions in which StarMedia purchased services from HMP and MVS in return for HMP and MVS directing its clients to purchase an equal amount of internet advertising from StarMedia.  (*See, e.g.*, Compl. ¶ 46.)  The only difference appears to be the timing of StarMedia's payments, with StarMedia wiring the money to HMP and MVS in increments across several quarters rather than contemporaneously with the recording of its own revenue.  (*See, e.g.*, *id*. at ¶ 53.)  In its brief, the SEC calls these transactions—for the first time—"purely sham transactions", (Pl. Br. at 28).  However, the Complaint makes no such allegation and fails to plead facts supporting such a conclusion.  The Complaint alleges that in an effort to make revenue targets, Espuelas and Chen "devised a set of round trip transactions", complete with a "diagram", (Compl. ¶¶ 42-44.), but these allegations are no different from those relating to the base book transactions insofar as they establish knowledge of the transactions' details but not knowledge of the impropriety of their accounting.  Moreover, accounting for the incremental transactions is at least as complex as that for the base book transactions, eliminating the possibility that the accounting improprieties were "obvious".  Of course, because the transactions were reciprocal, they created an

opportunity for accounting fraud. For instance, the transactions would certainly be fraudulent if MVS and HMP's clients did not actually purchase advertising from StarMedia, or if MVS and HMP were not providing StarMedia with the services for which StarMedia was ostensibly sending the pre-payments. The SEC, however, does not allege facts of this nature. Finally, while the Complaint does allege that Morales initially disagreed with the accounting treatment, (*id*. at ¶ 55), and that some of HMP and MVS's clients were unaware that they were purchasing advertising from StarMedia, (*id*. at ¶ 55), the Complaint does not allege that these potential red flags were ever known to Espuelas and Chen.

  The paucity of the SEC's allegations of scienter regarding the barter transactions negotiated by Espuelas and Chen is particularly telling when one considers the fact that the Complaint was filed after 17 depositions, including that of StarMedia's CFO following which he entered into a consent decree with the SEC. (Def. Br. at 2.) Had the SEC gathered any evidence upon which it could have alleged the defendants' reckless or knowing involvement with the CFO in the improper accounting of barter transactions, surely it should have found its way into the Complaint. The generalized allegations in the Complaint that Espuelas and Chen "knew or [were] reckless in not knowing" that the accounting treatment for these transactions are insufficient to establish "conscious misbehavior" or such "an extreme departure from the standards of ordinary care to the extent that the danger was either known to [Espuelas and Chen] or so obvious [they] must have been aware of it." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (quotations and alterations in original omitted). Accordingly, the primary violations of 10(b) and Rule 10b-5 as against Espuelas and Chen are dismissed.

*Scolnik*

From February 1999 until November 2001, Betsy Scolnik was StarMedia's Senior Vice President for Strategic Development and later an Executive Vice President.  (Compl. ¶ 17.)  She reported first to Espuelas, and then to Chen.  (*Id*.)  In its brief, the SEC argues that its claims against Scolnik "are predicated upon her involvement with certain of the contingent sales transactions and, to a lesser extent, her role in the development of the incremental revenue transactions."  (Pl. Br. at 38.)  If anything, Scolnik had an even smaller role in the incremental transactions than Espuelas and Chen.  Accordingly, for the same reasons as Espuelas and Chen, the Court finds that the SEC has failed to adequately plead scienter for these transactions and dismisses the primary violations of 10(b) and Rule 10b-5 claims against Scolnik relating to them.

With regard to several of the contingent transactions, however, the allegations against Scolnik are more troublesome.[9]  Of the five contingent transactions described by the SEC in their Complaint, four were with AMG and one was with Danone.  In its brief, the SEC argues that the following allegations are sufficient to plead scienter for Scolnik:  (1) Scolnik actively negotiated the transactions with AMG; (2) Scolnik "pressured Blacker to negotiate a similar transaction with Danone"; (3) StarMedia's sales department had a policy requiring accurate insertion orders or contracts in order to properly report revenue and Scolnik was aware of this policy; (4) Scolnik nevertheless made several side agreements with AMG making payment contingent on AMG's approval of the advertising and never reported these side agreements to the sales

_____

[9] Espuelas and Chen are not alleged to have engaged in fraudulent behavior with regard to the contingent transactions.

department; and (5) she thereafter received internal reports detailing the companies' earnings and showing recognition of earnings from these transactions.  (Pl. Br. at 38-39.)

