UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

                                                          06 Civ. 2435 (RJH)

                                                          **MEMORANDUM OPINION
                                                          AND ORDER**

FERNANDO J. ESPUELAS, JACK C. CHEN,
STEVEN J. HELLER, PETER R. MORALES,
WALTER MÖLLER, BETSY D. SCOLNIK,
ADRIANA J. KAMPFNER, and PETER E.
BLACKER,

                              Defendants.

---

Richard J. Holwell, District Judge:

        This is an enforcement action by the Securities Exchange Commission ("SEC")

against former executives of StarMedia Network, Inc. ("StarMedia" or the "Company")

for accounting fraud.  The SEC alleges violations of Section 17(a) of the Securities Act of

1933 ("Securities Act"), 15 U.S.C. § 77q(a); Sections 10(b), 13(a), 13(b)(2)(A), and 20(e)

of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(a),

78m(b)(2)(A), and 78t(e); and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-1, and 13b2-2

thereunder, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-1, and

240.13b2-2.  This Court previously dismissed all of the SEC's claims against Espuelas

and Chen, and some of the claims against Scolnik and Kampfner, but it granted the SEC

leave to replead.  The SEC did so, and defendants Fernando J. Espuelas ("Espuelas"),

Jack C. Chen ("Chen"), Betsy D. Scolnik ("Scolnik"), and Adriana J. Kampfner

("Kampfner")[1] again move to dismiss the claims against them.  For the reasons set forth below, the Court denies the motion in part and grants it in part.

## BACKGROUND

The SEC's original allegations are set forth in the Court's prior Memorandum Opinion and Order dated September 30, 2008, *SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ("*Espuelas I*"), familiarity with which is assumed.  Allegations relevant to the disposition of this motion are stated below and are taken as true.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 151 (2d Cir. 2007).

## I.     The Basic Allegations

StarMedia, which at one time employed each of the defendants, was an Internet portal that targeted Spanish- and Portuguese-speaking markets.  (Am. Compl. ¶ 24.) Espuelas and Chen co-founded the company in 1996.  (*Id.* ¶ 16.)  Espuelas was its CEO from 1996 until August 2001 and Chairman of its Board of Directors until November 2001.  (*Id.*)  Chen was its President and a member of its Board from 1996 until August 2001; from June to August 2001, he also served as Vice Chairman of the Board.  (*Id.* ¶ 17.)  Scolnik worked for StarMedia from February 1999 through November 2001, first as Senior Vice President for Strategic Development and later as an Executive Vice President.  (*Id.* ¶ 19.)  Kampfner worked for the company from August 1997 through December 2001; in 2000 and 2001, she was Senior Vice President, Global Sales and President of StarMedia de Mexico.  (*Id.* ¶ 20.)[2]

---

[1] The Court will refer to these defendants collectively as the "Moving Defendants."
[2] Also named as defendants in the Amended Complaint are Peter R. Morales, the company's Controller and Vice President of Finance from 1998 to 2001; Walther Möller, President of AdNet, a subsidiary StarMedia acquired in 2000; Steven J. Heller, a company Senior Vice President and CFO from 1999 to 2001; and

In both its original and amended complaints, the SEC's allegations center on StarMedia's recognition of revenue from three types of transactions, which the SEC refers to as the base book, incremental revenue, and contingent transactions. (Compl. ¶ 1; Am. Compl. ¶ 1.)  In late 2001, StarMedia restated its financial statements to correct the accounting for these transactions.  (Am. Compl. ¶ 3.)

## A.        The Base Book Transactions

StarMedia acquired AdNet S.A. de C.V. ("AdNet") in 1999.  (*Id.* ¶ 30.)  Pre-acquisition, as much as 60 percent of AdNet's revenue had come from "base book" transactions.  (*Id.* ¶ 31.)  Post-acquisition, these transactions continued through 2000 and the first two quarters of 2001.  (*Id.* ¶¶ 31, 33, 39, 52, 72, 86, 103.)  The essence of the base book transactions was AdNet's sale of services in exchange for its reciprocal purchase of services.  Grupo MVS, S.A. de C.V. ("MVS") and Harry Möller Publicidad, S.A. de C.V. ("HMP")[3] (collectively, "MVS/HMP"), which owned AdNet before StarMedia acquired it, would buy Internet advertising from AdNet for their clients; in return, AdNet would buy advertising services from MVS/HMP in the same amount.  (*Id.* ¶ 31.)  Because AdNet was obligated to pay MVS/HMP exactly what MVS/HMP paid AdNet, neither party generated any cash revenue on the transactions.  (*Id.* ¶ 33.)

Had StarMedia categorized these transactions as barter—two parties trading services without earning cash—it would have reported them in its SEC filings as "barter

---

Peter E. Blacker, the Senior Vice President of Global Sales Strategy & Partnerships from 1997 to 2001. (*Id.* ¶¶ 18, 21, 22, 23.)  None of these defendants is moving to dismiss the complaint.  Heller and Blacker have settled all claims against them (*see* Pltf.'s Opp. 2), and Möller did not respond to the complaint and his default has been entered on the docket (*see id.* 3).  Morales remains a defendant and has filed an answer to the Amended Complaint.  (*See id.*)

[3] Defendant Möller's family owned HMP.  After StarMedia acquired AdNet, it hired Möller as AdNet's president.

revenue."[4]  (*See id.* ¶¶ 39, 43, 45.)  Instead, the SEC alleges, StarMedia treated them as

entirely independent transactions: AdNet sold services to MVS/HMP, and MVS/HMP

sold other services to AdNet.  StarMedia thus recognized all of AdNet's sales to

MVS/HMP as advertising revenue, just as if no reciprocal arrangement existed.  (*Id.* ¶

39.)  Later, StarMedia re-categorized these transactions as barter transactions; treated

revenue from them as barter revenue; and, pursuant to the relevant accounting rules,

wrote off more than 90 percent of the barter revenue.  (*Id.* ¶¶ 3, 43.)  The original

complaint asserted that "Espuelas and Chen each caused StarMedia to book the full

amount of AdNet's base book transactions" even though they "knew or were reckless in

not knowing that these amounts were improperly recorded as revenue."  (Compl. ¶ 39.)

The amended complaint adds several allegations.  First, it alleges that StarMedia's

acquisition of AdNet was a deal done partly on the books and partly off them.  As part of

the acquisition, StarMedia had agreed to buy a dollar of services from MVS/HMP for

every dollar of advertising MVS/HMP directed their clients to buy from AdNet.  (Am.

Compl. ¶ 33.)  This part of the agreement was not recorded.  (*Id.*)  Thus none of the

documents executed in connection with the acquisition disclosed the reciprocal nature of

the barter deal; nor did any of the AdNet acquisition documents, StarMedia's SEC

filings, or the company's public statements in 2000 and 2001.  (*Id.* ¶¶ 33, 36.)

