UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

                                                              06 Civ. 2435 (RJH)

                                                              <u>**MEMORANDUM OPINION
                                                              AND ORDER**</u>

FERNANDO J. ESPUELAS, JACK C. CHEN,
STEVEN J. HELLER, PETER R. MORALES,
WALTER MÖLLER, BETSY D. SCOLNIK,
ADRIANA J. KAMPFNER, and PETER E.
BLACKER,

                              Defendants.

----------------------------------------

Richard J. Holwell, District Judge:

This is third motion to dismiss in this enforcement action by the Securities

Exchange Commission ("SEC") against former executives of StarMedia Network, Inc.

("StarMedia" or the "Company") for accounting fraud.  The SEC alleges violations of

Sections 10(b), 13(a), 13(b)(2)(A), and 20(e) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78t(e); and Rules

12b-20, 13a-1, 13a-13, 13b2-1, and 13b2-2 thereunder, 17 C.F.R. §§ 240.12b-20,

240.13a-1, 240.13a-13, 240.13b2-1, and 240.13b2-2.  This Court initially dismissed many

of the SEC's claims against several defendants but found that the SEC's original

complaint stated claims against defendant Peter M. Morales.  *See SEC v. Espuelas*, 579 F.

Supp. 2d 461 (S.D.N.Y. 2008) ("*Espuelas I*").  The SEC filed an amended complaint and,

with a few exceptions not relevant here, denied a motion by defendants other than

Morales to dismiss the claims against them.  *See SEC v. Espuelas*, 698 F. Supp. 2d 415 (S.D.N.Y. 2010) ("*Espuelas II*").  Now before the Court is a motion by Morales for judgment on the pleadings as to the claims against him on the ground that the content of the amended complaint vitiates the basis on which the Court denied his motion to dismiss the original complaint.  For the reasons set forth below, the motion is denied.

## BACKGROUND

The SEC's original allegations are set forth in the Court's prior opinions in *Espuelas I* and *Espuelas II*, familiarity with which is assumed.  The following allegations are relevant to disposition of the instant motion and taken as true for that purpose.  *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

StarMedia was an Internet portal focused on Spanish- and Portuguese-speaking markets.  (Am. Compl. ¶ 24.)  Defendant Morales served as Controller and Vice President, Finance for StarMedia from June 1998 through November 2001.  (*Id.* ¶ 22.)[1] In 2000, StarMedia experienced a steady decline in its stock price, "in part because of a general decline in Internet advertising revenues."  (*Id.* ¶ 37.)

---

[1] Also named as defendants in the Amended Complaint are Fernando J. Espuelas, who co-founded StarMedia in 1996 and served as its CEO from 1996 until August 2001 and Chairman of its Board of Directors until November 2001 (Am. Compl. ¶ 16); Jack C. Chen, the other co-founder, who served as StarMedia's President and a member of its Board from 1996 until August 2001, including as Vice Chairman from June to August 2001 (*id.* ¶ 17); Betsy Scolnik who served as Senior Vice President for Strategic Development and later as Executive Vice President from February 1999 through November 2001 (*id.* ¶ 19); Adriana J. Kampfner who worked for StarMedia from August 1997 through December 2001 and served as Senior Vice President, Global Sales and President of StarMedia de Mexico in 2000 and 2001 (*id.* ¶ 20); Walther Möller, President of AdNet, a subsidiary StarMedia acquired in 2000 (*id.* ¶ 21); Steven J. Heller, a Senior Vice President and CFO from 1999 to 2001 (*id* ¶ 18); and Peter E. Blacker, the Senior Vice President of Global Sales Strategy & Partnerships from 1997 to 2001 (*id.* ¶ 23). Claims remain pending against these defendants.

The SEC alleges that, in response to the decline in revenues, StarMedia developed a series of schemes to falsely inflate and improperly recognize revenue through three types of transactions, referred to by the SEC as (1) base book; (2) incremental revenue; and (3) contingent transactions.  (Am. Compl. ¶ 1.)  In late 2001, StarMedia restated its financial statements to correct the accounting for these transactions.  (Am. Compl. ¶ 3.) The allegations against Morales relate to the incremental revenue transactions.  However, because Morales essentially contends that the SEC has conflated its theories regarding the base book and incremental revenue transactions, discussion of both kinds of transactions is warranted.

