UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                          :

SECURITIES AND EXCHANGE COMMISSION,     :
                                                            :          06 Civ. 2435 (PAE)
                                Plaintiff,       :
                                                            :          OPINION & ORDER

                    -v-                              :

FERNANDO J. ESPUELAS et al.,                 :
                                                          :
                                 Defendants.    :
                                                             :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        In this lawsuit, the Securities Exchange Commission ("SEC") has sued various former

executives of StarMedia Network, Inc. ("StarMedia" or the "Company") for accounting fraud.

Pending here is defendant Betsy Scolnik's motion for summary judgment as to the remaining

claims against her: for aiding and abetting StarMedia's violations of Sections 13(a) and

13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13, and for

directly violating Exchange Act Rule 13b2-1.  For the reasons stated below, Scolnik's motion is

granted.

**I.     Background and Undisputed Facts**[1]

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' respective
Local Rule 56.1 Statements ("Pl.'s 56.1", "Def.'s 56.1", and "Pl.'s Reply 56.1"), as well as,
where uncontested, various exhibits to the parties' submissions on the instant motion.  These
submissions include: the Declaration of Ana C. Reyes in Support of Scolnik's Motion for
Summary Judgment ("Reyes Decl."), and attached exhibits; the Declaration of Paul W. Sharratt
in Opposition to Scolnik's Motion for Summary Judgment ("Sharratt Decl."), and attached
exhibits; and the Declaration of Michael Hartman in Opposition to Scolnik's Motion for
Summary Judgment ("Hartman Decl."), and attached exhibits.  Generally, references herein to a
paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited in
that paragraph; however, where a party's 56.1 statement cites multiple evidentiary materials that

The SEC's allegations in this action are set forth in detail in the decisions of the Hon. Richard J. Holwell, who was previously assigned to this case. The Court assumes familiarity with those decisions. Here, the Court sets forth only those facts relevant to the resolution of this motion. Except as otherwise specified, the following facts are not in dispute.

A.      **Procedural History**

On March 29, 2006, the SEC filed its initial complaint against eight defendants in this case, alleging violations of the Securities Act of 1933 ("Securities Act") and the Exchange Act of 1934 ("Exchange Act") (Dkt. 1). On September 30, 2008, Judge Holwell dismissed various claims against several defendants. *SEC v. Espuelas* (*Espuelas I*), 579 F. Supp. 2d 461 (S.D.N.Y. 2008) (Dkt. 59). On December 11, 2008, the SEC filed an amended complaint (Dkt. 66).

On March 29, 2010, Judge Holwell denied Scolnik's motion to dismiss the aiding and abetting claims against her based on the Company's "contingent" transactions. However, he granted her motion to dismiss the SEC's claims relating to the Company's "base book" and "incremental revenue" transactions. *SEC v. Espuelas* (*Espuelas II*), 698 F. Supp. 2d 415 (S.D.N.Y. 2010) (Dkt. 100). On March 30, 2010, Judge Holwell granted summary judgment to Scolnik on the fraud allegations relating to the "contingent" transactions. However, he denied her motion for summary judgment as to the SEC's Rule 13b2-1 claim. *SEC v. Espuelas* (*Espuelas III*), 699 F. Supp. 2d 655 (S.D.N.Y. 2010) (Dkt. 101).

On October 20, 2011, the case was reassigned to this Court. Two defendants remain in this case: Scolnik and Peter Morales. Morales has also filed a motion for summary judgment; that motion is addressed in a separate opinion issued today.

offer varying degrees of support for the stated proposition, the Court has specified the most relevant documents.

### B.      Key Parties, Individuals, and Entities

StarMedia was an internet media company that targeted Spanish- and Portuguese-speaking markets.  Pl.'s 56.1 ¶ 1; Ans. ¶ 24.  It was incorporated in Delaware, maintained its headquarters in New York City, and its common stock was registered with the SEC and traded on NASDAQ.  Pl.'s 56.1 ¶ 1; Ans. ¶ 24.

Between February 1998 and November 2001, Scolnik worked for StarMedia, initially as Director of Business Development.  Pl.'s 56.1 ¶ 2; Ans. ¶ 19.  Beginning in April 1998, Scolnik served as Vice President of Business Development ("VP").  Pl.'s Reply 56.1 ¶ 11; Def.'s 56.1 ¶ 11.  In February 1999, she became Senior Vice President for Strategic Development ("SVP").  Pl.'s Reply 56.1 ¶ 12; Def.'s 56.1 ¶ 12.  In May 2001, she was promoted to Executive Vice President.  *Id.*

Scolnik testified that her duties consisted of identifying and closing strategic deals, focusing on e-commerce opportunities, building distribution relationships, and opening and staffing offices in Latin America.  Reyes Decl. Ex. A (Investigative Testimony of Betsy Scolnik, May 8, 2003) ("Scolnik Inv. Test.") at 29–30.  She further testified that, upon her promotion to VP, her only additional duties involved developing strategies toward e-commerce and distribution and managing a few employees; she also testified that, upon her promotion to SVP, her only additional responsibility was content development.  *Id.* at 31–32.  Scolnik testified that she was never responsible for preparing, reviewing, or approving company filings or public statements.  *Id.* at 43–44.  The SEC disputes Scolnik's description of her work, stating that it ignores her involvement in various business activities.  Pl.'s Reply 56.1 ¶¶ 9–12.  The SEC states that Scolnik "had one of the broadest roles in the company" and that "she interacted at the highest levels with sales, business development, revenue development, and the strategic planning

of the company."  Pl.'s 56.1  ¶¶ 3–4, citing Hartman Decl. ¶ 26.  The SEC asserts that Scolnik

had the confidence of the company's CEO, Fernando Espuelas, and its president, Jack Chen, and

that Scolnik was a member of StarMedia's Executive Team, which included Espuelas, Chen,

Justin Macedonia (the General Counsel), Steven Heller (the CFO), and Andriana Kampfner

(President of StarMedia de Mexico, a subsidiary).  Pl.'s 56.1 ¶¶ 3, 5.

