UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                          :

SECURITIES AND EXCHANGE COMMISSION,    :
                                            :            06 Civ. 2435 (PAE)
                       Plaintiff,        :
                                            :            OPINION & ORDER
                -v-                     :

FERNANDO J. ESPUELAS et al.,            :

                     Defendants.    :

---------------------------------------------------------------------X


PAUL A. ENGELMAYER, District Judge:

      In this lawsuit, the Securities Exchange Commission ("SEC") has sued various former

executives of StarMedia Network, Inc. ("StarMedia" or the "Company") for accounting fraud.

Pending here is defendant Peter Morales's motion for summary judgment as to the remaining

claims against him: for aiding and abetting StarMedia's violations of Sections 13(a) and

13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13; directly

violating Exchange Act Rule 13b2-1; and directly violating Exchange Act Rule 13b2-2.  For the

reasons stated below, that motion is denied as to each claim.  Also pending is Morales's motion

to exclude expert testimony offered by the SEC.  For the reasons stated below, that motion is

denied, without prejudice to Morales's right to refile such a motion at the time that motions *in

limine* are due.

I.      **Background and Undisputed Facts**[1]

The SEC's allegations in this action are set forth in detail in the decisions of the Hon. Richard J. Holwell, who was previously assigned to this case.  The Court assumes familiarity with those decisions.  Here, the Court sets forth only those facts relevant to the resolution of this motion.  Except as otherwise specified, the following facts are not in dispute.

A.      **Procedural History**

On March 29, 2006, the SEC filed its initial complaint in this case against eight defendants, alleging violations of the Securities Act of 1933 ("Securities Act") and the Exchange Act of 1934 ("Exchange Act") (Dkt. 1).  On September 30, 2008, Judge Holwell denied Morales's motion to dismiss all claims against him, but granted a motion to dismiss as to certain claims against other defendants.  *SEC v. Espuelas* (*Espuelas I*), 579 F. Supp. 2d 461 (S.D.N.Y. 2008) (Dkt. 59).

On December 11, 2008, the SEC filed an amended complaint (Dkt. 66).  Morales thereupon moved for judgment on the pleadings.  On March 3, 2011, Judge Holwell denied that motion.  *SEC v. Espuelas* (*Espuelas IV*), 767 F. Supp. 2d 467, 476 (S.D.N.Y. 2011) (Dkt. 129).  On October 20, 2011, the case was reassigned to this Court.  Two defendants remain in this case:

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' respective Local Rule 56.1 Statements ("Pl.'s 56.1", "Def.'s. 56.1" and "Pl.'s Reply 56.1"), as well as, where uncontested, various exhibits to the parties' submissions on the instant motion.  These submissions include: the Declaration of Nancy R. Grunberg in Support of Morales's Motion for Summary Judgment ("Grunberg Decl."), and attached exhibits; the Declaration of Paul W. Sharratt in Opposition to Morales's Motion for Summary Judgment ("Sharratt Decl."), and attached exhibits; the Declaration of Roger B. Savell in Opposition to Morales's Motion for Summary Judgment ("Savell Decl."), and attached exhibits; and the Declaration of Michael Hartman in Opposition to Scolnik's Motion for Summary Judgment ("Hartman Decl."), and attached exhibits.  Generally, references herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited in that paragraph; however, where a party's 56.1 statement cites multiple evidentiary materials that offer varying degrees of support for the stated proposition, the Court has specified the most relevant documents.

Morales and Betsy Scolnik.  Scolnik has also filed a motion for summary judgment, which is addressed in a separate opinion issued today.

### B.    Key Parties, Individuals, and Entities

StarMedia was an internet media company that targeted Spanish- and Portuguese-speaking markets.  Sharratt Decl. Ex. 1; Ans. ¶ 24.  It was incorporated in Delaware, maintained its headquarters in New York City, and its common stock was registered with the SEC and traded on NASDAQ.  Sharratt Decl. Ex. 1; Ans. ¶ 24.

Peter Morales was employed by StarMedia from June 1998 until November 2001.  Am. Compl. ¶ 22; Ans. ¶ 22.  During that time, he served as the company's Vice President for Finance.  Am. Compl. ¶ 22; Ans. ¶ 22.  Morales reported to Steven Heller, the company's Chief Financial Officer ("CFO").  Sharratt Decl. Ex. 24 (Investigative Testimony of Peter Morales, June 9, 2003) ("Morales Inv. Test.") at 28–29; Grunberg Decl. Ex. A (Deposition of Peter Morales, February 2, 2011) ("Morales Dep.") at 82.  The parties dispute whether Morales served as the company's Controller between November 2000 and November 2001.  *Compare* Pl.'s 56.1 ¶ 2, citing Ans. ¶ 22, *with* Def.'s 56.1 ¶ 2, citing Grunberg Decl. Exs. NN, SS, TT.  As detailed below, the parties also dispute the nature of Morales's responsibilities, as well as his accounting expertise.