Scolnik attacks the sufficiency of the SEC's allegations by noting that the Complaint nowhere alleges that she had any obligation to report the side agreements with AMG to the sales or finance department or that she had any knowledge of GAAP or the proper accounting for the contingent transactions.  (Def. Br. at 54-62.)  Scolnik argues that because she had no obligation to report the side agreements, she cannot be said to have misled the sales and finance departments.  (*Id*. at 59-61.)  Moreover, because she had no accounting knowledge, she could not have known that failing to report the side agreements would render the accounting of the transactions incorrect.[10]  (*Id*. at 60.)

The problem with Scolnik's argument is two-fold.  First, unlike the base book and incremental transactions, the accounting for the contingent transactions was not complex.  *Cf. In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 566-67.  The only thing that differentiated the contingent transactions with AMG from ordinary internet advertising sales was the fact that payment of the full price was contingent on AMG's approval.  It does not require an accounting background to realize that this contingency radically changed the nature of the transaction.  In one case, without the contingency StarMedia receives a guaranteed $500,000; with the contingency it may receive only $10,000—a difference of 98%.  While it may require accounting knowledge to know

---

[10] Scolnik also argues that the Complaint "hides behind group pleading", making insufficient distinction between herself and others for the Court to "evaluate Ms. Scolnik's individual state of mind, scienter, or knowledge." (Def. Br. at 57.)  Scolnik is correct to the extent she argues that the group pleading doctrine can only be invoked to attribute fraudulent statements to defendants, remaining wholly insufficient to plead scienter.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 440 ("[T]he group pleading doctrine has no effect on the PSLRA's *scienter* requirement.  It merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants.").  For the reasons described above, however, the Court finds that the SEC has pleaded sufficient facts with regard to Scolnik to raise a strong inference of fraudulent intent.

exactly how such a contingency is accounted for, it does not require such knowledge to know that the recognition of all the revenue for sales that were entirely contingent on further approval of the buyer was improper. *See id.*; *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 375; *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d at 637-40; *see also Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 222 (holding complaint had adequately pleaded scienter when defendant had negotiated a side agreement imposing certain contingencies on payment for software not reflected in license agreement that resulted in the reporting of improperly booked revenue in documents attributable to the defendant under group pleading doctrine).

Second, the allegation that Scolnik was aware of the sales department's policy on insertion orders further suggests the importance of disclosing the side agreements. (Compl. ¶¶ 41, 61, 74.) Not adhering to an existing policy can itself give rise to a strong inference of recklessness. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("[D]efendants asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."); *Rothman*, 220 F.3d at 90-92. The act of concealing information or failing to document agreements—as Scolnik initially did in the first contingent transaction—can also give rise to a strong inference of fraudulent intent. *See In re Homestore.com I*, 252 F. Supp. 2d at 1033. While the Complaint is thin by any standard, allegations as to Scolnik's role in the contingent transactions raise a sufficiently strong inference of scienter to withstand defendants' motion to dismiss.