The amended complaint also adds facts about the extent of Espuelas's and Chen's

knowledge of the nature and significance of reciprocal barter transactions as opposed to

unlinked cash transactions.  Espuelas and Chen were allegedly familiar with barter

transactions because of "their executive positions, their knowledge of the company's

---

[4] Implicitly acknowledging that barter revenue is qualitatively different from cash revenue generated by
ordinary advertising sales, StarMedia disclosed in its SEC filings the amount of total revenue attributable to
barter transactions, which it termed "barter revenue."  (*See* Am. Compl. ¶¶ 44, 45.)

business, and StarMedia's disclosures" in SEC filings and public statements that differentiated between cash revenues and barter (non-cash) revenues.  (*Id.* ¶ 44.) Moreover, Espuelas and Chen, as "members of the executive team," had received StarMedia's written policies on how to account for barter transactions.  (*Id.* ¶ 46.)  And in April and October 2000, when analysts questioned whether barter was boosting company revenue, Espuelas indicated his comprehension of the concept when he assured them that StarMedia had "surging revenue" and that barter would likely fall "below 10 percent by the end of the year."  (*Id.* ¶ 46.)  Relying on these allegations, the SEC asserts that Espuelas and Chen knew or should have known that the base book transactions were barter transactions; that, without documentation of the reciprocal arrangement, the "linked nature of the base book transactions would not be apparent to [StarMedia's] finance department"; and thus that StarMedia's representations as to the amount of its barter revenue would be understated.  (*Id.* ¶ 39.)

**B.      Incremental Revenue Transactions**

The incremental revenue transactions involved both AdNet and StarMedia de Mexico, another StarMedia subsidiary.  They occurred in the fourth quarter of 2000 and the first two quarters of 2001, and all defendants allegedly took part in them.  (*Id.* ¶¶ 4, 57–71, 88–93, 104.)  The genesis of these transactions was the defendants' realization in late 2000 that revenues were projected to fall well short of analyst expectations.  (*Id.* ¶ 57.)  As Espuelas, Chen, Heller, Kampfner, and Scolnik began searching for ways to close the revenue gap, they decided that Möller's connections with MVS/HMP— Möller's family owned HMP—could prove a useful way to boost revenue.  (*Id.* ¶¶ 57, 59.)  Scolnik and Kampfner had "initial discussions with Möller" about possible

transactions; later, Chen got Heller involved in the discussions, and Heller became a "conduit" between Chen and Möller.  (*Id.*)  In late November of 2000, Möller sent Heller an e-mail diagramming what became called the "incremental revenue" transactions; Heller discussed the structure with Chen, who approved it.  (*Id.* ¶ 60.)  The next day, Heller spoke with Espuelas and Kampfner about "possible terms for the incremental revenue transactions," and later Espuelas and Kampfner confirmed to Möller that StarMedia had decided to go through with them.  (*Id.* ¶ 61.)  As the transactions were structured, StarMedia made capital contributions to AdNet, which AdNet then used along with its own funds to buy services from MVS and HMP.  (*Id.* ¶ 62.)  In return, clients of MVS and HMP agreed to buy the same amount in advertising from StarMedia.  (*Id.*)  The SEC claims that some of these clients were unaware of the purchases, and that others knew but did not care because it was MVS and HMP, not their clients, who were actually paying for the advertising.  (*Id.* ¶ 65.).

The amended complaint adds that the defendants did not document the underlying oral agreement that made clear the transactions were reciprocal, and knew that no such documentation existed.  (*Id.* ¶¶ 67, 80, 97, 110.)  Although StarMedia's internal controls "requir[ed] all terms of a sales contract to be in writing," no document was recorded "showing all the terms of the agreement."  (*Id.*)  Without documentation, the finance department and StarMedia's auditors were unable to assess the transactions holistically.  (*Id.*)  Consequently, the transactions were recorded as non-barter revenue when they should have been recorded either as barter revenue or not as revenue at all.

### C.     Contingent Transactions

The contingent transactions, which implicate Kampfner, Scolnik, and Blacker, took place in the last three quarters of 2000 and the first quarter of 2001.  (*Id.* ¶¶ 47–51, 73–74, 82, 94, 100.)  These transactions were subject to contingencies, but StarMedia recorded revenue from them without taking those contingencies into account.  (*Id.* ¶ 5.) In the second quarter of 2000, for example, Scolnik, Kampfner, and Blacker orally agreed to provide advertising to AMG International, Inc. ("AMG") on a contingent basis: if AMG approved of the advertising services, it would owe StarMedia $500,000; if it did not, it would owe only $10,000.  (*Id.* ¶ 47.)  "At Blacker's direction," an order for $500,000 was submitted to StarMedia's finance department, and the contingency was not noted.  (*Id.*)  StarMedia then recognized revenue of $500,000.  (*Id.* ¶ 48.)  Although the oral contingency was later documented, Blacker, Scolnik, and Kampfner did not give that documentation to the finance department.  (*Id.* ¶ 49.)  Such transactions occurred in the second and fourth quarters of 2000 and in the first quarter of 2001.  (*Id.* ¶¶ 47, 74, 94.) The defendants also engaged in transactions with a company called Groupe Danone ("Danone"); although the SEC calls these contingent transactions, they actually seem to have been nothing more than free giveaways.  In the third quarter of 2000, for example, Blacker and Kampfner are said to have offered Danone $500,000 of Internet services at no charge, to provide an incentive for Danone to hire StarMedia for a large project in Latin America.  (*Id.* ¶ 50.)  At Blacker's direction, a $500,000 order was submitted to StarMedia's finance department, and none of the three defendants informed the department that the services were actually to be provided free of charge.  (*Id.* ¶ 51.)  Such transactions occurred in the third and fourth quarters of 2000.  (*Id.* ¶¶ 50, 73.)

The amended complaint adds allegations that Scolnik and Kampfner knew that StarMedia reported too much revenue from the contingent sales it made to Danone and AMG's portfolio company. Scolnik and Kampfner each received revenue reports generated from StarMedia's books and records that recorded the contingent transactions as revenue. (*Id.* ¶ 56.) Thus, says the SEC, these defendants were or should have been aware that StarMedia improperly recognized the full amount of the contingent deals as revenue. (*Id.*)

**D.     Misleading Statements**

The SEC contends that the defendants made misleading statements in SEC filings,[5] to external auditors, and to potential investors. (*Id.* ¶¶ 112–21.) First, Chen and Espuelas are alleged to have made a misleading statement by signing StarMedia's annual Report on Form 10-K for its fiscal year 2000. (*Id.* ¶ 113.) As in its first complaint, the SEC alleges that this 10-K overstated the company's total revenue for 2000 because it had improperly accounted for several transactions in that year. But now the SEC also alleges that the 10-K misrepresented the *quality* of StarMedia's 2000 revenue. (Am. Compl. ¶¶ 7, 28, 44, 45, 113.) The 10-K contained this disclosure:

> [a] portion of the Company's revenues are from barter advertisements (agreement whereby the Company trades advertisements on its Network in exchange for advertisement from third parties). Barter advertising revenues and expenses are recognized in accordance with Emerging Issues Task Force Issue No. 99-17, "Accounting for Barter Advertising." Revenues from barter transactions are recognized during the period in which the advertisements are displayed on the Company's Network. Barter expense is recognized when the Company's advertisements are run by the third-party, which is typically in the same period

---

[5] Somewhat surprisingly, the SEC's amended complaint does not actually quote from any of StarMedia's SEC filings. Still, the Court "may take judicial notice of the full contents of the SEC's filings relating to this enforcement action because plaintiffs rely upon portions of them in their pleadings and, in any event, these proceedings are a matter of public record." *In re Morgan Stanley Information Fund Sec. Litig.*, Nos. 09-0837, 09-0858, 2010 WL 252294, at *3 n.5 (2d Cir. Jan. 25, 2010).