**A.     The Base Book Transactions**

The essence of the base book transactions was reciprocal advertising sales.  In April 2000, StarMedia acquired AdNet S.A. de C.V. ("AdNet"), "a leading Mexican Internet search portal and Web directory", from its shareholders, the media companies Grupo MVS, S.A. de C.V. ("MVS") and Harry Möller Publicidad, S.A. de C.V. ("HMP").  (*Id.* ¶ 25.)   Prior to this acquisition, MVS, HMP, and AdNet had an agreement whereby MVS and HMP would purchase internet advertising from Adnet and AdNet would buy advertising from MVS and HMP in the same amount.  (*Id.* ¶ 31.) Because AdNet was obligated to pay MVS and HMP exactly what MVS and HMP paid AdNet, neither party generated any cash revenue on the transactions.  (*Id.* ¶ 33.) However, the services that MVS and HMP purchased from AdNet pursuant to this arrangement accounted for 60% of AdNet's revenue.  (*Id.* ¶ 31.)  In acquiring AdNet, Star Media agreed to continue the arrangement and to retain defendant Walther Möller,

whose family owned HMP, as President of AdNet to maintain the relationships between MVS, HMP, and AdNet.  (*Id.* ¶¶ 32-33.)

StarMedia reported revenue from advertising sales to MVS and HMP in late 2000 and the first two quarters of 2001.  (*Id.* ¶¶ 31, 33, 39, 52, 72, 86, 103.)  The SEC alleges that, because MVS and HMP purchased advertising in exchange for receiving an identical dollar amount in purchases by AdNet, accounting for sales to MVS and HMP as equivalent to cash revenue was improper.  Indeed, StarMedia later wrote off more than 90 percent of the revenue it had previously reported from the transactions.  (*Id.* ¶¶ 3, 43-45.)

**B.      Incremental Revenue Transactions**

The incremental revenue transactions occurred in the fourth quarter of 2000 and the first two quarters of 2001, and all defendants allegedly took part in them.  (*Id.* ¶¶ 4, 57–71, 88–93, 104.)  These transactions were similar to the base book transactions in that they involved transfers of money from StarMedia, through AdNet, to MVS and HMP in amounts equal to advertising purchased by MVS and HMP from AdNet.   However, whereas the SEC alleges that the base book transactions involved reciprocal purchases of advertising, the SEC alleges that the incremental revenue transactions involved an agreement to purchase unspecified "services" from HMP and MVS.  (Am. Compl. ¶ 65.) Indeed, the SEC merely alleges that "MVS and HMP purchased the ad space in exchange for StarMedia's promise to provide them with funds in an amount equal to the advertising purchases."  (*Id.* ¶ 4.)

StarMedia management developed these transactions in late 2000 after it learned that revenues would fall significantly short of both internal and analyst expectations.  (*Id.* ¶ 57.)  To fill the gap, StarMedia management decided to leverage Möller's family

connections with MVS and HMP to increase revenue.  (*Id.* ¶¶ 57, 59.)  On November

29, 2000, Möller sent an e-mail to Steven J. Heller, StarMedia's CFO and Morales's

superior, in which Möller diagrammed what would come to be called the "incremental

revenue" transactions:  StarMedia would make capital contributions to AdNet; AdNet

would use the funds to purchase $3.2 million in "services" from HMP and MVS; and

HMP and MVS would direct the purchase of $3.2 million in advertising from AdNet

purportedly on behalf of HMP and MVS clients.  (*Id.* ¶¶ 60, 62.)  Some of these clients

were unaware of the purchases, while others knew but did not care because it was MVS

and HMP who were actually paying for the advertising.  (*Id.* ¶ 65.).