Other relevant players and entities are as follows:  Peter Blacker was a Senior Vice

President for Global Sales Strategies and Partnerships, whose responsibilities included selling

online advertising in the United States and Latin America.  Pl.'s Reply 56.1 ¶¶ 27, 29; Def.'s

56.1 ¶¶ 27, 29.  Yusell Muxo was a lower level employee.  Pl.'s Reply 56.1 ¶ 46; Def.'s 56.1 ¶

46; Reyes Decl. Ex. E (Investigative Testimony of Yisell Muxo, August 26, 2003) ("Muxo Inv.

Test.") at 46–48.  Advanced Multimedia Group ("AMG") is a separate company started in 2009

by Kamal Hotchandani and a partner, with the purpose of investing in internet start-up

companies that focused on Latin America.  Pl.'s Reply 56.1 ¶ 34; Def.'s 56.1 ¶ 34.  Hotchandani,

who is the SEC's key witness on the issue of Scolnik's knowledge, was among the people at

AMG who negotiated deals on its behalf.  Pl.'s Reply 56.1 ¶ 36; Def.'s 56.1 ¶ 36.  AMG held a

25% interest in Official Kiosk Group ("OKG"), a company that was developing internet kiosks.

Pl.'s Reply 56.1 ¶ 37; Def.'s 56.1 ¶ 37.  AMG held a less than 1% interest in a company called

Medium4, of which a company called Media4.com was a part.  Pl.'s Reply 56.1 ¶ 38; Def.'s 56.1

¶ 38.  Gemelo is another company in which AMG invested.  Pl.'s Reply 56.1 ¶ 39; Am. Compl. ¶

47.

### C.      StarMedia Seeks Financing

The claims brought by the SEC relate to StarMedia's allegedly improper recognition of

revenue for certain transactions it undertook in 2000 and 2001.  Around the middle of 2000,

4

executives of StarMedia became concerned about the company's financial situation. Scolnik Inv. Test. 62–63. Chen told Scolnik that StarMedia was having financial problems, and directed her to begin working on a project to secure financing from a consortium led by BellSouth. *Id.* Although there was no formal written requirement that StarMedia meet certain revenue targets, Scolnik testified that there were verbal discussions to that effect. *Id.* StarMedia's desire to meet revenue targets was heightened by its need to secure financing. *Id.* at 63; Pl.'s 56.1 ¶ 44.

The SEC alleges that desire to meet revenue targets motivated the transactions on which the SEC bases its claims against various former executives of StarMedia. Although the SEC has brought claims against former StarMedia executives based on a variety of transactions— including the so-called "base book" and "incremental revenue" transactions—the only transactions relevant to Scolnik are the Company's so-called "contingent" transactions.

### D.     The "Contingent" Transactions

StarMedia sold internet advertising. When StarMedia's sales associates made a sale, they were required to complete an "insertion order" or to develop a long-form contract memorializing the sale. Sharratt Decl. Ex. 39 (StarMedia Business Practices Guide) at 00602. To ensure that revenue from transactions would be properly recognized, StarMedia's finance department had specific guidelines that required the insertion order to reflect any discounts given to clients. Sharratt Decl. Ex. 132 (Insertion Order Guide). StarMedia's revenue recognition policies were consistent with SEC Staff Accounting Bulletin 101, which requires that four criteria be met before revenue can be recognized. Hartman Decl. Ex. 28 at 00002. One criterion relevant here is that there be persuasive evidence of an arrangement, *i.e.* that "[s]ubsequent arrangements of the same deal or side agreements preclude recognition [of revenue]." *Id.* A second is that collectability of the revenue be "probable." *Id.* at 00003.

In the contingent transactions, as alleged by the SEC, StarMedia agreed to provide services to another party that would be obligated to pay *only if* it approved of the services; StarMedia, however, improperly reported revenue on the transactions despite their contingent nature. Am. Compl. ¶ 47.[2] There are four such transactions at issue here, two in 2000 and two in 2001. Pl.'s 56.1 ¶ 40. Although the SEC has long cast all four as "contingent" transactions, in defending against Scolnik's motion for summary judgment, it has made the additional argument that the 2001 transactions can alternatively be viewed as either "round-trip" or "barter" transactions, under either of which characterizations the recognition of revenue was also improper. Pl.'s 56.1 ¶¶ 88–89.

### 1. The 2000 Transactions

The first transaction (the "Gemelo transaction") involved the sale of $500,000 of advertising services to Gemelo; on June 27, 2000, Hotchandani sent a StarMedia insertion order by facsimile to Blacker reflecting this sale. Sharratt Decl. Ex. 54; Pl.'s 56.1 ¶ 40. The second transaction (the "OKG transaction") involved the sale of $750,000 of advertising services to OKG in December 2000; a StarMedia insertion order, dated December 27, 2000 and signed by Hotchandani, reflects this sale. Sharratt Decl. Ex. 55; Pl.'s 56.1 ¶ 40. The insertion order lists Blacker as the sales executive and Muxo as the account manager. Sharratt Decl. Ex. 55.

In investigative testimony taken by the SEC in 2003, Hotchandani testified that he understood that these two transactions were contingent—*i.e*., the insertion orders were non-binding and, if the buyers were dissatisfied with StarMedia's services, they were obliged to pay StarMedia only $10,000. Sharratt Decl. Ex. 10 (Investigative Testimony of Kamal Hotchandani,

---

[2] The Amended Complaint also alleged that StarMedia engaged in contingent transactions with Groupe Danone, in which Groupe Danone was not obligated to pay for the services. Am. Compl. ¶ 50. The SEC has voluntarily dismissed its charges relating to those transactions.

August 6, 2003) ("Hotchandani Inv. Test.") at 40, 45–46.  He testified that this term was, at first,

only agreed to orally by the parties.  *Id.* at 40.  However, on December 20, 2000, Blacker sent

Hotchandani a letter that expressly made the OKG transaction contingent.  Sharratt Decl. Ex. 56.

The letter was also addressed to Guy DiPierro, AMG's General Counsel, and was faxed by

Muxo.  *Id.*; Muxo Inv. Test. 46–48.  The letter states that Gemelo was to send a check for

$10,000, representing full payment for the last email campaign, and that Gemelo would then

receive a bonus email campaign.  Sharratt Decl. Ex. 56.  Gemelo would then, through OKG,

purchase $750,000 worth of services from StarMedia, "*provided* that Gemelo or [OKG] is

satisfied, in its sole and absolute discretion, with the results of the Bonus Campaign."  *Id.*

(emphasis in original).  In the event they were not satisfied, the letter stated, Gemelo and OKG

would not have any further liability or payment obligation to StarMedia.  *Id.*  On January 11,

2001, AMG sent StarMedia a check for $10,000, which read "Gemelo.com e-mail campaign" in

the memo line.  Sharratt Decl. Ex. 57.