AdNet, S.A. de C.V. ("AdNet") was one of StarMedia's Mexican subsidiaries.  Grunberg Decl. Ex. W at 2.  StarMedia acquired AdNet in 2000 from two Mexican media companies— Grupo MVS S.A. de C.V. ("MVS") and HarryMoller Publicidad, S.A. ("HMP").  *Id.*  Walther Moller worked for AdNet before its acquisition, and, after the acquisition, was promoted to be its President; his family owned HMP.  Def.'s 56.1 ¶ 15; Pl.'s Reply 56.1 ¶ 15.  StarMedia de

Mexico was another of StarMedia's Mexican subsidiaries.  Grunberg Decl. Ex. L (Deposition of

Steven Heller, January 25, 2011) ("Heller Dep.") at 121.

### C.      The "Incremental Revenue" Transactions

The SEC refers to the transactions on which its claims are based as the "incremental

revenue transactions."  It alleges that, in November 2000, a group of StarMedia executives—not

including Morales—devised a plan to exploit Moller's connections with HMP and MVS to

inflate StarMedia's revenue.  Am. Compl. ¶ 59.  On November 29, 2000, Moller described these

transactions to Heller in an email, which included a diagram.  Sharratt Decl. Ex. 46.[2]  Heller

relayed this information to Jack Chen, StarMedia's President, and obtained Chen's approval to

go ahead with the deal.  Sharratt Decl. Ex. 27 (Investigative Testimony of Steven Heller, May

29, 2003) ("Heller Inv. Test.") at 140.  Heller then spoke with Fernando Espuelas, StarMedia's

CEO, and Andriana Kampfner, another StarMedia executive, who were in Mexico.  *Id.* at 164–

65.  Espuelas and Kampfner met with Moller, and after negotiation, agreed to the terms of the

transactions.  *Id.* at 136–39.  The basic structure of those transactions is as follows:

StarMedia would send funds to AdNet, which it characterized as capital contributions.

Heller Inv. Test. 141.[3]  AdNet would then purchase pre-paid services from HMP and MVS.  *Id.*

at 108; Sharratt Decl. Exs. 46, 48, 51.  In return, Moller would refer third-party clients of HMP

and MVS to buy internet advertising from AdNet and StarMedia de Mexico.  Heller Inv. Test.

108; Sharratt Decl. Exs. 46, 48, 51.  These third parties would pay AdNet and StarMedia

directly, ostensibly for the advertising.  Heller Dep. 127.  The revenue created from the third-

---

[2] Morales testified that he never saw this email or the diagram.  Morales Dep. 112, 118–19.

[3] Morales argues that there was "nothing unusual" about StarMedia making such contributions to
its subsidiaries.  Def.'s 56.1 ¶ 20, citing Grunberg Decl. Ex. J (Investigative Testimony of Robert
Glashow, July 29, 2003) at 85–86.

party advertising sales would be recorded as delivered, but the expenses for AdNet's services would be expensed only later, at the time utilized. *Id.* at 126.

Although the parties agree on the basic framework of the transactions, they have two main disputes as to their substance.

First, the parties dispute whether services were actually purchased from HMP and MVS. *Compare* Pl.'s 56.1 ¶ 95, *and* Pl.'s Reply ¶¶ 34–35, *with* Def.'s 56.1 ¶¶ 34–35. Morales asserts that it was legitimate for AdNet to purchase prepaid services from HMP and MVS, because StarMedia, AdNet's parent, actually received and used services that HMP and MVS provided. Def.'s 56.1 ¶ 34, citing Grunberg Decl. Ex. F (Investigative Testimony of Cynthia Cueto, May 20, 2003) at 38, 46–48; Exs. OO, QQ; Heller Dep. 139. In return for the prepaid services, Morales asserts, StarMedia/AdNet made total payments of approximately $2.3 million to HMP and MVS during fourth quarter 2000 and the first two quarters of 2001. Def.'s 56.1 ¶ 25, citing Grunberg Decl. Exs. HH, II. The SEC disputes this amount, asserting that StarMedia's records reflect a series of payments to AdNet and HMP, as part of the incremental revenue transactions, totaling $2,617,500. Pl.'s 56.1 ¶ 87, citing Sharratt Decl. Ex. 92. The SEC also questions whether AdNet genuinely received value from the transactions, noting that the accounting firm KPMG could not verify the value of the services received from HMP. Pl.'s 56.1 ¶ 95, citing Sharratt Decl. Exs. 97–100.