## B.     Insider Trading Allegations against Chen

Sections 17(a) and 10(b) and Rule 10b-5 prohibit corporate officers, directors, and insiders from trading[11] securities of the company while in the knowing possession of material, non-public information.  *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 168-169 (2d Cir. 1999); *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008) (standards for insider trading are the same under 10b-5 as Section 17(a)).[12]

Allegations of insider trading must meet the scienter requirements of Section 10(b) and 17(a)(1).  *See SEC v. Drescher*, No. 99 Civ. 1418 (SAS), 1999 U.S. Dist. LEXIS 16033, at *9 (S.D.N.Y. Oct. 18, 1999).  The Complaint does not allege, and the SEC does not argue, that Chen knew that StarMedia was about to issue the restatement and sold his shares to escape the predictable drop in stock price.  (Pl. Br. at 37–38).  Indeed, Chen ceased to be an officer of StarMedia in May 2001 and ended his service as a director in August 2001, (Compl. ¶ 15), suggesting that he would not have had access to this information.  Instead, the Complaint alleges that the material nonpublic information on which Chen traded is the fact of the accounting improprieties.  The Court, however, has already found the allegations insufficient that Chen knew or was reckless in not knowing that StarMedia had overstated its revenues.  The insider trading claim is deficient for the same reason.

---

[11] In contrast to Section 10(b) and Rule 10b-5, which also apply to purchases, Section 17(a) applies only to the "offer or sale" of securities.  *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 n.2 (S.D.N.Y. 2008).  The difference here, however, is immaterial because Chen sold his shares.

[12] Well-pleaded allegations of insider trading can support liability for material misstatements as such allegations support a strong inference of scienter where "corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  Here, however, the SEC does not claim that Chen's trades support a finding of scienter for the material misrepresentations contained in StarMedia's SEC filings.  (Pl. Br. at 27–30, 36–37).

## C. Aiding and Abetting Allegations against Kampfner

During 2000 and 2001, Adriana Kampfner was StarMedia's Vice President for Global Sales and the President of StarMedia's subsidiary, StarMedia de Mexico. (Compl. ¶ 18.) The Complaint alleges that Kampfner violated Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), by aiding and abetting StarMedia's primary violations of Section 10(b) and Rule 10b-5. (Compl. ¶ 95-96.) To state a claim that defendants aided and abetted violations of the Exchange Act, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation. *See SEC v. Cedrick Kushner Promotions*, 417 F. Supp. 2d at 334. The Complaint's allegations against Kampfner are almost identical to Scolnik. Indeed, the allegations concerning the contingent transactions almost never distinguish between the two. (*See, e.g.*, Compl. ¶¶ 34-38, 57-61.) The only differences between the SEC's allegations against Scolnik and Kampfner appear to be their slightly differing roles in the incremental revenue transactions and Kampfner's absence in the BellSouth presentation. As with Scolnik, the allegations against Kampfner—that she negotiated the AMG transactions, that she was aware of the StarMedia's policy with regard to insertion orders, and that she failed to report the side agreements to the sales department—raise a strong inference that Kampfner was reckless. The fact that actual knowledge is the standard for aiding and abetting, however, compels the Court to dismiss the claims against Kampfner relating to the contingent transactions. The Complaint contains no allegations that someone with accounting knowledge communicated to her that the transactions were being accounted for incorrectly, and like Scolnik, the Complaint lacks any allegations

that Kampfner possessed any accounting expertise herself.  While the group pleading

doctrine permits an inference that StarMedia's financial statements and the errors therein

are attributable to Kampfner, the doctrine does not permit an inference that Kampfner

actually knew the statements contained errors.  *See In re BISYS Sec. Litig.*, 397 F. Supp.

2d at 440.  As against Kampfner, the Court therefore dismisses the Complaint's claim of

aiding and abetting primary violations of Section 10(b) and Rule 10b-5.

## III.     Violations of Section 13 of the Exchange Act

### A.     Aiding and Abetting Allegations

The Complaint alleges that all defendants aided and abetted StarMedia's

violation of Section 13(a) and Rules 13a-1, 13a-13, and 12b-20, which proscribe the

filing of false or misleading statements in annual and quarterly SEC filings.  15 U.S.C. §

78m(a); 17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13.  In particular, Section 13(a) requires

issuers of securities to file the information, documents, and annual and quarterly reports

prescribed by the SEC.  15 U.S.C. § 78m(a).  Rules 13a-1 and 13a-13 require issuers to

file annual and quarterly reports, respectively.  17 C.F.R. §§ 240.13a-1, 13a-13.  Rule

12b-20 requires that issuers add "such further material information, if any, as may be

necessary to make the required statements, in the light of the circumstances under which

they are made, not misleading." 17 C.F.R. § 240.12b-20.  The Complaint also alleges that

all defendants aided and abetted StarMedia's violation of Section 13(b)(2)(A), which

requires issuers who are subject to the reporting provisions of the Exchange Act to "make

and keep books, records, and accounts, which . . . accurately and fairly reflect their

transactions and dispositions of their assets."  15 U.S.C. § 78m(b)(2)(A).