> when barter revenues [are] recognized.  For the years ended December 31, 1998, 1999 and 2000, revenues derived from barter transactions, were approximately $2,400,000, $5,500,000, and $7,200,000 respectively. . . . For the years ended December 31, 1998, 1999 and 2000, advertising expense amounted to approximately $21,246,000, $29,076,000, and $33,131,000 respectively.  For the years ended December 31, 1998, 1999 and 2000, advertising expense includes approximately $2,400,000, $5,500,000 and $7,200,000 of charges related to barter advertising transactions.

StarMedia Network, Inc. April 2, 2001 Form 10-K, 2000 Annual Report, at F-6, F-8 (available at http://www.sec.gov/Archives/edgar/data/1057334/000091205701506571/ 0000912057-01-506571.txt).[6]  Investors viewed barter revenues as qualitatively different from cash revenues.  (*See* Am. Compl. ¶ 46 ("analysts questioned whether the company was increasing revenue by using barter").)  Thus the 10-K's disclosure on barter—that, in 2000, only $7.2 million of StarMedia's revenue came from barter transactions—made a representation about the quality of the company's total revenue.  The SEC says that because StarMedia was not treating the base book and incremental transactions as barter transactions during this period, as it should have, that representation was false.

The SEC also alleges that the defendants misled potential investors in StarMedia.  The original complaint alleged simply that "Espuelas, Chen, Heller, and Scolnik each played a role in the presentation of financial information, discussions, and negotiations with entities, led by BellSouth, that were considering whether to provide financing to the company during 2000 and 2001."  (Compl. ¶ 87.)  As the Court said in *Espuelas I*, "this allegation fails utterly to provide these defendants with 'fair notice of the specific conduct with which [each] is charged.'"  *Espuelas*, 579 F. Supp. 2d at 473 (citation omitted).  The amended complaint provides somewhat more detail.  It alleges that, in

---

[6] StarMedia made similar disclosures in its Forms 10-Q for the first and second quarters of 2001, but only Heller signed these filings.  The 10-Qs also report StarMedia's barter revenues as a percentage of total revenue.

mid-2000, Chen told Scolnik to try to "secure financing for StarMedia from a consortium of investors led by BellSouth." (Am. Compl. ¶ 117.) BellSouth ultimately did provide financing, by buying $35 million in convertible preferred shares of StarMedia stock. (*Id.* ¶ 118.) The deal closed in mid-2001. (*Id.*) Prior to the closing, Scolnik acted as a "conduit" between BellSouth, which wanted additional financial information, and StarMedia, which provided that information. (*Id.*) In connection with the parties' agreement, StarMedia represented to BellSouth that none of its SEC filings, as of their filing dates, contained any materially false or misleading statements and that its financial statements complied with Generally Accepted Accounting Principles ("GAAP"). (*Id.* ¶ 120.) Espuelas executed the agreement, and he and Chen approved it. (*Id.*) The SEC alleges that the following defendants made materially misleading statements about the amount and quality of StarMedia's revenue: (1) Chen and Heller, by providing "financial information . . . relating to StarMedia's revenue in 2000 and the first quarter of 2001" to BellSouth during negotiations; (2) Scolnik, by relaying unidentified "financial information" from StarMedia to BellSouth; and (3) Chen and Espuelas, by approving the agreement with the BellSouth group, which represented that StarMedia's SEC filings contained no materially false or misleading statements and that its financial statements complied with GAAP. (*Id.* ¶¶ 118–121.) The SEC says these representations were misleading in that they endorsed the veracity of StarMedia's public disclosures about its total revenues, its total barter revenues, and its barter revenues as a percentage of total revenues. (*Id.* ¶ 121.)

Finally, the SEC alleges that Chen, Heller, and Morales made misleading statements to StarMedia's outside auditor, Ernst & Young ("E&Y"). These defendants

signed letters representing to E&Y that "[w]e have made available . . . all significant contracts and agreements"; "[r]eceivables represent valid claims . . . and do not include amounts for . . . other types of arrangements not constituting sales"; "[w]e have disclosed to you all sales terms, including all rights of return or price adjustments"; "[w]e have provided you with all sales agreements . . . [and] [t]hese represent the entire arrangements and are not supplemented by other agreements either written or oral"; "[t]here has been no fraud involving management or employees who have significant roles in internal control"; and "[t]here has been no fraud involving other employees that could have a material effect on the financial statements." (*Id.* ¶ 116.) Taking the SEC's allegations as true, these statements were misleading because significant aspects of the base book, incremental revenue, and contingent transactions were not documented or otherwise disclosed to the company's auditor.

**E.      Margin Loans**

The original complaint contained an allegation that Chen engaged in insider trading, selling his stock before StarMedia restated its financial statements to minimize losses. (Compl. ¶ 88.) The amended complaint adds an allegation that Espuelas, Chen, Heller, and Kampfner all used inflated StarMedia stock for their personal gain. (Am. Compl. ¶ 6.) Each used stock as collateral for loans in margin accounts with his or her broker, thus benefiting from the stock's inflation. (*Id.*)

## II.      Procedural History

In its original complaint, the SEC asserted a variety of securities claims against the defendants.  Against Espuelas, Chen, and Scolnik, it asserted claims under Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. Kampfner allegedly violated Section 20(e) of the Exchange Act by aiding and abetting these primary violations.  Espuelas, Chen, Scolnik, and Kampfner all allegedly aided and abetted StarMedia's reporting and record-keeping violations under the Exchange Act, and also violated the record-keeping rules themselves.  Finally, Chen was alleged to have violated the Exchange Act's bar on making false statements to auditors.

In *Espuelas I*, the Court dismissed all the claims against Espuelas and Chen, and the aiding and abetting claims against Chen, Espuelas, Scolnik, and Kampfner.  The Section 17(a), Section 10(b), and Rule 10b-5 claims against Scolnik survived as to her involvement in the contingent transactions,[7] but not as to her involvement in the incremental revenue transactions.  The claim that defendants violated the record-keeping rules survived as against Scolnik and Kampfner but not Chen and Espuelas.  *Espuelas*, 579 F. Supp. 2d at 488.

Following the Court's ruling, the SEC amended its complaint, and defendants Chen, Espuelas, Scolnik, and Kampfner now move to dismiss the claims against them.

## DISCUSSION

## I.      Pleading Standards

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences

---

[7] As to these claims, Scolnik has separately moved for summary judgment.  (*See* Scolnik's Mot. Summ. J.)

in the plaintiff's favor. *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir. 2009). The complaint's allegations, however, "must be enough to raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only a "plausible claim for relief survives a motion to dismiss." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 476 (2d Cir. 2009). Thus courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009) (internal quotation marks omitted).

As this Court has noted, securities complaints brought by the SEC are "subject to the heightened pleading standards imposed by Rule 9(b) to the extent that they make allegations sounding in fraud." *Espuelas*, 579 F. Supp. 2d at 469; *see SEC v. Kelly*, No. 08-4612, 2009 WL 3241548, at *5 (S.D.N.Y. Sept. 30, 2009). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Although intent may be alleged generally, *id.*, a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995).