Morales was "not involved in the negotiations of the incremental revenue

transactions."  (*Id.* ¶ 70.)  Rather, Morales "learned about the scheme from Heller" at

some time between November 29 and December 4, 2000.  (*Id.*)  The SEC alleges that

"Heller first told Morales about the incremental revenue transactions" and "also told him

the planned accounting treatment for them," namely, "that StarMedia would recognize all

revenue from the transaction in the fourth quarter but defer recognition of the expenses

related to the offsetting, purchased services until the quarter in which the services were

utilized."  (*Id.*)  "Morales initially did not agree with this treatment" and "told Heller that

the transactions appeared to be barter transactions and should be classified and recorded

as such."  (*Id.*)  However, after Heller assured Morales that Heller would take care of any

issues raised by the company's auditors, "Morales relented" and on December 4 at

Heller's direction, "approved the wire transfer of $345,000 from StarMedia directly to

HMP", a payment that "provided the initial funds used to capitalize the incremental

revenue transactions."  (*Id.* ¶ 71.)  Morales also later transferred $950,000 to HMP after

the close of the first quarter of 2001 "for advertising purchased pursuant to the incremental revenue transactions in that quarter" and, at the close of the second quarter, "directed the transfer" of $517,500 from StarMedia to AdNet and "knew that the funds were to be paid to HMP as part of the incremental revenue agreement." (*Id.* ¶¶ 93, 105.)

In reports to the SEC, StarMedia recognized and recorded $3.2 million in revenue in the fourth quarter of 2000, $2.6 million in revenue in the first quarter of 2001, and $2.6757 million in revenues in the second quarter of 2001 from the incremental revenue transactions. (*Id.* ¶¶ 67-68, 87, 103-104.)   However, in November 2001, StarMedia "wrote off the entire amounts previously reported as revenue." (*Id.* ¶ 4.)   The SEC alleges that StarMedia improperly recorded the revenue it reported regarding the incremental revenue transactions.

### C.  Motion to Dismiss the Original Complaint

The SEC alleged most of the foregoing in the original complaint filed on March 30, 2006.   That complaint alleged, *inter alia*, that StarMedia had violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder by submitting false statements to the SEC and that Morales and others had aided and abetted those violations. (Compl. ¶¶ 100-103.)   The original complaint also alleged that StarMedia had falsified its books and records in violation of Section 13(b)(2)(A), that Morales and others had aided and abetted that violation, and that Morales, among others, had personally violated Rule 13b2-1. (*Id.* ¶¶ 104-108.)   Finally, the original complaint alleged that Morales and others had made false statements to StarMedia's auditors in violation of Rule 13b2-2. (*Id.* ¶¶ 109-110.)

Morales moved [34] with his co-defendants to dismiss these claims.  In *Espuelas I,* the Court denied that motion as to Morales.  With respect to the aiding and abetting allegations, the Court found that the allegations regarding what Morales heard from Heller and how he reacted were "sufficient to demonstrate that . . . Morales had actual knowledge of StarMedia's reporting and record-keeping violations."  *Espuelas I*, 579 F. Supp. 2d at 485.  The Court also found that the complaint adequately alleged that Morales had substantially assisted the reporting violations by (1) sending the wire transfers to HMP and AdNet and (2) affirming in letters to auditors that StarMedia had disclosed all frauds and that "receivables . . . do not include amounts for . . . other types of arrangements not constituting sales" even though he knew that StarMedia was recognizing revenue that he believed should be accounted for as barter.  *Id.* at 485-486. Based on the same allegations, the Court found that the original complaint adequately alleged that Morales had acted unreasonably in causing StarMedia's books and records to be falsified in violation of Rule 13b2-1 and made false statements to StarMedia's auditors in violation of Rule 13b2-2.  *See id.* at 486-487.  However, the Court dismissed the claims against several of Morales's co-defendants without prejudice to the SEC's filing an amended complaint.  *See id.* at 488.

### D.  The Amended Complaint

On September 30, 2008, the SEC filed an amended complaint [66] alleging the same claims against the same defendants and essentially repeating the allegations against Morales made in the original complaint.  The amended complaint, however, made several additional allegations relevant here.

First, the amended complaint specified that, to the extent that StarMedia should have accounted for certain transactions as barter, StarMedia should have done so pursuant to Emerging Issues Task Force Issue No. 99-17 ("ETIF 99-17") which, according to the complaint, "essentially required that the fair value of Internet barter advertising would be determined on similar cash sales within six months before the barter transaction and that if the[re] were no comparable cash sales for similar advertising the fair value of the barter advertising 'likely will be zero.'"  (Am. Compl. ¶¶ 3, 42.)