Hotchandani testified that, in addition to the letter, his understanding of the contingent

nature of these transactions stemmed from certain discussions he had with Blacker and Scolnik

regarding the formation of a "preferred partnership" between AMG and StarMedia.  Hotchandani

Inv. Test. 22–23, 26.  He testified that Scolnik and Blacker initially approached him sometime in

late 1999 or early 2000, and that in discussing the terms of such a preferred partnership, he told

them:  "[W]e said, look we can go into the first round.  We will set you up with the testing . . .

but then we would say we will go into a test and if it doesn't work out we are not going to

commit ourselves to $10,000,000."  *Id.* at 24.  Hotchandani testified that, once StarMedia and

AMG began executing the transactions at issue, he understood that the process of sending a non-

binding insertion order was "kind of like the norm"; by non-binding, Hotchandani meant that "if

they do the test and they are happy, they will go into a full-fledged contract."  *Id.* at 37–38.

Scolnik denies that there was any mention of contingent transactions during these discussions;

she testified that Blacker and Hotchandani arranged any such side deal without her knowledge.

Def.'s 56.1 ¶¶ 44–49.

### 2.  The 2001 Transactions

The third transaction (the "AMG transaction") involved the sale of $750,000 of

advertising services to AMG; a StarMedia insertion order, dated March 28, 2001, reflects this

sale and lists Blacker/Scolnik as the sales executives.  Sharratt Decl. Ex. 103; Pl.'s 56.1 ¶ 40.

The fourth transaction (the "Media4 transaction") involved the sale of $750,000 of

advertising services to Media4.com; another insertion order, also dated March 28, 2001, reflects

this sale and also lists Blacker/Scolnik as the sales executives.  Sharratt Decl. Ex. 103; Pl.'s 56.1

¶ 40.

Because the SEC now defends its claims that revenue recognition on these transactions

was improper by advancing three alternative theories as to how the transactions should be

characterized, the Court recaps the evidence relevant to each theory in turn.

### a.  *As Contingent Transactions*

For both 2001 transactions, Hotchandani signed the insertion order, and testified that he

understood it to be non-binding.  Hotchandani Inv. Test. 49–51.  Hotchandani testified that he

understood, based on his discussion with Blacker and Scolnik, that the AMG transaction was

"like that preferred partnership."  *Id.* at 50.  He further testified that both the AMG and Media4

transactions were contingent, as the 2000 transactions had been.  *Id.* at 56–59.  On March 30,

2001, Blacker sent a letter to Hotchandani summarizing the benefits of their preferred

partnership, and extending to AMG $1.5 million in bonus advertising at a 30% discount from

StarMedia's normal rates.  Sharratt Decl. Ex. 104.  Hotchandani testified that he understood that AMG's payment obligations for the AMG and Media4 transactions could be satisfied by either applying this credit, or making a payment.  Hotchandani Inv. Test. 53–58.  Hotchandani's testimony as to the exact amount of the required payment vacillated between $10,000 and 10 percent of the sales price.  *See id.* at 53, 57, 59.  Blacker's March 30, 2001 letter was copied to Scolnik.  Sharratt Decl. Ex. 104.

### b.  *As Round-Trip Transactions*

In its interrogatory answers, the SEC alternatively characterized the 2001 transactions as round-trip transactions, which it described as those in which an "inflated purchase price . . . provide[s] funding to come back to StarMedia in the form of advertising purchases."  Reyes Decl. Ex. I at 28.  The SEC asserts that StarMedia purchased $2.5 million worth of internet kiosks from OKG so as to provide funding for Gemelo and OKG to pay down their advertising purchases, and for AMG and Media4 to make more advertising purchases.  Pl.'s 56.1 ¶¶ 64–66, 88.  Scolnik denies that the transactions were linked in this fashion.  Def.'s 56.1 ¶ 63.

The parties agree that, in March 2001, Scolnik and Michael Hartman, StarMedia's Assistant General Counsel, participated in negotiations with DiPierro regarding the purchase of the kiosks from OKG; the parties dispute, however, whether other individuals were involved in these negotiations.  Pl.'s Reply 56.1 ¶ 57; Def.'s 56.1 ¶ 57.  Blacker testified that he participated. Reyes Decl. Ex. D. ("Blacker Aff.") ¶ 12.  Hotchandani's involvement in these negotiations is disputed, as is the involvement of Ben Solomon, OKG's CEO.  Pl.'s Reply 56.1 ¶ 60; Def.'s 56.1 ¶ 60.  The parties also agree that Scolnik was aware, at the very least, that there were contemporaneous negotiations between Blacker and Hotchandani regarding the AMG and Media4 transactions.  Pl.'s Reply 56.1 ¶ 59; Def.'s 56.1 ¶ 59.  However, the SEC argues that,

based on Scolnik's involvement in the preferred partnership discussions as testified to by Hotchandani, it can be inferred that Scolnik was more involved in the AMG and Media4 transactions than she admits.  Pl.'s Reply 56.1 ¶ 59.

The contract between StarMedia and OKG for the sale of the kiosks called for a purchase price of $2.5 million, with an initial payment of $1.25 million due in April 2001, and the balance to be paid in 11 monthly installments.  Sharratt Decl. Ex. 106 at 3.  That contract was executed on the same day, March 30, 2001, that the insertion orders for the AMG and Media4 transactions were faxed from AMG to StarMedia.  Sharratt Decl. Exs. 103, 105–106.

### c. *As Barter Transactions*

The SEC now alternatively asserts that the purchase of kiosks from OKG and the AMG and Media4 transactions can also be viewed as barter, because StarMedia received kiosks and the various AMG affiliates received advertising services.  Pl.'s 56.1 ¶ 89.  Scolnik replies that, by the SEC's own definition, these two transactions were not barter, because, in each of the two transactions, cash was exchanged for goods or services.  Def. Reply Br. 7.