Second, the parties dispute whether and how the third-party clients paid for their purchases of advertising from AdNet and StarMedia. The SEC asserts that the third-party clients either did not know of their advertising purchases, or were indifferent to them, because they were not paying for these purchases. Pl.'s 56.1 ¶ 40, citing Sharratt Decl. Exs. 33, 88–90. Rather, the SEC asserts, StarMedia funded its own revenue, in that the payments from AdNet to HMP and

MVS were, in actuality, used to pay for the advertising services the third-party clients purchased. Am. Compl. ¶¶ 60–66.  By contrast, Morales asserts that the parties never discussed or contemplated that HMP and MVS would send money to the third-party clients to purchase the advertising from StarMedia.  Def.'s 56.1 ¶ 18, citing Heller Inv. Test. 158–59.  Morales asserts that StarMedia provided legitimate advertising services to the third-party clients.  Def.'s 56.1 ¶ 32–33.  The SEC does not dispute that such services were provided, but notes that "[t]he delivery of products does not establish that the transactions were properly recorded in StarMedia's books and records or properly reported in the company's public disclosure."  Pl.'s Reply 56.1 ¶ 33.  During the fourth quarter of 2000, StarMedia booked revenues of $3.2 million from advertising that was placed at StarMedia de Mexico on behalf of clients of HMP and MVS. Sharratt Decl. Exs. 32–33; Am. Compl. ¶¶ 62–63.  StarMedia booked revenues of $2.6 million from such advertising during the first quarter of 2001, and $2.675 million during the second quarter of 2001.  Sharratt Decl. Exs. 32–33; Am. Compl. ¶¶ 87, 104.  The parties do not dispute that these figures were booked as revenue.  Def.'s 56.1 ¶¶ 23–24; Pl.'s Reply 56.1 ¶¶ 23–24.

The parties also dispute who at StarMedia was aware of the terms of the incremental revenue transactions.  The SEC alleges that these terms were agreed upon orally, and never memorialized, Am. Compl. ¶ 67, and that, as a result, StarMedia's finance department and auditors were unaware of these transactions and therefore could not properly account for them. Am. Compl. ¶¶ 97, 99, 110.  By contrast, Morales asserts that the finance department knew of the transactions because Heller, the CFO, helped to negotiate them and to determine the proper accounting treatment for them.  Def.'s 56.1 ¶¶ 8, 27, 30, 37.  Morales also asserts that the company's legal team was aware of the transactions and their accounting treatment.  Def.'s 56.1 ¶ 59, citing Grunberg Decl. Exs. LL at 04270, GG at 06190–92.

### D.       StarMedia Restates Its Financials

On November 19, 2001, StarMedia announced that it would restate its financial

statements for the fiscal year 2000 and the first two quarters of 2001.  Sharratt Decl. Exs. 2–4.

The company announced that it was investigating accounting issues with respect to revenue

recognition at two subsidiaries, and that Espuelas and Heller would be resigning.  *Id.*  On

February 12, 2003, StarMedia reported the results of its internal investigations in an amended

Form 10-K for fiscal year 2001, which it filed with the SEC.  Sharratt Decl. Ex. 8.  In the portion

relevant here, StarMedia stated that:

> [T]he Company improperly recognized certain revenues and pre-paid
> expenses . . . . The transactions in question involved transactions in which
> StarMedia de Mexico and AdNet purportedly sold advertising to third parties with
> the assistance of two former shareholders of AdNet and, at the same time, made
> payments to such former shareholders in apparent anticipation of future services
> rendered, which payments were booked as pre-paid expenses.  Based in part on
> failure to receive confirmations of sales from the third party purchasers of
> advertising and the failure to substantiate the delivery and value of services that
> were pre-paid, the Special Committee determined to restate such transactions.

Sharratt Decl. Ex. 8 at 2.

## II.   Summary Judgment Standard

Summary judgment may be granted only where the submissions, taken together, "show[]

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the

absence of a material factual question; in making this determination, the court must view all facts

"in the light most favorable" to the non-movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  "A party may not rely

on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment," because "conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.    Discussion

The SEC brings the following claims against Morales: (1) aiding and abetting StarMedia's violation of Section 13(a) of the Exchange Act; (2) aiding and abetting StarMedia's violation of Section 13(b)(2)(A) of the Exchange Act; (3) directly violating Exchange Act Rule 13b2-1; and (4) directly violating Exchange Act Rule 13b2-2. The Court addresses each in turn.

In bringing these claims, the SEC claims that Morales furthered StarMedia's improper accounting by wiring funds related to the incremental revenue transactions, and by signing representation letters to the company's auditors that vouched for the company's accounting. The parties disagree about three primary issues: (1) whether there is sufficient evidence that StarMedia misstated its revenue; (2) whether there is sufficient evidence to permit a jury to find that, at the time he took these actions, Morales knew of the facts which caused StarMedia's revenues from the transactions at issue to be overstated; and (3) whether Morales substantially assisted StarMedia's improper revenue recognition by taking these actions.

### A.    Aiding and Abetting StarMedia's Violation of Section 13(a)

The SEC's first claim is that Morales aided and abetted StarMedia's violation of Section 13(a) of the Exchange Act, and Exchange Act Rules 12b-20, 13a-1, and 13a-13. Section 13(a) requires issuers of securities to file information, documents, and annual and quarterly reports as required by the SEC. 15 U.S.C. § 78m(a). Rules 13a-1 and 13a-13 require issuers to file annual and quarterly reports, respectively. 17 C.F.R. §§ 240.13a-1, 240.13a-13. Rule 12b-20 requires

that issuers add "such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b-20.