As noted above, for aiding and abetting claims, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation. *See SEC v. Cedrick Kushner Promotions*, 417 F. Supp. 2d at 334. For Chen, Espuelas, Scolnik, and Kampfner, the SEC's aiding and abetting claims fail because they do not sufficiently allege that these four defendants had actual knowledge of StarMedia's violations. As to Chen and Espuelas, the Court has already found that the Complaint does not adequately plead scienter in connection with the accounting improprieties resulting from the base book and incremental revenue transactions. Therefore, the Court finds that the Complaint has not sufficiently alleged that Chen or Espuelas had actual knowledge of those accounting errors. As for Scolnik and Kampfner, the Court has found that the Complaint has adequately plead recklessness for both defendants in their conduct concerning the contingent transactions, but not the possession of actual knowledge concerning the transactions' improper accounting. Therefore, the Court dismisses the SEC's claims that Espuelas, Chen, Kampfner and Scolnik aided and abetted StarMedia's Section 13 violations.

The allegations regarding Morales present a much closer question. Morales was StarMedia's Controller and Vice President of Finance. In December 2000, he learned from Heller, StarMedia's CFO, about the accounting treatment that would be used for the incremental revenue transactions. Morales told Heller he thought that they should be treated as barter transactions, but, according to the Complaint, Morales "relented only after" Heller said he would handle any problems with the auditors. (Compl. ¶ 55.) The Court finds that this allegation is sufficient to demonstrate that Heller

and Morales had actual knowledge of StarMedia's reporting and record-keeping violations. Given that Heller, as StarMedia's Chief financial officer, both signed and helped prepare StarMedia's financial reports, (Compl. ¶ 84), these allegations are sufficient to plead a primary violation by Heller. The question remains whether Morales substantially assisted Heller in effecting this violation.

The Complaint alleges that Morales substantially assisted the fraud in two ways. First, Morales sent wire transfers to HMP and to AdNet that partially fulfilled StarMedia's obligation to pre-pay HMP and MVS. (Compl. ¶¶ 54, 79.) Second, Morales affirmed in management representation letters to StarMedia's auditors that all frauds had been disclosed and that StarMedia's "receivables represent valid claims . . . and do not include amounts for . . . other types of arrangements not constituting sales" even though he knew that StarMedia was improperly recognizing revenue from the incremental revenue transactions. (Compl. ¶ 86.) The question is whether these actions were a substantial and proximate cause of StarMedia's reporting and record-keeping violations. The Court finds that StarMedia's record-keeping and reporting violations were a foreseeable result of Morales' failure to alert E&Y to the accounting improprieties of which he was aware. Under pre-Reform Act cases, it was well-settled that where there existed a conscious or reckless violation of an independent duty to act, inaction or silence was sufficient to create aider and abetter liability. *See IIT v. Cornfeld*, 619 F.2d 909, 927 (2d Cir.1980) ("[I]naction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act."); *Armstrong v. McAlpin* 699 F.2d 79, 91 (2d Cir. 1983) ("Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed

intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act.")

Here, Morales, by signing the management representation letters, was under a legal duty not to mislead the auditors. *See* 17 C.F.R. § 240.13b2-2. Thus whether or not Morales' signing of the management letters was necessary to E&Y's engagement, *cf. Armstrong v. McAlpin*, 669 F.2d at 92 (investment advisor's approval of advisee's improper trades was not substantial assistance in the absence of allegation that advisor's approval was required), he became obligated not to mislead the auditors by omission of the material fact of the undisclosed accounting problems. In light of the eventual restatement of earnings, it is reasonable to infer that if Morales had disclosed to the auditors that he believed that StarMedia was recognizing the incremental revenue improperly, the auditors would have discovered the accounting problems. Therefore, the Court dismisses the aiding and abetting claims contained in counts 4 and 5 as against Espuelas, Chen, Scolnik and Kampfner, but not as against Morales.