## II.    Primary Violations of Section 10(b), Rule 10b-5, and Section 17(a)

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the SEC must plead that defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

"Essentially the same elements are required under Section 17(a)(1)–(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)."[8]  *Id.*  The amended complaint alleges that Espuelas and Chen violated Section 17(a), Section 10(b), and Rule 10b-5 by ratifying disclosures they should have known were misleading in two ways: first, because StarMedia had improperly accounted for the base book and incremental revenue transactions, and second, because StarMedia had failed to report them as barter transactions.  It makes the same allegations against Scolnik with respect to her role in the incremental revenue transactions.[9]  Finally, it alleges that Chen violated Sections 17(a) and 10(b) and Rule 10b-5 by engaging in insider trading in late 2001.

## A.      The Complaint Alleges Material Misstatements with Sufficient Particularity

A securities fraud complaint based on misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see* Fed. R. Civ. P. 9(b).  Here, the Court has already decided that, except for the misstatements allegedly made to a consortium of investors led by BellSouth, all the misstatements have been pled with particularity.[10]  *Espuelas*, 579 F. Supp. 2d at 472–73.

---

[8] In *Espuelas I*, in the absence of any contention by the SEC that it was not required to plead scienter, the Court assumed that the SEC only intended to sue under Section 17(a)(1).  The SEC has never argued otherwise.  Thus the Court considers claims under Section 17(a)(2) and (a)(3), if they ever existed, to have been abandoned.

[9] The SEC also alleges that Scolnik violated Sections 17(a) and 10(b) and Rule 10b-5 by virtue of her involvement in the contingent revenue transactions.  Because the Court has already ruled that this claim survives dismissal, defendants do not move to dismiss it here.  (*See* Defs.' Mem. 51 n.20.)

[10] Of course, the SEC will still ultimately have to prove that each of these defendants *made* a misstatement.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).").  They would be liable for

The amended complaint adds some detail about the BellSouth misstatements.  It alleges, for example, that Espuelas executed, and he and Chen both approved, the agreement executed by StarMedia and the BellSouth investor group in connection with the financing.  That agreement allegedly "represented that, as of their respective filing dates, none of the [SEC] filings contained any materially false or misleading statements and that [StarMedia's] financial statements complied with GAAP and fairly presented in all material respects the financial position of the company as of the dates of the statements . . . ."  (Am. Compl. ¶ 120.)  If, as alleged, the SEC filings did contain misleading statements, this representation would be misleading as well.  The amended complaint also alleges a second species of misstatement: that the "financial information" presented to BellSouth, "including information relating to StarMedia's revenue in 2000 and the first quarter of 2001," was misleading.  (*See id.* ¶ 119.)

Although the precise roles of Chen, Espuelas, and Scolnik in the BellSouth deal are less than crystal-clear, the amended complaint does add enough detail to give Chen and Espuelas fair notice of the conduct with which they are charged.  Defendants do not argue to the contrary.  But the allegations against Scolnik are weaker.  The SEC evidently pegs liability to Scolnik's role as a liaison between BellSouth and StarMedia, relaying to StarMedia the investors' requests for more information, and then forwarding that information to BellSouth once she received it.  But the amended complaint is extremely vague on this point.  It calls Scolnik a "conduit" who sent unidentified "financial

---

misstatements in a group-published document if the SEC could show that they were "involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by [the company] during the class period."  *In re Scholastic Corp.*, 252 F.3d 63, 76 (2d Cir. 2001).  The SEC has not shown that yet, but at the pleading stage, it does not have to.  It may rely on the group pleading doctrine—a presumption that group-published documents are the "collective work of those individuals with direct involvement in the everyday business of the company."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (citation omitted).  The doctrine applies to high-level corporate insiders like Chen and Espuelas.

information" to the investors (*id.* ¶ 118), but it does not say she ever forwarded

StarMedia's *revenue numbers* from 2000 and 2001.  That allegation is only directed

against defendants Jack C. Chen ("Chen") and Fernando J. Espuelas ("Espuelas").  (*Id.* ¶

119.)  If the SEC means to suggest that Chen and Espuelas presented the revenue

information to the investor group by way of Scolnik, it never says so.  Accordingly, the

Court finds that the amended complaint alleges the BellSouth misstatements with

particularity against Chen and Espuelas but not Scolnik.


**B.     The Complaint Properly Pleads Scienter for Espuelas and Chen but not for Scolnik**

Scienter may be established either by facts that show "the defendants had both

motive and opportunity to commit fraud" or by facts that "constitute strong circumstantial

evidence of conscious misbehavior or recklessness."[11]  *Acito v. IMCERA Group, Inc.*, 47

F.3d 47, 52 (2d Cir. 1995).  The Court previously found scienter lacking.  The original

complaint did allege GAAP violations, but it did not allege that the defendants possessed

a high level of accounting expertise; that they were familiar with the specific accounting

rules that governed the recognition of barter revenue; or that the accounting rules were

simple or straightforward to apply.  *Espuelas*, 579 F. Supp. 2d at 478.

The amended complaint supplies the SEC with two additional scienter arguments.

First, the SEC argues that Espuelas and Chen had a motive and opportunity to commit

fraud because they used inflated StarMedia stock as collateral for lines of credit.  (Pltf.'s

---

[11] In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Supreme Court held that in order to plead a "strong inference of fraudulent intent" under the PSLRA, the complaint must plead sufficient facts for a reasonable person to "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 2510.  As the Court said in *Espuelas I*, the *Tellabs* standard may not apply to non-PSLRA cases like this one.  *Espuelas*, 579 F. Supp. 2d at 470 n.3.  As the Court would reach the same conclusions even if *Tellabs* did apply, it need not resolve the issue here.

Opp. 38.)  Second, it argues that Espuelas, Chen, and Scolnik were either aware or recklessly unaware that StarMedia's disclosures misstated the amount of the company's barter revenue and thus misstated the percentage of revenue attributable to barter transactions.  (*Id.*)

### 1.      Motive and Opportunity

Motive and opportunity entail the prospect of "concrete and personal" benefits for the defendant.  *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000); *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  Thus a plaintiff must do more than merely charge a "motive[] possessed by virtually all corporate insiders." *Novak*, 216 F.3d at 307; *see Acito*, 47 F.3d at 54 ("the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter"); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008) (plaintiff cannot allege motive simply by pointing to "the universal incentive of corporate officers to increase stock prices").

Given these standards, the SEC has failed to adequately allege motive and opportunity as to Espuelas or Chen.  The SEC alleges that these defendants used StarMedia stock as collateral for lines of credit.  This demonstrates that Espuelas and Chen had an incentive to increase StarMedia's stock price, but that makes them no different from any other corporate executive whose compensation is tied to stock price. The Second Circuit has clearly said that such an incentive cannot give rise to an inference of fraud.  *See Acito*, 47 F.3d at 54.  Otherwise, pleading scienter for most corporate executives would be nothing more than a formality.

### 2.      Conscious Misbehavior or Recklessness

The SEC also contends that it has established scienter based on the circumstantial evidence that Espuelas, Chen, and Scolnik engaged in conscious misconduct or recklessness.  A plaintiff may state a securities fraud claim based on recklessness when it specifically alleges that defendants knew or had access to information contradicting their public statements.  *Novak*, 216 F.3d at 308.  It may also be enough to allege facts that suggest defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Id.* at 309.