Second, the amended complaint alleged that, although StarMedia's internal controls "requir[ed] all terms of a sales contract to be in writing," StarMedia management did not document the underlying oral agreement regarding these transactions and knew that no such documentation existed.  (*Id.* ¶¶ 67, 80, 97, 110.)   Morales and others in StarMedia's senior management received revenue reports from StarMedia's finance department but neither Morales nor his colleagues took action to reconcile these reports with what they knew about the reciprocal arrangement between AdNet, HMP, and MVS. (*Id.* ¶¶ 81, 98, 107.)   On the contrary, in connection with audits for fiscal year 2000 and the first two quarters of 2001, Morales signed letters addressed to Ernst and Young, StarMedia's outside auditor, which represented that all agreements had been disclosed and that all receivables represented valid claims rather than "other types of arrangements not constituting sales" and were "not supplemental by other agreements either written or oral."  (*Id.* ¶ 116.)  These acts and failures to act allegedly prevented StarMedia's finance department from accurately accounting for the funds received from HMP and MVS.  The SEC alleges that was all part of StarMedia's plan "to artificially inflate StarMedia's reported revenue."  (*Id.* ¶ 67.)

Third, the amended complaint elaborated on why StarMedia had improperly accounted for the incremental revenue transactions.  The amended complaint alleged that these transactions "did not have economic substance" and essentially "allowed StarMedia to fund its own revenue."  (Am. Compl. ¶¶ 4, 57, 60, 66, 93, 105.)  Indeed, the SEC affirmed as much when, in response to a motion by Morales's co-defendants to dismiss the amended complaint (which was largely denied in *Espuelas II*), the SEC argued that there was a "difference between the base book transactions and the incremental revenue transactions" apparent from StarMedia's own write-offs:  whereas StarMedia restated the base book transactions as barter pursuant to GAAP, resulting in a write-off of 90% of the claimed revenue for those transactions, StarMedia wrote off the entirety of the claimed revenue for the incremental revenue transactions as lacking in economic substance.  (SEC Opp'n Mot. to Dismiss Am. Compl. at 32-33.)  Thus, in the SEC's view, it was "[i]mplicit in StarMedia's disclosure . . . that the audit evidence of the transactions did not support a determination that the transactions should be considered barter transactions."  (*Id.* at 33.)  In sum, whereas the original complaint alleged that StarMedia had overstated the value of revenue by not accounting for it as barter, the amended complaint could be interpreted to allege that StarMedia should not have treated the incremental revenue transactions as revenue at all.

On May 7, 2010, Morales moved [116] for judgment on the pleadings as to the claims against him in the amended complaint.

## LEGAL STANDARD

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."  *Patel v.*

*Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).  "In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Id.*  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. 1949.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

        As this Court has noted, securities complaints brought by the SEC are "subject to the heightened pleading standards imposed by Rule 9(b) to the extent that they make allegations sounding in fraud." *Espuelas  I*, 579 F. Supp. 2d at 469.  Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Intent, however, may be alleged generally. *Id.*  But a plaintiff alleging claims that sound in fraud must still "allege facts

that give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Group*, 47

F.3d 47, 52 (2d Cir. 1995).

## DISCUSSION

The SEC alleges that Morales (1) aided and abetted StarMedia's violation of

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; (2)

aided and abetted StarMedia's violation of Section 13(b)(2)(A) of the Exchange Act and

personally violated Rule 13b2-1 thereunder; and (3) violated Rule 13b2-2.  The Court

addresses each claim in turn.

### A.  Aiding and Abetting StarMedia's Reporting and Record-Keeping Violations

Section 13(a) requires issuers of securities to file the information, documents, and

annual and quarterly reports prescribed by the SEC.  15 U.S.C. § 78m(a).  Rules 13a-1

and 13a-13 require issuers to file annual and quarterly reports, respectively.  17 C.F.R. §§

240.13a-1, 13a-13.  Rule 12b-20 requires that issuers add "such further material

information, if any, as may be necessary to make the required statements, in the light of

the circumstances under which they are made, not misleading."  17 C.F.R. § 240.12b-20.