### E. StarMedia Restates Its Financials

On November 19, 2001, StarMedia announced that it would restate its financial statements for the fiscal year 2000 and the first two quarters of 2001.  Sharratt Decl. Ex. 2–4.  The company announced that it was investigating accounting issues with respect to revenue recognition at two of its subsidiaries, and that Espuelas and Heller were resigning.  *Id.*  On February 12, 2003, StarMedia reported the results of its internal investigations in an amended Form 10-K for fiscal year 2001, which it filed with the SEC.  Sharratt Decl. Ex. 8.  StarMedia stated that:

> The Company improperly recognized approximately $7.5 million of revenues and related expenses from a number of sales that provided for future contingencies . . .

> or for some other reason were not appropriately recognized.  Typically, these
> transactions involved arrangements, such as conditions to payment obligations,
> which were reached between clients and lead sales people of the Company and
> which management learned of during the course of its additional investigation. . . .
> Management determined that if these arrangements had been considered as part of
> the terms and conditions of the transaction that generated the revenues in
> question, then such revenues would not have been permitted to be recognized
> under U.S. GAAP.

Sharratt Decl. Ex. 8 at 2–3.  The four transactions described above were among those

restated on this basis.  *Id.*; Pl.'s 56.1 ¶ 40.

## II.      Applicable Legal Standard

Summary judgment may be granted only where the submissions, taken together, "show[]

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the

absence of a material factual question; in making this determination, the court must view all facts

"in the light most favorable" to the non-movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  "A party may not rely

on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment," because "conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the

outcome of the suit under the governing law" will preclude a grant of summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.     Discussion

The SEC brings the following charges against Scolnik: (1) aiding and abetting

StarMedia's violation of Section 13(a) of the Exchange Act; (2) aiding and abetting StarMedia's

violation of Section 13(b)(2)(A) of the Exchange Act; and (3) directly violating Exchange Act Rule 13b2-1.  The Court will address each claim in turn.

As to each of these causes of action, the SEC claims that Scolnik furthered StarMedia's improper accounting by participating in the negotiation of the transactions at issue and helping to conceal their true nature.  The principal issue, on which the parties disagree, is whether, and if so when, Scolnik knew that the four transactions at issue were contingent (or round-trip, or barter), so as to make recognizing revenues from these transactions improper.

### A.    Aiding and Abetting StarMedia's Violation of Section 13(a)

The SEC's first claim is that Scolnik aided and abetted StarMedia's violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13.  Section 13(a) requires issuers of securities to file information, documents, and annual and quarterly reports as required by the SEC.  15 U.S.C. § 78m(a).  Rules 13a-1 and 13a-13 require issuers to file annual and quarterly reports, respectively.  17 C.F.R. §§ 240.13a-1, 240.13a-13.  Rule 12b-20 requires that issuers add "such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b-20.

As Judge Holwell previously held, "[t]o state a claim that defendants aided and abetted violations of the Exchange Act, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation."  *Espuelas I*, 579 F. Supp. 2d at 483–84; *see also SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (applying the same standard).[3]  "The[se]

---

[3] The Dodd-Frank Act of 2010 amended Section 20(e) of the Exchange Act to add the words "or recklessly" after "knowingly."  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. § 78t(e)).  In a case heard

three requirements cannot be considered in isolation from one another.  Satisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance."  *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal citations and alterations omitted); *see also Apuzzo*, 689 F.3d at 215 ("[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*.").

### 1.  *Primary Violation*

As Judge Holwell has held, to establish a primary violation, the SEC must show that StarMedia made statements to the SEC that misstated either the quantity or quality of the revenue from the transactions at issue.  *SEC v. Espuelas* (*Espuelas IV*), 767 F. Supp. 2d 467, 477–76 (S.D.N.Y. 2011).  The SEC argues that StarMedia's amended 10-K for fiscal year 2001, which restated the Company's financials for fiscal year 2000 and the first two quarters of 2001, is sufficient evidence by itself to create a genuine issue of material fact as to whether StarMedia materially misstated its revenue.  Pl. Br. 14.  Scolnik does not dispute this element:  At argument, she conceded that, for purposes of this motion, there is a genuine issue of material fact as to the existence of a primary violation, insofar as the SEC's theory is that these were contingent

---

after the enactment of Dodd-Frank, the Second Circuit applied the actual knowledge standard, holding that the Dodd-Frank amendment "does not apply," *see Apuzzo*, 689 F.3d at 211 n.6, apparently because the conduct at issue predated the amendment.  The same is true here—the acts at issue long predated Dodd-Frank, and the SEC does not argue that the Dodd-Frank recklessness standard applies.  *See* Tr. 42–43.  Accordingly, the Court, like Judge Holwell, evaluates the evidence against a standard of actual knowledge.

transactions.  Transcript of Oral Argument, October 3, 2012 ("Tr.") at 4–6.[4]  Scolnik instead

focuses her motion for summary judgment on the knowledge element.

## 2.  *Knowledge*

"The securities laws do not require that a defendant know the precise accounting

treatment that would have been applied before [she] can have the requisite scienter; the SEC

need only demonstrate that [a defendant] knew of facts that contradicted the substance of the

reported accounting."  *Espuelas IV*, 767 F. Supp. 2d at 476 (quoting *SEC v. Lucent Tech. Inc.*,

610 F. Supp. 2d 342, 362 (D.N.J. 2009)).  "A defendant's general awareness of its overall role in

the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability."

*SEC v. Apuzzo*, 758 F. Supp. 2d 136, 147 (D. Conn. 2010), *rev'd on other grounds*, 689 F.3d 204

(2d Cir. 2012).

This inquiry subdivides into three distinct questions.  First, did Scolnik know that

StarMedia booked revenue for each of the transactions at issue?  There is clearly sufficient

evidence on which a jury could find that she did.  *See* Sharratt Decl. Exs. 119–25.  Second, was

Scolnik aware of the facts that made recognition of that revenue improper (*i.e.*, that the

transactions were contingent or round-trip or barter)?  Third, was Scolnik aware that, in light of

the true nature of the transactions, it was improper to recognize revenue?  As to this third

question, the parties vigorously dispute whether Scolnik had sufficient accounting knowledge to

appreciate that revenue recognition under the circumstances was improper.[5]  However, the Court

---

[4] To the extent that the SEC argues that revenue recognition was improper based on other
theories—*i.e.*, that the transactions were either round-trip or barter transactions—Scolnik does
*not* concede the existence of a genuine issue of material fact as to a primary violation.  Tr. 11–
12.