As Judge Holwell recognized, "[t]o state a claim that defendants aided and abetted violations of the Exchange Act, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation." *Espuelas I*, 579 F. Supp. 2d at 483–84; *see also SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (applying the same standard).[4] "The[se] three requirements cannot be considered in isolation from one another. Satisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance." *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal citations and alterations omitted); *see also Apuzzo*, 689 F.3d at 215 ("[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*.").

---

[4] The Dodd-Frank Act of 2010 amended Section 20(e) of the Exchange Act to add the words "or recklessly" after "knowingly." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. § 78t(e)). In a case heard after the enactment of Dodd-Frank, the Second Circuit applied the actual knowledge standard, holding that the Dodd-Frank amendment "does not apply," *see Apuzzo*, 689 F.3d at 211 n.6, apparently because the conduct at issue predated the amendment. The same is true here—the acts at issue long predated Dodd-Frank, and the SEC does not argue that the Dodd-Frank recklessness standard applies. *See* Tr. 42–43. Accordingly, the Court, like Judge Holwell, evaluates the evidence against a standard of actual knowledge.

### a. *Primary Violation*

As Judge Holwell held, to establish a primary violation, the SEC must show that StarMedia materially misstated either the quantity or quality of the revenue from the transactions at issue in its SEC filings. *Espuelas IV*, 767 F. Supp. 2d at 475.

It is undisputed that StarMedia restated the incremental revenue transactions in its amended 10-K for fiscal year 2001. Sharratt Decl. Ex. 8 at 2. Nevertheless, Morales argues that there is no genuine issue of material fact as to whether StarMedia's original SEC filings materially misstated its revenues, relying primarily on *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) for the proposition that a restatement is not an admission of wrongdoing. Def. Reply Br. 3. On summary judgment, however, the restatement is fairly considered,[5] and Morales is wrong to claim that the "mere fact of a restatement is especially meaningless" because the restatement was not accompanied by a conclusion "that the incremental revenue transactions were either fraudulent or barter." Def. Reply Br. 3–4. Rather, the SEC need only establish at this stage a genuine issue of material fact as to whether StarMedia's filings materially misstated the quality or quantity of revenue. *See Espuelas IV*, 767 F. Supp. 2d at 475. For that limited purpose, the fact of the restatement is sufficient.[6] *Cf. Mowbray v. Waste Mgmt. Holdings, Inc.*, 45 F. Supp. 2d 132, 139 (D. Mass. 1999) (restatement of income sufficient to establish breach of warranty guaranteeing that

---

[5] The same is true on a motion to dismiss: "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas*, 324 F. Supp. 2d at 486; *see also Espuelas I*, 579 F. Supp. 2d at 472 (restatement sufficient to survive motion to dismiss).

[6] In a letter submitted to the Court after argument, Morales argues that the restatement is inadmissible hearsay. *See* Dkt. 205 at 1. Without prejudice to Morales's right to move *in limine* before trial to exclude such evidence, the Court's assessment, for present purposes, is that the restatement is admissible under multiple exceptions to or exclusions from the hearsay rule. *See, e.g.*, Fed. R. Evid. 803(6), 804(b)(3), and 807.

financial statements were prepared in accordance with GAAP and fairly presented the financial status of the company); *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (restatement sufficient to establish materiality of misrepresentations, because "a restatement issues only when errors are material").

### b.  *Morales's Knowledge*

As to the element of knowledge, "the question is not whether . . . Morales knew exactly how the incremental revenue transactions should have been accounted for."  *Espuelas IV*, 767 F. Supp. 2d at 476.  "The securities laws do not require that a defendant know the precise accounting treatment that would have been applied before [he] can have the requisite scienter; the SEC need only demonstrate that [a defendant] knew of facts that contradicted the substance of the reported accounting."  *Id.* (quoting *SEC v. Lucent Tech. Inc.*, 610 F. Supp. 2d 342, 362 (D.N.J. 2009)).  Rather, the question is whether, at the time that he took the actions that allegedly furthered StarMedia's violations, "Morales knew that StarMedia's statements to the SEC overstated the amount of its revenue."  *Id.*  "A defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability."  *SEC v. Apuzzo*, 758 F. Supp. 2d 136, 147 (D. Conn. 2010), *rev'd on other grounds* 689 F.3d 204 (2d Cir. 2012).

The SEC does not allege that Morales was involved in negotiating the incremental revenue transactions.  Am. Compl. ¶ 70.  Rather, the SEC's primary evidence of Morales's knowledge is his own testimony recounting a later conversation about these transactions with CFO Heller, on or about December 1, 2000, during which Morales first learned about them.  Morales Dep. 143–44; Pl.'s 56.1 ¶ 41; Am. Compl. ¶ 70.  In that conversation, Morales testified, Heller explained the structure of the incremental revenue transactions to him, and Morales

expressed doubt that these transactions were being properly booked: "I expressed the concern that this looked like a barter transaction to me." Morales Inv. Test. 89, 95. Morales also told Heller that such accounting could have adverse consequences: "Then I made a semi—I made a—it wasn't a veiled threat, but . . . I said to him, well, Steve, what would happen if . . . what would the auditors think of this transaction?" *Id.* at 96. The SEC argues that these admissions are sufficient to create a genuine issue of material fact as to whether Morales knew, from that point forward, that StarMedia's accounting for the incremental revenue transactions was improper.