### B.    Allegations of Violations of Rule 13b2-1

The Complaint's fifth claim alleges that all the defendants violated Rule 13b2-1 (Compl. ¶ 108), which provides that "no person shall directly or indirectly, falsify or cause to be falsified any book, record or account subject to section 13(b)(2)(A)." 17 C.F.R. § 240.13b2-1. However, the SEC's brief betrays some confusion as to whether the Complaint alleges that defendants committed primary violations of 13b2-1 or simply that they aided and abetted such violations. For instance, at one point, the SEC describes the Complaint as alleging a primary violation at one point (Pl. Br. at 18), but at another

states the Complaint alleges aiding and abetting of StarMedia's violation of 13b2-1 (*Id.* 30). This distinction is critical as primary violations of Rule 13b2-1 do not require an allegation of scienter. *SEC v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998) (holding that "lack of scienter [was not] a defense to . . . claims under § 13 and the regulations thereunder" because the absence of scienter was "consistent with precedent in this Circuit and with the Commission's interpretive regulations" which were entitled to deference under *Chevron*); *SEC v. Collins & Aikman Corp.*, 2007 U.S. Dist. LEXIS 94015, at *34. Rather "liability is predicated on standards of reasonableness." *SEC v. Softpoint*, 958 F.Supp. 846, 866 (S.D.N.Y. 1997) (referring to 13b2-1). As discussed more fully *supra*, aiding and abetting liability requires an allegation of actual knowledge.

Applying the reasonableness standard to the SEC's 13b2-1 claims, the Court finds that the Complaint states claims against Scolnik, Kampfner, and Morales, but not Espuelas and Chen. The Court has already found that the Complaint adequately pleads that Scolnik and Kampfner acted recklessly with regard to the contingent transactions and that Morales acted knowingly when he substantially assisted in misrepresenting the incremental revenue transactions. These findings are sufficient to conclude that the Complaint adequately alleges that Scolnik, Kampfner, and Morales acted unreasonably. *See Novak*, 216 F.3d at 308 (defining reckless conduct as "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care"). With regard to Espuelas and Chen, however, the SEC must again rely solely on defendants' knowledge of the transactions and the large percentage of revenues they generated. Large revenues, however, are not red flags that, when ignored, raise an inference of unreasonable conduct, and the Court has already

concluded that the accounting of the transactions was too complex to infer that defendants should have known they were being accounted for incorrectly. *See SEC v. Lowy*, 396 F. Supp. 2d 225, 249-52 (E.D.N.Y. 2003) (holding that SEC had insufficiently pleaded unreasonable conduct when it failed to demonstrate recklessness or ignorance of red flags). Accordingly, the Court dismisses the SEC's Rule 13b2-1 claims against Espuelas and Chen and denies Scolnik, Kampfner, and Morales's motions to dismiss the same.

### C.    Allegations of Violations of Rule 13b2-2

Count 6 of the Complaint alleges that Chen and Morales violated Rule 13b2-2, which prohibits directors or officers from "directly or indirectly" making or causing to be made materially false or misleading statements or omissions to an accountant in connection with filings to the SEC or other regulatory compliance efforts. 17 CFR § 240.13b2-2. Like Rule 13b2-1, 13b2-2 does not require the SEC to plead scienter. *SEC v. McNulty*, 137 F.3d at 740-41; *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d at 491.[13] While even the SEC is not crystal clear on the subject, the Court assumes Rule 13b2-1's reasonableness standard applies to violations of Rule 13b2-2. *See* SEC Release No. 34-15570, 44 Fed. Reg. 10,964, 10,969 (Feb. 15, 1979) (dismissing assertion that scienter requirement needed for Rule 13b2-2 and referring to reasons given for Rule 13b2-1).