In *Espuelas I*, the Court rejected the SEC's argument that defendants knew or should have known that the accounting for these transactions violated GAAP.  But while "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," *Espuelas*, 579 F. Supp. 2d at 474, the SEC now alleges more.  It asserts not just accounting violations but also the misrepresentation of barter as non-barter.  In view of these additional allegations, the Court concludes that scienter has been properly alleged for Espuelas and Chen, but not Scolnik, with respect to the barter transactions, and for Chen with respect to the insider trading claim.

### a.      Barter Transactions

*Espuelas and Chen*

StarMedia statements attributable to Chen and Espuelas make specific representations about the amount of StarMedia's barter revenue and the ratio of its barter to cash revenue.  First, Chen and Espuelas both signed StarMedia's 2000 10-K, which allegedly misrepresented the amount of barter revenue generated that year.  Second, they were involved in negotiating and approving an agreement with the BellSouth investor

group that vouched for the accuracy of the company's SEC filings—including the 2000 10-K and the 10-Qs for the first two quarters of 2001, which allegedly understated both the amount of barter revenue and the ratio of barter to cash revenue. On the SEC's allegations, Chen and Espuelas knew or should have known that these representations were material and that they were false. The representations were material because, as Chen and Espuelas should have known, the extent of the company's barter revenue, as opposed to its cash revenue, was important to members of the investing public. That explains why StarMedia consistently segregated barter revenue in public disclosures: in its March 1999 registration statement,[12] in its May 1999 prospectus,[13] in its 10-K for the 2000 fiscal year (*see supra* Background, at 8–9), and in its 10-Qs for the first two

---

[12] The registration statement StarMedia filed with the SEC for its initial public offering disclosed the following:

> Revenues from barter transactions are recognized during the period in which the advertisements are displayed on the Company's Network. Barter transactions are recorded at the lower of estimated fair value of the goods or services received or the estimated fair value of the advertisements given. For the year ended December 31, 1997, substantially all of the Company's revenues were derived from barter transactions. For the year ended December 31, 1998, revenues derived from barter transactions, were approximately $2.4 million.

StarMedia Network, Inc. March 18, 1999 Form S-1 Registration Statement, at F-7 (available at http://www.sec.gov/Archives/edgar/data/1057334/0001047469-99-010390.txt). Chen and Espuelas both signed that statement. *See id.* at II-3.

[13] The company's prospectus, filed in May of 1999, disclosed that,

> [f]or the year ended December 31, 1997, substantially all of the Company's revenues were derived from barter transactions. For the year ended December 31, 1998 and the three months ended March 31, 1998 and 1999, revenues derived from barter transactions, were approximately $2.4 million, $224,000 and $424,000, respectively. . . . For the period from March 5, 1996 (date of inception) to December 31, 1996, the years ended December 31, 1997 and 1998 and the three months ended March 31, 1998 and 1999, advertising expense amounted to approximately $0, $1,610,000, $21,246,000, $1,068,000 and $5,380,000, respectively. For the years ended December 31, 1997 and 1998 and the three months ended March 31, 1998 and 1999, advertising expense includes approximately $460,000, $2.4 million, $224,000 and $424,000 of charges related to barter advertising transactions.

StarMedia Network, Inc. May 25, 1999 Prospectus, at F-7, F-8–F-9 (available at http://www.sec.gov/Archives/edgar/data/1057334/0001047469-99-022290.txt).

quarters of 2001.[14]  In its 2001 10-Qs, StarMedia also included year-over-year

breakdowns of the ratio of barter to cash revenue.  Its first-quarter 10-Q reported that

"barter revenue[s] for the three months ended March 31, 2001 and 2000 were 21% and

14%, respectively."  StarMedia Network, Inc. April 15, 2001 Form 10-Q, Report for 1st

Quarter 2001, at 11 (available at http://www.sec.gov/Archives/edgar/data/1057334/

000091205701516232/000912057-01-516232.txt).  Its second-quarter 10-Q stated that

"barter revenues for the three months ended June 30, 2001 and 2000 were 25% and 14%,

respectively. . . . Barter revenues for the six months ended June 30, 2001 and 2000 were

23% and 14%, respectively."  StarMedia Network, Inc. August14, 2001 Form 10-Q,

Report for 2nd Quarter 2001, at 10, 12 (available at http://www.sec.gov/Archives/edgar/

data/1057334/000091205701528679/0000912057-01-528679.txt).[15]  In addition to these

disclosures, StarMedia's own "Standard Business Practices" policy, which the SEC

---

[14] The company's 10-Q for the first quarter of 2001 reported that,

> [f]or the three months ended March 31, 2000 and 2001, revenue derived from advertising barter transactions were approximately $1.4 million and $2.1 million, respectively.  For the three months ended March 31, 2000 and 2001, revenue derived from service barter transactions were approximately $0 and $1.3 million, respectively. . . . Barter revenue for the three months ended March 31, 2001 and 2000 were 21% and 14%, respectively.

StarMedia Network, Inc. April 15, 2001 Form 10-Q, Report for 1st Quarter 2001, at 5, 11 (available at http://www.sec.gov/Archives/edgar/data/1057334/000091205701516232/000912057-01-516232.txt).  And StarMedia's 10-Q for the second quarter of 2001 disclosed that,

> [f]or the three months ended June 30, 2001 and 2000, revenues derived from barter transactions were approximately $3.6 million and $1.9 million, respectively.  For the six months ended June 30, 2001 and 2000, revenues derived from barter transactions were approximately $7.0 million and $3.4 million, respectively. . . . Barter revenues for the three months ended June 30, 2001 and 2000 were 25% and 14%, respectively. . . . Barter revenues for the six months ended June 30, 2001 and 2000 were 23% and 14%, respectively.

StarMedia Network, Inc. August14, 2001 Form 10-Q, Report for 2nd Quarter 2001, at 3–4, 10, 12 (available at http://www.sec.gov/Archives/edgar/data/1057334/000091205701528679/0000912057-01-528679.txt).

[15] The SEC does not claim that Chen and Espuelas are liable for misstatements in the 10-Qs, documents they did not sign.  Still, statements about barter revenue in these filings provide additional support for the theory that StarMedia executives, including Chen and Espuelas, knew or should have known that barter revenue was a category of some significance.

repeatedly refers to in its amended complaint, states that the company "should only engage in high quality barter" and "[t]he percentage of barter to total revenue should be less than 9%." (*See* Defs.' Reply Ex. A, at 6.)[16]  In short, StarMedia's barter revenue mattered to investors, and employees understood this fact.

Espuelas and Chen should also have known that StarMedia's representations of barter revenue were misleading in that they omitted revenue from the base book and incremental revenue transactions.  This conclusion follows from four premises, each alleged in the amended complaint: that Espuelas and Chen understood barter; that they should have recognized base book and incremental revenue transactions as barter; that they failed to record the barter features (i.e., the reciprocal nature) of the agreements underlying these transactions; and that they knew that, without such a record, the company's revenue from the transactions would misleadingly be characterized as non-barter.