As this Court has held, "[t]o state a claim that defendants aided and abetted

violations of the Exchange Act, the SEC must allege (1) a primary violation of the

Exchange Act; (2) actual knowledge of the violation by the aider and abettor, and (3) that

the aider and abettor substantially assisted the primary violation."  *Espuelas I*, 579 F.

Supp. 2d at 483-84.[2]  "The three requirements cannot be considered in isolation from one

another.  Satisfaction of the knowledge requirement will . . . depend on the theory of

---

[2] As the Court has previously noted, "this district is divided on whether the standard is reckless or actual knowledge" but the Court has held "that it is the latter."  *Espuelas II*, 698 F. Supp. 2d at 431 n.19.

primary liability, and there may be a nexus between the degree of knowledge and the
requirement that the alleged aider and abettor render substantial assistance." *SEC v.
DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal citation and quotation marks
omitted).

   In his motion, Morales does not contest that the SEC has sufficiently alleged that
StarMedia committed a primary violation and that Morales substantially assisted that
violation.   Rather, Morales takes aim at the SEC's allegations regarding scienter.
Specifically, Morales contends that "the SEC fails to allege sufficient facts in its
Amended Complaint to infer that Mr. Morales had knowledge of the allegedly fictitious,
round trip nature of the incremental revenue transactions."  (Morales Br. at 10-11.)   In
essence, Morales argues that the SEC has re-pleaded itself out of court.  That argument
runs as follows.  According to Morales, the Court concluded that it denied his motion to
dismiss the original complaint "based on its understanding that . . . these incremental
revenue transactions were barter transactions that had not been accounted for or disclosed
as barter in StarMedia's financial reporting" and its conclusion that "the SEC sufficiently
alleged in the original Complaint that Mr. Morales knew these transactions were barter . .
. ."  (*Id.* at 1.)  However, the SEC "has now amended its complaint . . . and clarified that
it does not allege that these incremental revenue transactions were barter, but that they
were fraudulent, round trip transactions without any economic substance."  (*Id.*)  The
amended complaint, however, still alleges only that Morales told Heller that the
transactions appeared to be barter and "[i]t is simply implausible to infer from the SEC's
allegation that Mr. Morales believed anything but that these transactions were

legitimate." (*Id.* at 13.)  Accordingly, the SEC has eliminated the basis for the Court's

prior ruling which is "no longer applicable." (*Id.* at 1.)

That argument tries to hit the mark by changing the target.   Morales contends that

"the SEC must allege facts from which one can reasonably infer that Mr. Morales knew

that these incremental revenue transactions were fraudulent and lacked any economic

substance." (Morales Br. at 10.)  But the SEC's claim is that StarMedia made statements

to the SEC that overstated both the amount of revenue the company earned and

understated the portion of that revenue that came from barter transactions.  The SEC

claims that those statements violated Sections 13(a) and Rules 12b-20, 13a-1, and 13a-13

thereunder.  To be liable for aiding and abetting, Morales must have known of *those*

violations.

Accordingly, the question is not whether the SEC has alleged that Morales knew

exactly how the incremental revenue transactions should have been accounted for.

(Morales Br. at 8.)   "The securities laws do not require that a defendant know the precise

accounting treatment that would have been applied before [he] can have the requisite

scienter; the SEC need only demonstrate that [a defendant] knew of facts that

contradicted the substance of the reported accounting."  *SEC v. Lucent Tech. Inc.*, 610 F.

Supp. 2d 342, 362 (D. N.J. 2009) (finding that aiding and abetting requires actual

knowledge but denying summary judgment on aiding and abetting claim that defendant

substantially assisted reporting of inflated revenue based on undocumented side deals).

Thus, the question is whether the SEC has alleged that Morales knew that StarMedia's

statements to the SEC overstated the amount of its revenue.