[5] Scolnik is not a certified public accountant.  Pl.'s Reply 56.1 ¶ 14; Def.'s 56.1 ¶ 14.  Scolnik
denies relevant accounting expertise, Def.'s 56.1 ¶ 14, but the SEC contends that various training

need not reach that issue, because the Court finds for Scolnik on the second inquiry: The SEC has failed to establish a genuine issue of material fact with regard to whether Scolnik knew of the facts that made the recognition of revenue inappropriate. The Court addresses the transactions in turn.

### a)  The 2000 Transactions

Scolnik testified that she did not learn of the contingent nature of the Gemelo and OKG transactions until June 2001, after they were complete. Scolnik Inv. Test. 192–93. She testified that, in connection with her efforts to collect past due receivables, at that time she saw a copy of the December 20, 2000 letter from Blacker to Hotchandani outlining the contingent arrangement. *Id.*

In asserting that Scolnik knew, when she took the actions constituting substantial assistance, that the Gemelo and OKG transactions were contingent, the SEC relies on: "(a) the heightened concern with revenue among senior StarMedia executives during the relevant period; (b) Ms. Scolnik's involvement in the [preferred partnership] discussions with Mr. Hotchandani; (c) his testimony that he believed she understood that payment obligations under the insertion orders were contingent on AMG's satisfaction with the services provided; (d) Ms. Scolnik's receipt of substantial revenue information; and (e) Ms. Scolnik's awareness of the company's revenue recognition policies and guidelines." Pl. Br. 18.

---

sessions she attended gave her enough expertise to understand the pertinent concepts regarding revenue recognition. Pl.'s Reply 56.1 ¶ 14; Pl.'s 56.1 ¶¶ 8–26. Scolnik also asserts that she was never responsible for preparing, reviewing, or approving StarMedia's SEC filings or public statements regarding its financial condition. Scolnik Inv. Test. 43–44; Reyes Ex. B (Deposition of Betsy Scolnik, June 8, 2001) at 88–89; Def.'s 56.1 ¶ 15. The SEC replies that Scolnik provided financial information to BellSouth, and was significantly involved in the company's day-to-day affairs. Pl.'s Reply 56.1 ¶ 15.

The first of these factors is insufficient to establish Scolnik's knowledge.  Although the heightened concern with revenue among StarMedia executives might suggest a motive to misstate revenues, the desire to "meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004); *see also In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("[D]esirability for growth is too universal a corporate goal to constitute a basis for scienter.").  Still less does it suffice to establish a defendant's knowledge of the underlying structure of a particular business transaction.  To be sure, the SEC has adduced evidence that Scolnik was privy to management's concerns about the Company's revenues, and that she was an active participant in internal discussions about meeting revenue goals.  *See* Sharratt Decl. Ex. 80 (Scolnik email: "i will not stop ticking until i get the number we need.").  But this evidence in no sense establishes that Scolnik knew of the purported side agreement between Blacker and Hotchandani which made the Gemelo and OKG transactions contingent.

The SEC's primary evidence of Scolnik's knowledge that the 2000 transactions were contingent is the investigative testimony of Hotchandani.  He testified that his primary contact at StarMedia had been Blacker, but that he had several meetings with Scolnik in the course of arranging the two companies' preferred partnership.  Hotchandani Inv. Test. 18, 23.  In the critical excerpt on which the SEC relied, Hotchandani was asked if he felt comfortable saying that Scolnik knew about the process that included the non-binding insertion orders.  Hotchandani replied:  "Yes, I believe so."  *Id.* at 39.  Hotchandani did not elaborate on his basis for this belief, nor did the SEC's examining attorneys ask him what that basis was.  *Id.*  It is, therefore, unclear whether Hotchandani had any factual basis for this belief (as would be the case if the pertinent facts had been stated in her presence), or whether he was merely conjecturing or speculating

(*e.g.*, based on her position, role, general savvy, or presence in conversations discussing other aspects of the transactions).

Scolnik contends that Hotchandani's testimony as to his belief about her knowledge is inadmissible and unreliable, with the SEC having failed to establish what, if any, foundation Hotchandani had for that belief. *See* Def. Br. 12. Scolnik also notes that in other parts of Hotchandani's investigative testimony, he was equivocal about whether Scolnik knew of the contingent nature of the payment obligations to StarMedia. Notably, when asked whether anyone other than Blacker told him that the insertion orders were contingent, Hotchandani testified: "That may be possible, but you are talking about the millennium." Hotchandani Inv. Test. 46. And when asked whether Scolnik specifically ever told him that, he stated: "I can't remember. Honestly, I don't know if [Scolnik] said that or not." *Id.* at 47.

Pivotally here, in considering whether the evidence is sufficient to survive a summary judgment motion, "only admissible evidence need be considered by the trial court." *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009); *see also LaSalle Bank Nat'l. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("Even on summary judgment, a district court has wide discretion in determining which evidence is admissible." (internal quotation marks omitted)). And to be admissible, the opinion of a lay witness must be "rationally based on the witness's perception." Fed. R. Evid. 701(a). "There is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others, provided that the proponent of the testimony first establishes a proper foundation." *United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002) (citation omitted). But:

> When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally

> based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find.

*United States v. Rea*, 958 F.2d 1206, 1217 (2d Cir. 1992); *see also United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) ("Rule 701(a) reflects, in part, the Rules' more general requirement that '[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'" (quoting Fed. R. Evid. 602)). The SEC has simply not provided a foundation to demonstrate that Hotchandani's belief that Scolnik knew of the contingent arrangement was rationally based on his own perceptions.

The closest the SEC comes to offering such a foundation is Hotchandani's testimony that he had engaged in discussions with Scolnik and Blacker about the formation of a "preferred partnership" between AMG and StarMedia. Hotchandani Inv. Test. 22–23, 26. From this, the SEC would, presumably, ask the finder of fact to infer that the alleged contingent arrangement was ironed out during these preferred partnership discussions, and in Scolnik's presence. However, Hotchandani did not testify to that effect, and his testimony as to the content of these discussions is, at best, vague. *See id.* at 24 ("[W]e said, look we can go into the first round. We will set you up with the testing . . . but then we would say we will go into a test and if it doesn't work out we are not going to commit ourselves to $10,000,000."). And Blacker, a participant in these discussions, undermined any such inference: He testified that he does not recall telling Scolnik that either of the 2000 transactions were contingent, Blacker Aff. ¶ 10, and did not otherwise support the SEC's notion that she had been present when such an arrangement was arranged. Nor was Scolnik copied on Blacker's December 20, 2000 letter to Hotchandani memorializing the contingent arrangement. Sharratt Decl. Ex. 56. Finally, Muxo testified that Scolnik was never present for the discussions about the Gemelo and OKG transactions at which Muxo was present. Muxo Inv. Test. 58.