Morales makes two primary arguments in response. First, he argues that the SEC selectively presents the Heller-Morales conversation as related by Morales. Morales argues that, rather than reflecting a firm belief on his part that the transactions precluded recognition of revenue, Morales's testimony demonstrates that he entered the conversation thinking that the transactions were barter, but left, convinced by his supervisor, the CFO, that they were not, and that revenue could properly be booked. Transcript of Oral Argument, October 3, 2012 ("Tr.") at 58. ("I think you could also say that he held the view that he was agreeing with his supervisor who had a lot more experience than him."). Viewing this portion of Morales's investigative testimony in isolation, this argument would have some force, as Morales testified that Heller told him that he, Heller, would "walk [the auditors] through the transaction" and explain why it was not barter. Morales Inv. Test. 96–97.

However, there is also evidence that, after Morales spoke with Heller, he had conversations with at least three other individuals. Each conversation may be fairly read to reflect that, after his meeting with Heller, Morales continued to believe that these transactions

should have been booked as barter, and that StarMedia therefore could not properly book revenue on them.

First, in 2001, Morales spoke several times with Mike Bigatti, a new employee who was reporting to StarMedia's new president.  Morales Inv. Test. 160–61.  Morales admitted in testimony that, during those conversations, he, Morales, raised "the issue that [Morales] had about whether it should be classified as . . . barter."  *Id.* at 160.  Morales raised that concern "in the hope that [Bigatti] would . . . go to the person he's reporting to [the new president] and . . . bring that forward."  *Id.* at 161.  Second, sometime in mid-2001, Morales spoke with Salek Brodsky, a new employee assigned to review the AdNet deals.  During that conversation, as recounted by Brodsky, Morales explained the structure of the incremental revenue transactions, telling Brodsky that "monies were being transferred to AdNet, and AdNet in turn was funneling those monies to clients of theirs, who were then using those monies to purchase advertising from AdNet, and from StarMedia."  Sharratt Ex. 26 (Investigative Testimony of Salek Brodsky) ("Brodsky Inv. Test.") at 80–81.[7]  Although Morales did not state in that conversation that he regarded the accounting for those transactions as wrongful, he was later asked in his deposition why he believed that Brodsky was questioning him on the subject.  Morales replied that he hoped that the conversation had resulted from his having raised concerns about this accounting with Bigatti: "I always thought that it might have been my – my hope that Mike Bigatti would tell [StarMedia's new president]."  Morales Inv. Test. 205.  Finally, in November 2001 Morales

---

[7] As Morales correctly points out, Brodsky's testimony regarding the source of his information about the incremental revenue transactions was inconsistent and equivocal.  *See* Brodsky Inv. Test. 85–86 ("I don't exactly recall who I got that information from.  It was either from [Morales] or Steve Heller.  I'm trying to think.  Yes, it was [Morales], Steve Heller, or it could have even been Robert Glashow who divulged that information to me.").  However, Morales's testimony that he told Brodsky about these transactions corroborates Brodsky's testimony that it was Morales.

spoke on the phone with Roger Savell, an auditor from Ernst & Young.  Savell's notes of

Morales's statements in the initial part of that call support Morales's argument, in that they read

that "[Heller] convinced him [Morales] that it was not barter but it was considered" and that

"[Morales] also never saw any fraud."  Savell Decl. Ex. 4.  But the notes go on to state that:

"[Morales] thinks it looks and smells like barter and should be reclassed."  *Id.*[8]

Each of these conversations tends to undermine Morales's argument that he left the

conversation with CFO Heller no longer concerned about the propriety of StarMedia's

recognition of revenue on these transactions.  And, significantly, Morales himself, in his

investigative testimony, *admitted* to being unconvinced by Heller:

> Q:     By the end of the conversation, had you communicated to Mr. Heller that
> you accepted his view of how the revenue should be recognized if the company
> went forward with this transaction?
> A:     No.  I'm a pretty stubborn individual.  If I think I'm right, I – I probably –
> I don't think – I don't think that my style would have been – although I don't
> recall, I don't think my style would have been like, oh, okay, I agree with you,
> because I didn't then and I don't now believe that it wasn't barter.

Morales Inv. Test. 106.  On the basis of this evidence, viewed in totality, there is clearly a

genuine issue of material fact as to whether or not Morales, following his conversation with

Heller, believed that the company could properly recognize revenue on these transactions.

For much the same reasons, Morales's argument that he did not appreciate that it is

improper to recognize revenue on a barter transaction, Def. Br. 20, cannot be resolved in his

favor on summary judgment.  Morales argues that he lacked the accounting expertise to reach

such a conclusion, and therefore was justified in deferring to Heller on this point.  *Id.*  But the

---

[8] Morales contests the admissibility of Savell's notes, pointing to an inaccuracy in transcription
of the notes made by Savell's assistant.  Pl. Reply. Br. 6–7; Tr. 56–57.  However, such an
inaccuracy goes to the weight, not the admissibility, of the notes.

evidence summarized above supplies a sufficient basis on which a jury could find that Morales appreciated that recognition of revenue on these transactions was improper.