---

[13] Despite clear statements by the Second Circuit and the SEC, courts elsewhere have doubted the absence of a scienter requirement for Rule 13b2-2. *See, e.g.*, *SEC v. Todd*, 2007 U.S. Dist. LEXIS 38985 (S.D. Cal. 2007) ("The Court has yet to find a case where a claim of Rule 13b2-2 violations was sustained without knowledge of the falsity of the statements at issue."). Furthermore, the Commission does not argue in its brief that the defendants may be liable for violations of 13b2-2 in the absence of an allegation of knowledge or recklessness. (Pl. Br. at 42 (distinguishing *Todd* on its facts, but not disputing holding that knowledge or recklessness is required for 13b2-2 allegations), 37 (arguing that Chen was liable for violation of 13b2-2 because of his knowledge or recklessness). Returning to the Complaint, however, it is clear that the SEC does not plead scienter in its sixth claim. (Compl. ¶¶ 109-10.)

Chen and Morales directly made statements in the management representation letters that were materially misleading or false in that they represented that all frauds had been reported, that receivables represented valid claims, and that all sales terms and agreements had been disclosed. (Compl. ¶¶ 85-86.) For the reasons set forth above, the Court finds that the Complaint properly alleges that Morales's conduct was unreasonable because he knew that the statements in the management representation letters were false or misleading. As for Chen, again for the reasons stated above, the Court concludes that his conduct was reasonable because he neither ignored red flags nor acted recklessly. Accordingly, the Court dismisses the SEC's Rule 13b2-2 claim against Chen, but not against Morales.

## IV.    Amendment

In its opposition brief, the SEC requests leave to amend its complaint in the event of dismissal. (Pl. Br. at 45.) Defendants strenuously oppose the granting of leave to amend. (Def. Reply Br. at 20-22.) Rule 15(a) of the Federal Rules of Civil Procedure instructs that "when justice so requires", leave to amend should be "freely given." However, leave to amend "may properly be denied for: undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment . . ." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quotations and citations omitted). The Court has broad discretion to determine whether leave to amend should be granted. *Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998).

Reluctantly, the Court will permit the SEC to file an amended complaint provided that strict compliance with Rule 11 is observed. Defendants correctly point out that they filed a pre-motion letter setting forth the bases for the motion to dismiss and that the Court then invited the SEC to amend its complaint to address the asserted flaws. (Tr. of June 15, 2006 Hearing at 8-9.) The SEC, despite having reviewed thousands of documents and deposing all the defendants in its pre-suit investigation, declined to do so, launching the parties into lengthy, time-consuming motion practice. The mere fact of that discovery, in sum and substance, has already occurred, however, does not conclusively demonstrate undue delay and prejudice. *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) ("[P]arties . . . have been permitted to amend their pleadings . . . long after they acquired the facts necessary to support those claims."). Furthermore, given the SEC's long interest in these claims, the "traditional form of prejudice" that amendment presents—a failure of notice—is not an issue here. *See S.E.C. v. Alejandro Duclaud Gonzalez de Castilla*, 184 F.Supp.2d 365, 382 (S.D.N.Y. 2002). There is also no evidence of bad faith on the part of the SEC. *See State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."). Perhaps defendants' strongest argument is that because the current complaint was produced after extensive review of the facts, further amendment would be futile. Having not seen the evidence, however, the Court declines to engage in speculation. Accordingly, the SEC may proceed to amend its complaint.

## CONCLUSION

For the reasons stated above, the claims against Espuelas and Chen are

DISMISSED WITHOUT PREJUDICE in their entirety. Similarly, the aiding and

abetting claims against Scolnik and Kampfner are DISMISSED WITHOUT

PREJUDICE. Motions to dismiss the remaining claims are DENIED.

SO ORDERED.

Dated: New York, New York
September 30, 2008

Richard J. Holwell
United States District Judge