First, even if they lacked the expertise to properly account for these transactions, Espuelas and Chen should have recognized the transactions as barter.  While accounting for barter may be complex, the concept of barter itself is not.[17]  *Cf. In re Bristol-Myers Squib Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (scienter properly alleged where a simple fact, like the return rate on consignment sales, was misrepresented, but not where hard-to-apply accounting rules were violated).  Moreover, Chen and Espuelas were top executives of an Internet company that relied heavily on barter for its revenue

---

[16] The Court may consider the contents of the policy on this motion because the amended complaint "relies heavily on its terms and effect."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[17] At oral argument, defendants' counsel disagreed.  (Tr. of Feb. 17, 2010 Hearing ("Tr.") 10 ("What is a barter . . . was evolving and not straightforward.  It was complex.").)  But counsel's reason was that this question—whether or not a transaction counts as barter—"is complex accounting" that was evolving at the time.  (Tr. 11.)  The Court is not persuaded.  It is relatively easy to tell that the reciprocal arrangements at issue are barter.  It may require more accounting knowledge to know how to account for the revenue from them.

stream.  (Am. Compl. ¶ 44.)  Both were familiar with StarMedia documents that discussed barter.  Both, for example, signed StarMedia's registration statement, which (1) described the company's barter arrangements with media companies; (2) disclosed the company's accounting for barter transactions; (3) disclosed that StarMedia had derived $2.4 million in revenue from barter in 1998, and (4) stated that some of its revenues had come from reciprocal advertising agreements that generated no cash revenue.  (*Id.*)  In an indication that he was familiar with barter, Espuelas told analysts in 2000 that the company's revenue was "surging" and that barter would likely fall "below 10 percent [of total revenue] by the end of the year."  (*Id.* ¶ 46.)  In view of the defendants' extensive exposure to the concept, the Court is skeptical that they failed to comprehend what a barter transaction is.

Second, if Chen and Espuelas understood the nature of barter, they also should have understood that the deals StarMedia struck with MVS/HMP were barter transactions.[18]  In the base book transactions, AdNet sold advertising to MVS/HMP, which bought advertising back in exactly the same amount.  Cash changed hands, but only nominally: the agreement between AdNet and MVS/HMP required that the parties buy and sell the same dollar amount of services to each other.  The incremental revenue transactions worked similarly; AdNet sold MVS/HMP advertising, and MVS/HMP bought advertising back in the same amount, although it did so incrementally over time.

---

[18] Defendants emphasize that StarMedia's CFO approved the accounting for the transactions.  (Tr. 11, 13.)  From this they evidently want the Court to infer that Chen and Espuelas were guileless victims of the CFO's assurances.  (*See* Tr. 11 (defendants' counsel stated that "the inference is actually that the CEO, and the president relying upon the CFO, are signing that public filing because they understand the CFO has signed off on the accounting").)  Perhaps, but the opposite inference—that they were willful or willfully blind co-conspirators—is also plausible.  (*See id.* 22 (SEC stated that "[w]e allege that the CFO . . . was part of the arrangement, working with Chen and Espuelas to inflate the revenue").)  Executives cannot always insulate themselves from liability for securities fraud simply by claiming that the CFO said it was okay.

Third, Espuelas and Chen allegedly did not record all aspects of the agreements underlying the base book and incremental transactions.  (Am. Compl. ¶ 72.)  Such a claim supports an inference of scienter.  *See Espuelas*, 579 F. Supp. 2d at 483 ("The act of concealing information or failing to document agreements . . . can also give rise to a strong inference of fraudulent intent."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("[D]efendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness.").  That is particularly true where, as here, defendants are said to have known StarMedia's policy that all aspects of sales contracts must be in writing.  (*See* Am. Compl. ¶ 67.)

The fourth premise that supports scienter is self-evident.  Given their knowledge that the reciprocal aspects of the transactions were unrecorded, Espuelas and Chen should have known that the company would report revenue from the transactions as if they were ordinary ad sales, and thus its disclosures of the amount and percentage of barter revenue would be wrong.  Taken together, all of these allegations suffice to establish scienter for Espuelas and Chen with regard to the base book and incremental revenue transactions.  Accordingly, the Section 17(a), Section 10(b), and Rule 10b-5 claims against them will not be dismissed.

*Scolnik*

The SEC bases its Section 17(a), Section 10(b), and Rule 10b-5 claims against Scolnik on her role in the incremental revenue transactions.  But this role is no more fleshed out in the amended complaint than it was originally.  Scolnik is alleged, along with Kampfner, to have had "initial discussions with Möller" about possible ways to boost revenue in late 2000.  Searching for ways to meet revenue targets, however,

"contributes little to a strong inference [of fraud] because such actions are common practice." *Espuelas*, 579 F. Supp. 2d at 474; *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegations that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness."). And the amended complaint alleges nothing else about Scolnik's role in the transactions besides a conclusory statement that she "knew that not all material aspects of the incremental revenue transactions had been memorialized." (Am. Compl. ¶ 80). Faced with such thin allegations, the Court is compelled to dismiss the complaint.

### b.    Insider Trading

Sections 17(a) and 10(b) and Rule 10b-5 prohibit corporate officers, directors, and insiders from trading securities of the company "on undisclosed material non-public information in certain circumstances." *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 168–169 (2d Cir. 1999); *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008) (standards for insider trading are the same under Rule 10b-5 and Section 17(a)). Allegations of insider trading must meet the scienter requirements of Section 10(b) and 17(a)(1). *See SEC v. Drescher*, No. 99-1418, 1999 U.S. Dist. LEXIS 16033, at *9 (S.D.N.Y. Oct. 18, 1999). Here, Chen sold StarMedia stock in late 2001. In doing so, he allegedly traded on his knowledge that StarMedia's public disclosures were materially misleading about the amount and percentage of the company's barter revenue in 2000 and 2001. The Court has already concluded that, taking the SEC's allegations as true, Chen knew or should have known that the company's statements were misleading.

Chen's recklessness just as easily supports an inference of scienter with respect to the insider trading charges.  Accordingly, that claim withstands dismissal.

### III.  Aiding and Abetting Violations of Section 10(b), Rule 10b-5, and Section 17(a)

Pursuant to Section 20(e) of the Exchange Act, the SEC alleges that Kampfner aided and abetted StarMedia's direct violations of Section 10(b) and Rule 10b-5.  (Am. Compl. ¶ 130.)  A 20(e) claim "must allege (1) a primary violation of the Exchange Act, (2) actual knowledge[19] of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation."  *Espuelas*, 579 F. Supp. 2d at 483–84.

The Section 20(e) claim against Kampfner relates to her roles in the incremental revenue and contingent revenue transactions.  As to the incremental revenue transactions, the SEC's allegations are thin.  Kampfner supposedly had "initial discussions with Möller" about possible transactions that StarMedia and MVS/HMP could engage in to boost StarMedia's revenue.  Later she said she understood that StarMedia had agreed to Möller's proposal to engage in incremental revenue transactions.  (Am. Compl. ¶¶ 57, 59, 61.)  The amended complaint adds that Kampfner "knew that not all material aspects of the incremental revenue transactions had been memorialized, disclosed to the public, or communicated to the finance department."  (*Id.* ¶ 80.)  But it provides no factual support for its conclusory statement that Kampfner knew the transactions were not fully "memorialized."  Kampfner's alleged role in these transactions was extremely limited.

---

[19] As the Court noted in *Espuelas I*, this district is divided on whether the standard is recklessness or actual knowledge.  The Court held that it is the latter.  *Espuelas*, 579 F. Supp. 2d at 471; *accord SEC v. Stanard*, No. 06-7736, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009) (Lynch, J.); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 382–84 (S.D.N.Y. 2006).