The answer to that question is plainly yes.  The SEC alleges that Morales had learned enough from Heller about the incremental transactions to conclude that the incremental revenue transactions should have been accounted for as barter rather than the way in which StarMedia planned to account for them.  If Morales had come to that conclusion, he would have known that StarMedia could not have reported the entire value of those transactions as revenue because ETIF 99-17 limits the amount of revenue that can be claimed from a barter transaction to equivalent cash sales within six months.  Thus Morales would have known that any statement to the SEC reporting the entire value of the incremental revenue transactions as revenue would have misleadingly overstated StarMedia's revenue.[3]

Morales does not contest that he was right that StarMedia did not properly account for the incremental revenue transactions.  Instead, Morales argues that he was right for the wrong reason.   That might have made a difference if overstating revenue that should have been accounted for as barter were not a violation of the securities laws, if StarMedia had accurately stated its revenue to the SEC, or if StarMedia's statements to the SEC were false in some other respect.  In the first case, the SEC would be proceeding against Morales for aiding and abetting a violation that does not exist.  In the second case, the SEC would be proceeding against Morales for aiding and abetting a violation that

_____

[3] Perhaps Morales could have believed that the incremental revenue transactions should have been accounted for as barter without knowing that reporting the entire value of those transactions as revenue would be misleading if he believed that StarMedia had earned or would earn cash from similar sales within six months.  But, if the complaint is to be believed, Morales could not have believed that because he received revenue reports from the StarMedia finance department.   (Am. Compl. ¶¶ 81, 98, 107.)  Given that accounting for transactions as barter led to a restatement of nearly all of its revenue, it seems reasonable to infer that the reports Morales received did not list any earned or expected equivalent cash sales.

never actually occurred.  That might not be a problem in a claim for attempt, a claim for

which "liability [is] focused upon the circumstances as the actor believes them to be

rather than as they actually exist," but that is not the SEC's claim here.  ALI, Model

Penal Code § 5.01, 2001 Commentaries.  *Cf. United States v. Williams*, 553 U.S. 285, 300

(2008) ("All courts are in agreement that what is usually referred to as 'factual

impossibility' is no defense to a charge of attempt."); *see also Untied States v. Weisser*,

417 F.3d 336, 352 (2d Cir. 2005) (noting that "[i]t is hornbook law that factual

impossibility is not a defense to a charge of attempt"); *United States v. Partida*, 385 F.3d

546, 561 (5th Cir. 2004) ("[B]ecause factual impossibility is no defense to an attempt

crime, the evidence is sufficient to show an attempt to aid and abet, despite the

defendants['] mistaken belief that actual loads of marijuana were in Quintanilla's

Suburban at the time of the escort.").   And in the third case, Morales would have

suspected a violation different than the one actually committed, which is generally

insufficient for aiding and abetting liability.  *Cf. United States v. Friedman*, 300 F.3d 111,

124 (2d Cir. 2002) ("Proof that the defendant knew that *some* crime would be committed

is not enough.") (emphasis in original).[4]

　　　　But none of those is this case.  This is not a case where Morales aided a violation

that does not exist or never actually occurred.  Here, Morales allegedly believed that

StarMedia would be misrepresenting its revenue with regard to the incremental revenue

transactions because those transactions involved reciprocal obligations.  StarMedia

allegedly did just that in violation of the securities laws.  Nor is this a case where Morales

---

[4] The Second Circuit has referred to principles normally applied in criminal law, and to
criminal cases applying those principles, in describing the principles applicable to civil
claims for aiding and abetting violations of the federal securities laws.  *See SEC v.
DiBella*, 587 F.3d 553, 566 (2d Cir. 2009).

suspected he was aiding one violation when StarMedia was actually committing another. Morales may not have known that HMP and MVS would be receiving funds for bogus services rather than for in-kind advertising, but if he believed that the incremental revenue transactions were barter, he cannot deny having known that reporting the entire value of those transactions as revenue would be misleading.  To the extent that the SEC alleges that the incremental revenue transactions were "sham" round-trip transactions, the SEC still alleges that StarMedia should not have reported as revenue the entire value of those transactions.  The only difference is that the SEC alleges that StarMedia should not have reported *any* of the value whereas Morales only knew that StarMedia should not have reported *most* of it.  Seen in that light, Morales's argument is nothing more than that he should not be liable for aiding StarMedia in making statements to the SEC that he knew were misleading because he did not know just how misleading the statements were.