18

Without a proper foundation, Hotchandani's testimony regarding Scolnik's knowledge is inadmissible, and cannot be considered on this motion.  *See Rea*, 958 F.2d at 1217.  It is no answer for the SEC to argue, Pl. Br. 17, that the Court should defer ruling on the admissibility of Hotchandani's testimony until trial, when it can assess whether he had a foundation for his belief that Scolnik knew of the contingent nature of the transactions.  As the Second Circuit has explained:

> Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact . . . it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court.  The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997) (internal citations and quotation marks omitted); *see also Presbyterian Church of Sudan*, 582 F.3d at 264 ("It is difficult to see how a court can decide a summary judgment motion without deciding questions of evidence.").

The circumstances of this case make particularly unpersuasive, and indeed audacious, the SEC's suggestion that the Court defer until trial its decision whether Hotchandani had an adequate basis for his opinion as to Scolnik's knowledge.  That is because the SEC has had ample notice of this deficiency:  On Scolnik's prior motion for summary judgment, made based on the record as it stood after investigative testimony, Judge Holwell pointedly described the evidence of Scolnik's knowledge as "remarkably thin."  *Espuelas III*, 699 F. Supp. 2d at 663. Nevertheless, Judge Holwell denied Scolnik's motion at that point and permitted discovery to go forward.  *Id.*  The SEC, therefore, had notice of this evidentiary shortcoming, and a ready opportunity to remedy it, including by deposing Hotchandani or obtaining a declaration from him.  The SEC, however, chose not to do so.  Tr. 29.  Pressed on the point at argument, the SEC

acknowledged that it made a strategic choice not to depose Hotchandani during discovery, because it preferred to utilize its 10 allotted depositions on other witnesses, and chose not to seek leave to take an additional deposition.  *Id.* at 29–30.  The SEC further conceded that discovery had yielded *no* new evidence whatsoever, beyond that which existed after investigative testimony, as to Scolnik's knowledge of the contingent nature of the 2000 transactions.  *Id.* at 30.

The SEC's final argument, that Scolnik's knowledge is demonstrated by her receipt of revenue information and awareness of the company's revenue recognition policies, is unavailing. Scolnik's general receipt of revenue information and her knowledge of recognition policies do nothing to establish her knowledge of the structure of the particular transactions here.  If she did not know the transactions were contingent, no amount of accounting expertise could inform her that they should be booked as such.  Indeed, the SEC conceded at oral argument that, without Hotchandani's testimony, its evidence of knowledge was "very slim" and that it would "probably not" have enough evidence to go to a jury.  Tr. 24.

For these reasons, the SEC has failed to establish a genuine issue of material fact as to whether Scolnik knew that the Gemelo and OKG transactions were contingent.

### b)  The 2001 Transactions

The SEC has advanced three alternative theories as to why it was improper for StarMedia to recognize revenue on the AMG and Media4 transactions.  The Court evaluates, with respect to each theory, the evidence that Scolnik knew of the pertinent features of these transactions.

### i.  *As Contingent Transactions*

The SEC relies on two pieces of evidence to support its theory that, if these two transactions were contingent, Scolnik knew that they were: (a) Hotchandani's testimony about the "preferred partnership" discussions and Scolnik's knowledge of the contingent arrangement;

and (b) the March 30, 2001 letter from Blacker to Hotchandani on which Scolnik was copied. For the same reasons discussed above, Hotchandani's testimony is inadmissible (and equivocal), and insufficient to establish a genuine issue of material fact.

For the March 30, 2001 letter to establish Scolnik's knowledge, she must have received and read it, and its contents must have conveyed the facts necessary to establish knowledge. As to receipt, Scolnik denies ever having received the letter, Scolnik Inv. Test. 192–93, and argues that there is no "presumption of receipt" arising from the fact that she was copied on the letter. Def. Br. 19. The SEC urges that because Scolnik worked primarily in the Miami office, where the letter originated, "a copy of the letter could simply be placed where she could retrieve it." Pl. Br. 20. However, the circumstances do not support a presumption of receipt,[6] and the SEC's claim that whether Scolnik ever received or saw the letter can be left to the jury, *id.* at 20–21, overlooks that it is the SEC's burden, in the first instance, to adduce evidence on which the jury could reliably so find. A party "cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts.'" *Bellantoni v. General Motors Corp.*, No. 08 Civ. 2407 (CS)(GAY), 2012 WL 1948779, at *2 (S.D.N.Y. May 3, 2012) (quoting *Borthwick v. First Georgetown Secs., Inc.*, 892 F.2d 178, 181 (2d Cir. 1989)).

---

[6] The SEC does not argue for such a presumption. Pl. Br. 24. And the presumption of receipt relates to *mailing*, not the hand-delivery of a document on a co-worker's desk. *See, e.g.*, *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010); *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985); *Nassau Ins. Co. v. Murray*, 386 N.E.2d 1085, 1086 (N.Y. 1978). Further, even the presumption of receipt that attaches to a mailing is triggered only where there is admissible evidence of the fact of mailing, such as testimony from the person who actually mailed the letter, *Meckel*, 758 F.2d at 817, or where "the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed." *Ma*, 597 F.3d at 92. There is no evidence of that sort here from any witness, and the only evidence offered to support a regular office procedure as to delivery is the equivocal testimony of Yisell Muxo. *See* Muxo Inv. Test. 49–50.

In any event, the contents of the letter fall short of notifying its reader that the AMG and

Media4 transactions were contingent.  The letter reads, in pertinent part:

> In recognition of this "Preferred Partnership" we would like to offer AMG media
> programs for its portfolio of companies.  This letter extends a total value of
> $1,500,000 worth of bonus media exposure across StarMedia properties.  This
> media is to be used solely by AMG Portfolio companies and can't conflict with
> any current paying clients that StarMedia has.  The media will be place [sic]
> according to a plan we jointly agree upon.