In claiming that the evidence is not sufficient to prove his knowledge, Morales relies on *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006). Def. Br. 20–21. But that case is inapposite. There, the defendant, a director and consultant who played a background role in the preparation of the company's 10-K, received an email on the eve of the filing of the 10-K, informing him that the auditors were not prepared to sign off on the inclusion of their audit opinion. *Cedric Kushner Promotions*, 417 F. Supp. 2d at 330. The defendant, who was not in the office, then called his superior, who told him that "the email was no longer relevant because he had been in regular communication with [the partner working on the audit], and believed that [the company] had [the auditor's] permission to file." *Id.* The court held that the defendant's reliance on his superior's reassurance "can by no means be termed reckless." *Id.* at 335. That is because the superior's representation necessarily changed the defendant's mind, by changing the factual basis upon which the defendant determined whether filing the 10-K was appropriate. Here, by contrast, Morales received no such clear reassurance, and even if Heller's statement could be taken as such, Morales's later conversations would justify a jury's finding that Morales continued to believe that recognition of revenue was improper.

Further, as Judge Holwell noted, a finding that Morales appreciated that the transactions were barter would itself justify a jury in concluding that he also appreciated that revenue could not be recognized on them:

> If Morales had come to [the conclusion that these were barter transactions] he would have known that StarMedia could not have reported the entire value of those transactions as revenue . . . . Thus Morales would have known that any statement to the SEC reporting the entire value of the incremental revenue transactions as revenue would have misleadingly overstated StarMedia's revenue.

15

*Espuelas IV*, 767 F. Supp. 2d at 476.[9]  As Judge Holwell emphasized: "The securities laws do not require that a defendant know the precise accounting treatment that would have applied. . . . [T]he SEC need only demonstrate that a defendant knew of facts that contradicted the substance of the reported accounting."  *Id.* (internal quotation and citation omitted).

The Court recognizes that the parties vigorously dispute the extent of Morales's accounting expertise, and whether it was sufficient to enable him to appreciate, in the abstract, the impropriety of recognizing revenue on a barter transaction.[10]  It is not necessary for the Court to resolve that issue on summary judgment.  First, there is sufficient evidence on which a reasonable jury could so find.  And second, in the record before the Court, there is evidence on which a jury could find that Morales appreciated that StarMedia's recognition of revenue on these transactions was improper.  This includes Morales's evocative statement to Heller:  "I

_____

[9] Judge Holwell's opinion did contain a caveat:  He noted that it was possible for Morales to believe the transactions were barter without knowing that reporting their entire value would be misleading, *if* he believed that StarMedia would earn cash from similar sales within six months. *Espuelas IV*, 767 F. Supp. 2d at 476 n.3.  In a letter to the Court submitted after oral argument, Morales argues that the SEC has presented no evidence to establish that StarMedia did not earn cash from such equivalent cash sales.  *See* Dkt. 206 at 2.  But neither has Morales presented any evidence to suggest that StarMedia *did* earn cash from such equivalent cash sales.  On a summary judgment motion, Morales's speculation that such facts may exist and therefore negate Morales's knowledge is insufficient to establish that there is no genuine issue of material fact on the issue.

[10]  Morales is not a certified public accountant, but he has a B.A. in Accounting and an M.B.A. in Finance.  Morales Inv. Test. 14.  The SEC asserts that Morales received or had access to the company's accounting policies and guidelines, including materials explaining the proper recognition of barter transactions.  Pl.'s 56.1 ¶ 17, citing Heller Inv. Test. 63–68, and Hartman Decl. Ex. 28.  Morales, in response, notes that his focus was finance and international operations, and asserts that he lacked accounting expertise.  Def.'s 56.1 ¶¶ 2–3, citing Morales Inv. Test. 100.  By his own admission, Morales had at least some accounting responsibilities.  Morales Dep. 103 ("[Heller] had hired a number of people as controller.  They had flamed out and then . . . I was the last person standing and—and I took on accounting.  I was never hired for, you know, technical accounting.").

made a semi—I made a—it wasn't a veiled threat, but . . . I said to him, well, Steve, what would happen if . . . what would the auditors think of this transaction?"  Morales Inv. Test. 96.

The Court, accordingly, concludes that there is sufficient evidence to create a genuine issue of material fact as to whether Morales knew, at the relevant times, that StarMedia's revenue was misstated.

### c.  *Substantial Assistance*

To satisfy the substantial assistance prong of aiding and abetting, "the SEC must show that the defendant 'in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed.'" *Apuzzo*, 689 F.3d at 206 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (internal alterations omitted)).