Nothing in the allegations suggests that Kampfner knew how the transactions were reported to the finance department or the public.[20]  Accordingly, her limited involvement in the incremental revenue transactions cannot support a Section 20(e) claim.

The SEC's allegations regarding the contingent revenue transactions, however, are more substantial.  The SEC claims that Kampfner actively participated in the so-called contingent transactions with AMG and Danone—transactions that generated very little revenue (in AMG's case) or none at all (in Danone's).  (*See id.* ¶¶ 47, 73.)  The allegations are strongest with respect to the Danone transactions.  These transactions were in effect sales incentives to encourage Danone to select StarMedia for a "large project involving a range of Internet services in Latin America."  (*Id.* ¶ 50.)  As an incentive, defendant Blacker, "with Kampfner's knowledge and consent," offered $500,000 of Internet services to Danone "at no charge."  (*Id.*)  Then, with Kampfner's "knowledge and consent," Blacker got Danone to sign an insertion order as if this were an ordinary sale, and he had that order submitted to StarMedia's finance department.  (*Id.* ¶ 51.)  This happened twice, in the second and fourth quarters of 2000.  According to the amended complaint, Kampfner knew that StarMedia recorded revenue from these transactions because (1) she knew that the insertion orders submitted to the finance department omitted the fact that the services were free (*id.* ¶¶ 51, 73), and (2) she received revenue reports that included the Danone transactions as revenue (*id.* ¶¶ 54, 56, 73, 81, 98, 107).  Moreover, Kampfner allegedly knew that the revenue recorded from

---

[20] The amended complaint alleges that Kampfner "assisted the finance department in resolving issues concerning sales documentation and the resulting expense recognition."  (Am. Compl. ¶ 81.)  "As a result," the amended complaint continues, "Kampfner had specific knowledge of the revenue recognized from the incremental revenue transactions and the contingent transactions . . . ."  (*Id.*)  This hardly follows.  The SEC does not say how or to what extent Kampfner assisted the finance department.  Nor does it allege that Kampfner assisted the finance department in resolving issues relating to the incremental revenue or the contingent transactions.

these transactions was reflected in StarMedia's SEC filings.  (*Id.* ¶ 56.)  From these allegations it is plausible to infer that Kampfner knew what the SEC alleges she knew: that StarMedia's SEC filings were misleading because they reported StarMedia's giveaways of its services to Danone as revenue.

Kampfner argues that the SEC still fails to allege that she actually knew the recognition of revenue from the AMG and Danone transactions was improper.  But the SEC's pleading burden, even after *Twombly* and under Rule 9(b), does not require all that Kampfner demands of it.  Although there is some language in the Court's previous opinion regarding the SEC's failure to assert that Kampfner possessed accounting expertise, the Court did not say a defendant must always have accounting knowledge or accounting expertise to have actual knowledge of an accounting violation.  If that were true, even the most egregious violation of revenue recognition principles—recognizing revenue from a transaction that never happened, for example—would not give rise to an inference of actual knowledge of an accounting violation, unless accounting knowledge were also alleged.  Pleading standards are not that stringent.  Although the Court found the SEC's original allegations inadequate to support an inference that Kampfner acted with actual knowledge, *see Espuelas*, 579 F. Supp. 2d at 484, the SEC has now strengthened those allegations enough for its Section 20(e) claim against Kampfner to survive dismissal.

Kampfner also argues that, even if the SEC has alleged actual knowledge, it has not alleged her substantial assistance in the primary violation.  Substantial assistance "requires a showing that 'the aider and abettor proximately caused the harm to [the victim] on which the primary liability is predicated.'"  *SEC v. DiBella*, 587 F.3d 553, 566

(2d Cir. 2009) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57,

62 (2d Cir. 1985)).  "A defendant provides substantial assistance only if she affirmatively

assists, helps conceal, or by virtue of failing to act when required to do so enables the

fraud to proceed."  *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256

(S.D.N.Y. 2005) (Lynch, J.).  Inaction can be enough if it was "designed intentionally to

aid the primary fraud or it was in conscious or reckless violation of a duty to act."  *SEC v.

Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) (quoting *Armstrong v. McAlpin*,

699 F.2d 79, 91 (2d Cir. 1983)).

Courts in this district have allowed aiding and abetting claims to survive dismissal

in circumstances similar to those the SEC has alleged here.  In *Winnick*, for example,

Judge Lynch said that a defendant's "direct[] involve[ment] in bringing about—including

negotiating—transactions, which while not themselves necessarily fraudulent, [we]re

alleged to have been carried out solely for the purpose of inflating revenue[,] . . . could

reasonably be understood as a proximate cause" of the fraud.  *Winnick*, 406 F. Supp. 2d at

257.  And in *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454 (S.D.N.Y.

2004), an aiding and abetting claim survived dismissal based on allegations that the

defendant executive "facilitat[ed]" an arrangement that allowed his company to engage in

"market timing" activities inconsistent with its public disclosures, and that he failed to

correct misleading statements in his funds' disclosures regarding market timing.  *Id.* at

468.[21]  As in *Winnick*, Kampfner is alleged to have negotiated transactions that, while not

themselves fraudulent, were executed and recorded so as to improperly inflate

StarMedia's revenue.  And, as in *Pimco Advisors*, Kampfner allegedly facilitated

---

[21] Although these cases predated *Twombly*, Kampfner does not contend that the standard for substantial
assistance has changed since that decision.

transactions with the purpose of generating phantom revenue: she helped Blacker negotiate the Danone transactions (Am. Compl. ¶ 50), and she decided, with Scolnik and Blacker, to go forward with the AMG and Danone transactions (*id.* ¶¶ 47, 50). Moreover, Kampfner's alleged inaction—her failure to report the circumstances of these transactions to StarMedia's finance department—was intentionally designed to aid the fraud. *See Treadway*, 430 F. Supp. 2d at 339. Had Kampfner, Scolnik, or Blacker told the finance department that StarMedia was giving away, rather than selling, services to Danone, the finance department would presumably have recorded no revenue. Instead, the finance department's ignorance of the true nature of the transactions led it to record revenue that did not exist.

Kampfner cites *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326 (S.D.N.Y. 2006), as an example of a court's refusing to find substantial assistance. But *Cedric Kushner* is a very different case. There, the SEC alleged that a company's former director and then-consultant had aided and abetted its misstatement of certain information, including cash flows and operating expenditures, in an SEC filing. *Id.* at 327. The court in *Cedric Kushner* found that the SEC's allegations did not even raise a triable issue of fact that the defendant acted recklessly (much less with actual knowledge). *Id.* at 335 ("The SEC has not made the slightest showing that [the defendant] was involved with any of the subjects . . . which turned out to be falsely presented."). Nor did its allegations demonstrate that the defendant substantially assisted in the fraud—his only involvement in preparing the SEC filing was to gather "backup documentation" for auditors and to answer questions about unrelated "events and pending litigation" against the company. *Id.* at 336. Kampfner's alleged involvement in the

questionable arrangements with Danone and AMG was much more significant.  The SEC

alleges that Kampfner helped to negotiate the transactions; consented to them; and

intended that revenue be reported from them, even though she knew that revenue

recognition would be improper.  Accordingly, the Court finds that the SEC has

sufficiently alleged Kampfner's substantial assistance in the primary Section 10(b)

violations for this claim to withstand dismissal.