But Morales should no more be absolved of providing that assistance than a defendant who asks to be absolved of providing the getaway car for a bank robbery because he did not know how much money the robbers planned to steal.  "Liability for aiding and abetting can be established by showing that the defendant joined the specific venture and shared in it," *DiBella*, 587 F.3d at 566 (applying criminal law principle to aiding and abetting civil violations of the securities laws), and Morales's claim that he did not know all the specifics of the incremental revenue transactions does not mean that he did not knowingly share in StarMedia's plan to overstate the revenue the company actually earned from those transactions.

Indeed, that becomes plain when Morales's argument is considered in light of how Morales allegedly provided substantial assistance to StarMedia's overstatement of

its revenue.  Whether the complaint sufficiently alleges that Morales knowingly provided

assistance may relate to what assistance he allegedly provided.  *Cf. DiBella*, 587 F.3d at

566 (noting that "there may be a nexus between the degree of knowledge and the

requirement that the alleged aider and abettor render substantial assistance").  Morales

does not challenge the complaint with regard to substantial assistance, but his argument

regarding scienter implies that the SEC is attempting to hold Morales liable for

mistakenly rather than knowingly providing assistance.  That is not so.

As the Court has previously noted, substantial assistance occurs where "(1) a

defendant affirmatively assists, helps conceal, or by virtue of failing to act when required

to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately

caused the harm on which the primary liability is predicated."  *Espuelas II*, 698 F. Supp.

2d at 435 n. 23 (quoting *Rosner v. Bank of China*, No. 06-13562, 2008 WL 5416380, at

*5 (S.D.N.Y. Dec. 18, 2008)); *see also Espuelas I*, 579 F. Supp. 2d at 471 ("To allege

substantial assistance, the complaint must allege that the aider and abettor's conduct was

a substantial causal factor in the perpetuation of the underlying violation.  The complaint

must also allege that the acts of the aider and abettor proximately caused the primary

violation." (internal citation omitted)).  Moreover, it is "well-settled that where there

existed a conscious or reckless violation of an independent duty to act, inaction or silence

was sufficient to create aider and abettor liability."  *Id*. at 485.

The original complaint alleged that Morales (1) wired funds to HMP and AdNet

to capitalize the incremental revenue transactions and (2) made written affirmations to

StarMedia's auditors that StarMedia had disclosed all relevant agreements and that all

receivables represented valid claims as opposed to "other arrangements not constituting

sales." (Compl. ¶¶ 47, 54, 72, 86.)  The original complaint alleged that Morales made these written representations even though he knew that the incremental revenue transactions were not valid claims and that, based on the reports he received, the finance department was not aware of the agreement with HMP and MVS.  Based on those allegations, the Court found that "it is reasonable to infer that if Morales had disclosed to the auditors that he believed that StarMedia was recognizing the incremental revenue improperly, the auditors would have discovered the accounting problems." *Espuelas I*, 579 F. Supp. 2d at 486.

       That inference is still reasonable even if StarMedia should not have recognized *any* revenue from the incremental revenue transactions because they were round-trip transactions.  The amended complaint still alleges that Morales wired funds to HMP, an allegation which, if true, for the reasons discussed above suggests that Morales knew exactly how the incremental revenue transactions worked.  The amended complaint also still alleges that Morales represented to auditors that StarMedia had disclosed all agreements when it had not disclosed the agreement with HMP and MVS and represented that all receivables were valid claims when he knew that the incremental revenue transactions were not valid claims.   Perhaps Morales did not know that the auditors would have found that the transactions were round-trip transactions, but that is not an argument that the auditors would not have found that StarMedia was overstating its revenues.   Morales knew that was the problem and the auditors ultimately discovered that problem.  All Morales's argument shows is that, but for his actions, the auditors would have discovered that the same problem was worse than he thought.

In short, the nub of the SEC's claim is that Morales knew that StarMedia would be accounting for the incremental revenue transactions in a way that overstated its revenue but nevertheless assisted StarMedia in carrying out and accounting for those transactions.  He cannot escape potential liability on the ground that he knew the revenue was mostly rather than entirely overstated.