Sharratt Decl. Ex. 104.  Hotchandani testified it was his understanding that this meant that his

obligations under the AMG and Media4 transactions could be satisfied by applying the credit

offered in this letter.  Hotchandani Inv. Test. 52–58.  However, Blacker testified that the credit

was only to be applied prospectively.  Blacker Aff. ¶ 19.  Regardless of which interpretation is

more plausible, nothing on the face of this letter refers at all to contingent transactions.  And the

SEC has not come forward with any evidence on which a jury could reliably find that Scolnik

construed the letter's elliptical contents to reflect a contingent arrangement.  Thus, the letter fails

to create a genuine issue of material fact as to whether Scolnik knew of the contingent

transactions.

### ii.   *As Round-Trip Transactions*

The SEC alternatively argues that the 2001 transactions were "round-trip" transactions in

which StarMedia in effect supplied its own revenue by purchasing $2.5 million of computer

kiosks from OKG, which in turn used that money to pay for AMG and Media4's purchase of

$1.5 million of advertising from StarMedia.  Pl. Br. 21–23.  Scolnik disputes that these

transactions were so linked, and argues that the SEC's round-trip thesis is implausible, both

because the transactions were for different values ($1.5 and $2.5 million), and because the

computer kiosks were purchased for fair value, as evidenced by the fact that their value was not

restated.  Def. Br. 21–22.

The SEC primarily relies on three documents in arguing that, if these transactions were round-trip, Scolnik knew about it.  The first is a handwritten note, dated March 28, 2001, in which Scolnik wrote "$ for $ — not pay at same time." Sharratt Decl. Ex. 79 at 6.  The second is an email from Scolnik to Espuelas that says, "I don't want you to think it is so amazing to get someone to give you money when you are also giving it to them.  It is a dance, but it is not extraordinary."  Sharratt Decl. Ex. 80.  The third is an email, dated April 2, 2001, indicating that Scolnik facilitated the exchange of funds between AMG and StarMedia on both transactions; in the email, to Heller, Scolnik wrote: "i am going to pick up a check from [Hotchandani] today.  i need to be able to tell him that our wire is going through to him as well.  can you confirm that we will be wiring the 1.25M today as well?"  Sharratt Decl. Ex. 108.

To be sure, if one starts with the premise that these two transactions together formed an improper round-trip transaction, in which StarMedia used an illusory transaction with OKG to supply funding that OKG could use for an illusory purchase from StarMedia, the evidence on which the SEC relies would be consistent with that premise.  But it is backwards for the SEC to start with that premise:  It must instead offer evidence sufficient to establish a genuine issue of material fact on which a fact-finder could find that this was indeed a round-trip transaction.  *See Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56–57 (2d Cir. 2012) ("'[T]he mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient.'  If the opposing party's preferred 'evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted.'" (quoting *Anderson*, 477 U.S. at 252 & 249–50) (internal citations and alterations omitted)); *cf. United States v. Brown*, 459 F.3d 509, 525 (5th Cir. 2006) ("[I]f we begin with the assumption that [defendant] is guilty, the documents can be read to

support that assumption.  But if we begin with the proper presumption that [defendant] is not

guilty . . . we must conclude that the evidence is insufficient.").

The SEC has not come forward with any such evidence.  The SEC points to internal

StarMedia spreadsheets as support for its claim that the transactions were structured as a round-

trip.  Sharratt Decl. Exs. 86–89.  But these documents do not clearly so indicate, and no fact

witness has offered testimony explaining these spreadsheets or claiming that these were round-

trip transactions.  Hotchandani, the SEC's principal witness, whose testimony it otherwise

embraces, testified that these were *not* round-trip transactions.  Hotchandani Inv. Test. 67.  And

the SEC admitted at oral argument that its own expert did not conclude that these were round-trip

transactions.  Tr. 41.  Absent evidence that these transactions actually were round-trip, the

existence of several documents consistent with that proposition does not make it so, nor does it

satisfy the SEC's burden to "offer enough evidence to enable a reasonable jury to return a verdict

in its favor."  *Stone v. Bd. of Educ. of Saranac Cent. School Dist.*, 153 F. App'x 44, 45 (2d Cir.

2005) (quoting *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001)).[7]

---

[7] Separately, the Court notes that the SEC appears to have developed the thesis of a round-trip
transaction after the close of discovery, based on the inferences its attorneys have drawn from the
documents on which it now relies.  *See* Reyes Decl. Ex. I at 28.  But "it is inappropriate to raise
new claims for the first time in submissions in opposition to a summary judgment motion."
*Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001); *see also Greenidge v. Allstate Ins. Co.*, 446
F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in
opposition to summary judgment); *Hughes v. McWilliams*, No. 04 Civ. 7030 (KMW), 2009 WL
4823940, at *13 n.6 (S.D.N.Y. Dec. 15, 2009) (same).  Nor has the SEC sought leave to amend
its complaint to add this theory, which would have enabled the Court to consider whether
additional time for discovery was merited to enable Scolnik to adduce evidence to defend against
this theory.  Given the long history of the litigation, any such application for leave to amend
would likely have been denied, as "[l]eave to amend a complaint will generally be denied when
the motion to amend is filed solely in an attempt to prevent the Court from granting . . . summary
judgment, particularly when the new claim could have been raised earlier."  *Berman v. Parco*,
986 F. Supp. 195, 217 (S.D.N.Y. 1997); *see also Ansam Assocs., Inc. v. Cola Petro., Ltd.*, 760
F.2d 442, 446 (2d Cir. 1985) (no abuse of discretion to deny leave to amend where discovery had
ended and the opposing party had already filed a summary judgment motion).

To survive summary judgment on its round-trip theory, the SEC must establish a genuine issue of material fact as to whether Scolnik knew of facts that contradicted the substance of the reported accounting. *Espuelas IV*, 767 F. Supp. 2d at 476. But in the absence of any evidence that these transactions were in fact round-trip, there can be no issue as to Scolnik's knowledge of such a fact.