The SEC argues that Morales substantially assisted StarMedia's primary violation in two ways.  First, the SEC notes that Morales facilitated a number of wire transfers from StarMedia to HMP and AdNet associated with the capital contribution component of the incremental revenue transactions.  Pl.'s 56.1 ¶ 87; Pl. Br. 22.  Morales does not dispute that he was involved in the wiring of funds, but minimizes his responsibility for this act:  He states that he did not have authorization to wire funds in the stated amounts, and that he performed the "wholly ministerial" task of carrying out the wire transfers at someone else's direction.  Def. Reply Br. 8, 23; Def.'s 56.1 ¶¶ 55–58.  Second, the SEC notes, Morales signed management representation letters that affirmed to StarMedia's auditors that the company had disclosed all relevant agreements and that all receivables represented valid claims.  Pl. Br. 22.[11]  Here, too, Morales does not dispute

---

[11] These management representation letters were made in connection with Ernst & Young's audit of StarMedia's financial statements for fiscal year 2000 and the first two quarters of 2001. Savell Decl. Exs. 1–3.  The first such letter contains representations including that "[r]eceivables

signing these letters, but argues that this act, by a mid-level executive, did not constitute substantial assistance.  Def. Reply. Br. 8.

Morales's argument that these actions cannot constitute substantial assistance faces two obstacles.  First, the Second Circuit has recently held that to establish aiding and abetting liability, the SEC need *not* show "that an aider and abettor proximately caused the primary securities law violation."  *Apuzzo*, 689 F.3d at 213.  Morales's brief, filed before the Second Circuit's decision in *Apuzzo*, relied on the district court's since-overturned holding in *Apuzzo* that proximate cause *is* required.  Def. Br. 22–23.  Morales's reply brief fails to reconcile his argument with the decision in *Apuzzo*.  Morales made wire transfers to facilitate the transactions, and signed letters that contained misrepresentations to StarMedia's auditors.  A trier of fact could reasonably conclude that by these actions, whether or not a proximate cause of the primary violation, Morales "associated himself with the venture . . . and that he sought by his action to make it succeed."  *Apuzzo*, 689 F.3d at 206 (internal quotation marks and citation omitted).  A material issue of fact exists as to this point.

Indeed, Judge Holwell previously held, even under the pre-*Apuzzo* standard requiring proximate cause, that Morales's two acts were sufficient to establish substantial assistance.  *See Espuelas IV*, 767 F. Supp. 2d at 478.  Morales argues that that holding is irrelevant because it came on a motion to dismiss.  Def. Reply Br. 9.  But that is wrong:  The facts alleged by the SEC and assumed to be true by Judge Holwell—that Morales facilitated the wire transfers and signed the representation letters—have now been found to have a basis in evidence.

---

represent valid claims . . . and do not include amounts for . . . other types of arrangements not constituting sales" and that "[t]hese represent the entire arrangements and are not supplemented by other agreements either written or oral."  Savell Decl. Ex. 1.  The other two letters each state that the representations in the first letter "remain current."  Savell Decl. Exs. 2–3.

For these reasons, Morales's motion for summary judgment is denied as to the SEC's Section 13(a) claim.

### B.        Aiding and Abetting StarMedia's Violation of Section 13(b)(2)(A)

The SEC's next claim is that Morales aided and abetted StarMedia's violation of Section 13(b)(2)(A) of the Exchange Act, which requires issuers to "make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A).  As noted, to prove an aiding and abetting claim, the SEC must establish a primary violation, actual knowledge, and substantial assistance.  *Espuelas I*, 579 F. Supp. 2d at 483–84; *Apuzzo*, 689 F.3d at 206.

The SEC has established a genuine issue of material fact as to whether StarMedia committed a primary violation of Section 13(b)(2)(A).  Just as the fact of restatement is sufficient to create a genuine issue of fact as to whether StarMedia misstated its revenue, it is also sufficient to create a genuine issue of fact regarding whether StarMedia kept books and records which did not accurately reflect its transactions, revenues, and the dispositions of its assets.

As to the element of knowledge, for the reasons discussed above, there is a genuine issue of material fact as to whether Morales knew that StarMedia's revenue, as reported, was false or misleading.  Accordingly, there is also a genuine issue regarding whether StarMedia's books and records accurately reflected those transactions.

Finally, because there is a genuine issue of material fact as to whether Morales's actions substantially assisted StarMedia's statements to the SEC that misstated the quality or quantity of revenue, there is also a genuine issue as to whether Morales's actions substantially assisted StarMedia's maintenance of inaccurate books and records regarding the same transactions. Accordingly, Morales's motion for summary judgment is denied as to this claim also.

### C.     Directly Violating Rule 13b2-1

Exchange Act Rule 13b2-1 provides that "[n]o person shall, directly or indirectly, falsify

or cause to be falsified any book, record or account subject to Section 13(b)(2)(A) of the

Securities Exchange Act."  17 C.F.R. § 240.13b2-1.  As Judge Holwell noted, primary violations

of Rule 13b2-1 do not require a showing of scienter.  *See Espuelas I*, 579 F. Supp. 2d at 486

(citing *SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998)).  Rather, "liability is predicated on

standards of reasonableness."  *Id.* at 486 (quoting *SEC v. Softpoint*, 958 F. Supp. 846, 866

(S.D.N.Y. 1997)).  Reckless conduct is unreasonable.  *See id.* at 486 (citing *Novak v. Kasaks*,

216 F.3d 300, 308 (2d Cir. 2000)).

The SEC argues that Morales acted recklessly in: (a) acquiescing to Heller's proposed

accounting treatment, under circumstances where he had reason to doubt its accuracy, and (b) not

requiring that the transactions be documented as required by StarMedia's policies.  Pl. Br. 23–24.