## IV.    Violations of Section 13 of the Exchange Act

### A.    Aiding and Abetting StarMedia's Reporting and Record-Keeping Violations

The SEC alleges that all the Moving Defendants aided and abetted StarMedia's

violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

thereunder, which proscribe the filing of false or misleading statements in annual and

quarterly SEC filings.  15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.12b-20, 13a-1, 13a-13.[22]

The SEC further alleges that the Moving Defendants aided and abetted StarMedia's

violation of Section 13(b)(2)(A); that provision requires issuers subject to the Exchange

Act's provisions to "make and keep books, records, and accounts, which . . . accurately

and fairly reflect their transactions and dispositions of their assets."  15 U.S.C. §

78m(b)(2)(A).  As mentioned above, an aiding-and-abetting claim must allege a primary

violation, actual knowledge of the violation, and substantial assistance in the violation.

*Id.* at 483–84.

---

[22] Section 13(a) requires issuers of securities to file the information, documents, and annual and quarterly
reports prescribed by the SEC.  15 U.S.C. § 78m(a).  Rules 13a-1 and 13a-13 require issuers to file annual
and quarterly reports, respectively.  17 C.F.R. §§ 240.13a-1, 13a.  Rule 12b-20 requires that issuers add
"such further material information, if any, as may be necessary to make the required statements, in the light
of the circumstances under which they are made, not misleading."  17 C.F.R. § 240.12b-20.

From the amended complaint it is plausible to infer Kampfner's and Scolnik's actual knowledge that StarMedia misstated its revenue from the contingent transactions. As the Court explained above, *see supra* Part III, Kampfner allegedly knew that the transactions would generate only contingent revenue or none at all, and that the company improperly recorded and reported revenue from them as if they were ordinary sales. These are sufficient facts from which to infer her actual knowledge of reporting and record-keeping violations. The same is true for Scolnik (*see* Am. Compl. ¶¶ 47, 48, 49, 50, 51, 54, 56, 73, 74, 82, 94, 95, 100), against whom the SEC makes substantially similar allegations. *See Espuelas I*, 579 F. Supp. 2d at 484 ("the allegations concerning the contingent transactions almost never distinguish between" Scolnik and Kampfner). In the same vein, the SEC has adequately alleged that Kampfner and Scolnik substantially assisted in the primary violations of Section 13. On the SEC's allegations, Kampfner and Scolnik negotiated and approved the AMG and Danone transactions, and they knew that, unless they provided full information about the transactions to the finance department, revenue would be recognized from them. At the pleading stage, these allegations are sufficient to establish that Kampfner and Scolnik provided substantial assistance in StarMedia's improper record-keeping and reporting of its revenues.

It is also plausible to infer from the amended complaint that Chen and Espuelas were aware of StarMedia's misstatements of barter revenue. Both defendants are alleged to have understood the nature of barter transactions; to have agreed to the base book and incremental revenue transactions without recording the fact that those transactions contained reciprocal obligations; and to have signed off on company reports that omitted

these transactions from their disclosures of barter revenue.[23]  For these reasons the aiding and abetting claims against these four defendants will survive.

## B.    Record-Keeping Violations

The SEC also alleges that the Espuelas, Chen, and Kampfner themselves[24] violated Rule 13b2-1, which provides that "no person shall, directly or indirectly, falsify or cause to be falsified any book, record or account subject to section 13(b)(2)(A)."[25]  17 C.F.R. § 240.13b2-1.  Primary violations of Rule 13b2-1, as the Court noted in *Espuelas I*, do not require an allegation of scienter.  *See Espuelas*, 579 F. Supp. 2d at 486 (citing *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998)).  Instead, "liability is predicated on standards of reasonableness." *Espuelas*, 579 F. Supp. 2d at 486 (quoting *SEC v. Softpoint*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997)).

A properly supported allegation of recklessness suffices to allege unreasonableness.  *See Espuelas*, 579 F. Supp. 2d at 486 (citing *Novak*, 216 F.3d at 308 (defining reckless conduct as "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care")).  As the

---

[23] Defendants do not suggest that the allegations against Chen and Espuelas fail the third requirement of the aiding-and-abetting test: that the defendants substantially assisted in the fraud.  Substantial assistance generally exists where: "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Rosner v. Bank of China*, No. 06-13562, 2008 WL 5416380, at *5 (S.D.N.Y. Dec.18, 2008) (internal quotation marks and citations omitted).  The allegations against Chen and Espuelas easily satisfy this test.  These defendants' alleged knowledge that a transaction should have been recorded as barter, together with their failure to record it as such, proximately caused the understatement of barter revenue in StarMedia periodic reports.

[24] The SEC also alleges that Scolnik violated Rule 13b2-1 by virtue of her involvement in the contingent revenue transactions.  Because the Court has already ruled that this claim survives dismissal, defendants do not move to dismiss it here.  (*See* Defs.' Mem. 51 n.20.)

[25] Kampfner argues that the amended complaint only asserts aiding and abetting claims under Rule 13b2-1, rather than primary violations of the Rule.  (Defs.' Mem. 57 n.22.)  As support it cites *Espuelas I*, wherein the Court noted that the SEC's briefs (not its complaint) betrayed some confusion on this score.  Even so, the Court assumed that the SEC's intent was to allege primary violations. *Espuelas I*, 579 F. Supp. 2d at 486.  In any event, the SEC now leaves no doubt that it means to assert primary liability claims.  (*See* Pltf.'s Opp. 40 n.23.).

Court has already found, the amended complaint properly pleads that Kampfner, Chen, and Espuelas acted recklessly—Kampfner with regard to the contingent transactions, and Chen and Espuelas with regard to the incremental revenue and base book transactions. Thus the motion to dismiss the Rule 13b2-1 claims is denied with respect to all Moving Defendants.

### C.      False Statements to Auditors

Finally, the SEC alleges that Chen violated Rule 13b2-2, which provides that directors or officers shall not make or cause to be made a materially misleading statement or omission to an accountant in connection with SEC filings, among other things.  17 CFR § 240.13b2-2.  Like Rule 13b2-1, 13b2-2 does not require the SEC to plead scienter. *McNulty*, 137 F.3d at 740-41.  As it did in *Espuelas I*, the Court "assumes Rule 13b2-1's reasonableness standard applies to violations of Rule 13b2-2."  *Espuelas*, 579 F. Supp. 2d at 487.

There is no question that Chen is alleged to have made materially misleading statements in the management representation letters.  Because, on these allegations, Chen knew or should have known that the statements were false or misleading, the Court has no difficulty finding that his conduct, as alleged, was unreasonable.  Accordingly, this claim survives.

## CONCLUSION

For the reasons stated above, defendants' motion **[69]** is denied as to all claims

against Chen and Espuelas, all claims against Kampfner, and the aiding and abetting

claims against Scolnik. It is granted as to the Section 17(a), Section 10(b), and Rule 10b-

5 claims against Scolnik for her involvement in the incremental revenue transactions.[26]

SO ORDERED.

Dated: New York, New York
     March **26**, 2010

Richard J. Holwell
United States District Judge

---

[26] Dismissal is with prejudice: the SEC has conducted a lengthy investigation and gotten its two bites at the apple. At this point, amendment would be futile.

34