### B.  Record-Keeping Violations

The SEC also alleges that Morales aided and abetted StarMedia's violation of Section 13(b)(2)(A) of the Exchange Act and personally violated Rule 13b2-1 thereunder. Rule 13b2-1 provides that "no person shall, directly or indirectly, falsify or cause to be falsified any book, record or account subject to section 13(b)(2)(A)."  17 C.F.R. § 240.13b2-1.  Primary violations of Rule 13b2-1, as the Court noted in *Espuelas I*, do not require an allegation of scienter.  *See Espuelas I*, 579 F. Supp. 2d at 486 (citing *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998)).  Instead, "liability is predicated on standards of reasonableness."  *Espuelas I*, 579 F. Supp. 2d at 486.  "A properly supported allegation of recklessness suffices to allege unreasonableness."  *Espuelas II*, 698 F. Supp. 2d at 435.  Recklessness means, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . ."  *Espuelas I*, 579 F. Supp. 2d at 470 (cting *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000).

With regard to the record-keeping claim, Morales makes an argument very similar to the argument he makes with respect to the aiding and abetting claim.  He contends that "the Amended Complaint fails to allege any factual basis to support a claim that Mr. Morales should have known that [the incremental revenue] transactions were fraudulent, round trip transactions lacking any economic substance."  (Morales Br. at 16.)   That

argument, again, changes the question.  The issue is whether the SEC alleges that

Morales had reason to know that "any book record or account" improperly reported the

entire value of the incremental revenue transactions as revenue.  The answer to that

question is yes since, for the reasons set forth above, the SEC alleges that Morales knew

that any such account would have been misleading.

To the extent that the SEC alleges that StarMedia violated the record-keeping

provisions because the incremental revenue transactions were fraudulent in the sense that

they were not transactions at all, it is hardly the case that "the SEC fails to allege any

specific facts or red flags that should have tipped Mr. Morales off to the fraudulent nature

of the incremental revenue transactions."  (Morales Br. at 16.)   On the contrary, the

entire premise of the instant motion is that the SEC alleges that Morales believed the

incremental revenue transactions should have been accounted for as barter.  That

"warning sign[], the investigation of which would reveal accounting problems," *Espuelas

I*, 579 F. Supp. 2d at 475, is the very definition of a red flag.   Whatever Morales knew,

he knew enough to conclude that StarMedia was accounting for the incremental revenue

transactions as normal revenue and not as barter.  Yet the SEC alleges that, rather than

investigating the propriety of the accounting treatment or alerting anyone at the company

or among its auditors that StarMedia was engaged in improper accounting, Morales

agreed to keep quiet if the auditors raised any questions.   Such allegations are more than

sufficient to state a claim that Morales acted unreasonably.

### C.  False Statements to Auditors

Finally, the SEC alleges that Morales violated Rule 13b2-2, which provides that

directors or officers shall not make or cause to be made a materially misleading statement

20

or omission to an accountant in connection with SEC filings, among other things.  *See* 17 CFR § 240.13b2-2.  Like Rule 13b2-1, 13b2-2 does not require the SEC to plead scienter. *See SEC v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998).  The parties have proceeded on the understanding that, as the Court assumed in *Espuelas I*, "Rule 13b2-1's reasonableness standard applies to violations of Rule 13b2-2."  579 F. Supp. 2d at 487. The Court will make the same assumption here.  And for the same reasons, set forth above, that the SEC has sufficiently alleged that Morales acted unreasonably with regard to StarMedia's own records, the Court finds that the SEC has sufficiently alleged that Morales acted unreasonably in representing to StarMedia's auditors that all receivables represented valid claims rather than "other arrangements not constituting sales."   The entire premise of the instant motion is that Morales had reason to believe that was not the case, yet the SEC alleges that Morales did nothing to alert the auditors of the same.

**CONCLUSION**

For the reasons stated above, defendant Morales' motion [116] is DENIED.


SO ORDERED.

Dated: New York, New York
       February 25, 2011

_____
Richard J. Holwell
United States District Judge