### iii.    *As Barter Transactions*

Finally, in claiming that the 2001 transactions were barter transactions on which revenue recognition was improper, the SEC states generally that, based on her senior position in the company and her receipt of various information regarding revenue, Scolnik knew enough about the transactions and the company's revenue recognition policies to conclude that the transactions were improperly booked. Pl. Br. 22–23. As with the round-trip theory, the SEC did not first identify this theory until after discovery had closed.

The Court rejects this theory on the grounds that there is simply insufficient evidence on which a jury could find a barter transaction. The SEC defines a barter transaction as one in which "two parties trad[e] services without earning cash." Pl. Br. 23. But under that definition, these transactions were not barter, as the SEC itself implicitly acknowledged in arguing for its separate round-trip theory: There, the SEC noted that Scolnik herself facilitated the transfer of cash between AMG and StarMedia, and requested that cash be transferred from StarMedia to OKG. Pl.'s 56.1 ¶ 83; Sharratt Decl. Ex. 108. Those transfers of cash were made. Sharratt Decl. Exs. 110–11. Nor did the SEC adduce lay or expert testimony that these transactions were barter, and Hotchandani testified that they were not. Hotchandani Inv. Test. 66. In the absence of any evidence that these transactions were in fact barter, there can be no serious claim that Scolnik knew them to be such.

In sum, the SEC has failed to establish a genuine issue of material fact so as to permit a jury to find that Scolnik knew of the features of any of the four transactions at issue that would make revenue recognition improper.  Accordingly, summary judgment is merited in favor of Scolnik on the SEC's Section 13(a) claim.

### 3.   *Substantial Assistance*

To satisfy the substantial assistance prong of aiding and abetting, "the SEC must show that the defendant 'in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed.'" *Apuzzo*, 689 F.3d at 206 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (internal alterations omitted)).  However, the SEC need *not* show that defendant's actions were the proximate cause of the violation.  *Id.* at 213.

The SEC argues that Scolnik substantially assisted StarMedia's primary violation "through her participation in and approval of the contingency arrangement with Hotchandani" and "in negotiating the AMG transactions, help[ing] conceal the true nature of the transactions and fail[ing] to act when required to do so."  Pl. Br. 18, 25.  However, because the Court has already found that the SEC has failed to establish a genuine issue of fact with regard to Scolnik's knowledge of the primary violation at the time that she took any of these actions, the Court need not determine whether these acts, or any others by Scolnik, were sufficient to establish a genuine issue of material fact as to substantial assistance.

### B.   Aiding and Abetting StarMedia's Violation of Section 13(b)(2)(A)

The SEC's next claim is that Scolnik aided and abetted StarMedia's violation of Section 13(b)(2)(A) of the Exchange Act, which requires issuers to "make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and

dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A).  As noted, to prove an aiding

and abetting claim, the SEC must establish a primary violation, actual knowledge, and

substantial assistance.  *Espuelas I*, 579 F. Supp. 2d at 483–84; *see also Apuzzo*, 689 F.3d at 206.

The SEC has established a genuine issue of material fact as to whether StarMedia

committed a primary violation of Section 13(b)(2)(A), as reflected in its restatement, and Scolnik

does not dispute the point for purposes of this motion.  Here too, however, in order to prevail, the

SEC must establish a genuine issue of material fact as to whether Scolnik knew that StarMedia's

books, records, or accounts improperly reported the transactions at issue.  *Espuelas IV*, 767 F.

Supp. 2d at 479.  For the same reasons discussed earlier, no reasonable jury could so find,

because there is insufficient evidence on which a jury could find that Scolnik knew of the

features of the 2000 and 2001 transactions that made it improper to recognize revenue resulting

from them.  Accordingly, summary judgment is merited in favor of Scolnik on this claim, also.

### C.      Directly Violating Rule 13b2-1

The SEC's final claim is that Scolnik directly violated Exchange Act Rule 13b2-1, which

provides that "[n]o person shall, directly or indirectly, falsify or cause to be falsified any book,

record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. §

240.13b2-1.  As Judge Holwell has previously noted, primary violations of Rule 13b2-1 do not

require an allegation of scienter.  *See Espuelas I*, 579 F. Supp. 2d at 486 (citing *SEC v. McNulty*,

137 F.3d 732, 740–41 (2d Cir. 1998)).  Rather, "liability is predicated on standards of

reasonableness."  *Id.* at 486 (quoting *SEC v. Softpoint*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997)).

Reckless conduct is unreasonable.  *See id.*, 579 F. Supp. 2d at 486 (citing *Novak v. Kasaks*, 216

F.3d 300, 308 (2d Cir. 2000)).

Judge Holwell allowed this claim to survive a motion to dismiss, because the SEC had adequately pled that Scolnik acted recklessly with respect to the contingent transactions. *Espuelas I*, 579 F. Supp. 2d at 486.  Judge Holwell later denied Scolnik's summary judgment motion on this claim, because formal discovery had just begun.  *Espuelas III*, 699 F. Supp. 2d at 663–64.  However, Judge Holwell observed, "without any . . . evidence that Scolnik knew the . . . transactions contained contingencies, it is hard to imagine how she could have acted unreasonably."  *Id.*

For the reasons stated above, the SEC has failed to establish a genuine issue of material fact with regard to Scolnik's knowledge of the true nature of the transactions in question.  Under these circumstances, as Judge Holwell observed, Scolnik can hardly be found to have acted unreasonably.  To be sure, because Rule 13b2-1 does not impose a scienter requirement, an individual lacking in knowledge conceivably could be found to have acted unreasonably.  *See, e.g.*, *SEC v. Lucent Techs.*, 610 F. Supp. 2d 342, 369 (D.N.J. 2009) (finding that, although scienter was not established, the Rule 13b2-1 claim could survive summary judgment).  However, on the facts at hand, there is no basis for any such finding.  The SEC has based its claims against Scolnik solely on the thesis that she knew that it was improper to recognize revenue on the four transactions in question; it has not articulated an alternative argument as to why her behavior was unreasonable.  The SEC thus has failed to establish a genuine issue of fact as to the reasonableness of Scolnik's conduct, and summary judgment is merited in Scolnik's favor on this claim, too.

## **CONCLUSION**

For the reasons stated, Scolnik's motion for summary judgment is GRANTED. The

Clerk of Court is directed to terminate the motion pending at docket number 157, and to

terminate defendant Betsy Scolnik from the case.


SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 26, 2012
New York, New York

29