It alleges that Morales directly violated Rule 13b2-1 by failing to conduct any further inquiry

about the transactions that he knew were being falsely booked.  *Id.*  In response, Morales argues

that he had no responsibility either to question Heller's accounting determination or to ensure

that such transactions were documented.  Def. Br. 25.  Thus, he argues, it was reasonable for him

to take no further action.  But Judge Holwell already addressed this defense:

> [T]he SEC alleges that, rather than investigating the propriety of the accounting
> treatment or alerting anyone at the company or among its auditors that StarMedia
> was engaged in improper accounting, Morales agreed to keep quiet if the auditors
> raised any questions.  Such allegations are more than sufficient to state a claim
> that Morales acted unreasonably.

*Espuelas IV*, 767 F. Supp. 2d at 479.

To be sure, that holding arose in the context of a motion to dismiss, in which Judge

Holwell was obliged to accept the SEC's allegations as true.  But the SEC has adduced evidence

on which a jury could find the facts it alleges.  And Morales largely concedes the point:  He does

not argue that, after meeting with Heller, he made any follow-up inquiry.  Rather, he argues that

there is no evidence that the true nature of the incremental revenue transactions was hidden from

StarMedia's finance department or auditors.  Def. Br. 25–26.  The SEC disputes this claim.

*Compare* Def.'s 56.1 ¶ 37, *with* Pl.'s Reply 56.1 ¶ 37.  However that dispute is resolved, a jury

could find that Morales acted recklessly or unreasonably, so as indirectly to cause StarMedia's

books to be falsified, by failing to conduct any further inquiry after learning about these

transactions.

Accordingly, Morales's motion for summary judgment is denied as to this claim.

### D.      Directly Violating Rule 13b2-2

Rule 13b2-2 provides that directors and officers shall not, *inter alia*, "[m]ake or cause to

be made a materially false or misleading statement to an accountant in connection with" SEC

filings.  17 C.F.R. § 240.13b2-2.  As with Rule 13b2-1, primary violations of Rule 13b2-2 do not

require a showing of scienter.  *See Espuelas I*, 579 F. Supp. 2d at 486 (citing *McNulty*, 137 F.3d

at 740–41).[12]   Rather, the same "reasonableness" standard applies here as well.  *See id.* at 487.

The SEC bases this claim on Morales's having signed the three management

representation letters to StarMedia's auditors.  *See* Savell Dec. Exs. 1–3.  Morales responds by

arguing that the SEC has not proven that the transactions were fraudulent or that the receivables

in the transactions did not represent valid claims.  Def. Br. 26.  But, as noted, at this stage, the

issue is not whether the transactions were fraudulent or whether the company had falsely

---

[12] Since Judge Holwell's decision, the Ninth Circuit has held that actual knowledge is required for a Rule 13b2-2 claim.  *See SEC v. Todd*, 642 F.3d 1207, 1224–25 (9th Cir. 2011).  That decision is not controlling here, and for purposes of this motion, the Court assumes that Judge Holwell's holding as to the applicable standard is correct.  In any event, the Court finds that there is a genuine issue of material fact under either standard.

represented claims as valid; it is whether there is a genuine issue of material fact as to those

questions.  For the reasons discussed above, there is.  Finally, Morales reprises his argument that

he was unaware that the management representation letters were false.  But, for the reasons

discussed, there is a genuine issue of material fact as to whether Morales either knew of the

falsity of the letters or was reckless in signing them.  Accordingly, his motion is denied as to this

claim.

### IV.  Morales's Motion to Suppress Expert Testimony

Morales has also filed a motion *in limine* to suppress the testimony of the SEC's expert

witness, Paul Regan.  At oral argument, the SEC represented that it was not relying on Regan's

testimony in opposing Morales's motion for summary judgment.  Tr. 46–47.  Accordingly, it is

unnecessary to address the motion at this time.  The motion is therefore denied, without

prejudice to re-filing on the date set for the filing of motions *in limine* if the SEC indicates an

intention to offer Regan's testimony.

## CONCLUSION

For the reasons stated above, Morales's motion for summary judgment is denied. Morales's motion to suppress Regan's testimony is also denied, without prejudice to re-filing closer to trial. The Clerk of Court is directed to terminate the motions pending at docket numbers 158 and 161. A pretrial conference is scheduled for December 13, 2012, at 4 p.m., at which the Court will set, *inter alia,* a deadline for the filing of pretrial submissions, and a trial date.

SO ORDERED.

_Paul A. Engelmayer_

Paul A. Engelmayer
United States District Judge

Dated: October 26, 2012
      New York, New York